EUGENE E. STEARNS (Fla. Bar No. 0149335)
[*Pro hac vice* to be submitted]
estearns@stearnsweaver.com
JASON P. HERNANDEZ (Cal. Bar No. 308959; Fla. Bar No. 18598)
jhernandez@stearnsweaver.com
**STEARNS WEAVER MILLER**
**WEISSLER ALHADEFF & SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone:  (305) 789-3200
Facsimile:  (305) 789-3395

-and-

JONATHAN A. PATCHEN (SBN 237346)
jpatchen@taylorpatchen.com
MAX BABA TWINE (SBN 296128)
mtwine@taylorpatchen.com
**TAYLOR & PATCHEN, LLP**
One Ferry Building, Suite 355
San Francisco, CA 94111
Telephone:  (415) 788-8200
Facsimile:  (415) 788-8208

Attorneys for Plaintiffs
JOHN E. ABDO, as Trustee of the JOHN E. ABDO
TRUST DATED JUNE 11, 2014, and JOHN E. ABDO,
as Trustee of the JOHN E. ABDO TRUST
DATED MARCH 15, 1976

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. ABDO, as Trustee of the JOHN E. ABDO TRUST DATED JUNE 11, 2014, and JOHN E. ABDO, as Trustee of the JOHN E. ABDO TRUST DATED MARCH 15, 1976,<br><br>Plaintiffs,<br>v.<br><br>MICHAEL R. FITZSIMMONS, PETER LAI, CHRISTOPHER G. POWER, PETER J. GOETNER, CHRISTIAN BORCHER, ERNEST D. DEL, MARC S. YI, JAMES C. PETERS, and SOUHEIL S. BADRAN,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION**<br><br>**DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1.     This is a securities fraud action against Delivery Agent, Inc.'s ("Delivery Agent") Chief Executive Officer, Michael R. Fitzsimmons ("Fitzsimmons"), and other of Delivery Agent's former and current officers/directors.  This civil action is brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).  Plaintiffs also assert causes of action for intentional and negligent misrepresentation.

2.     Delivery Agent is a company in the burgeoning television-commerce space, known as "t-commerce."  Delivery Agent claimed that it developed proprietary, interactive technology to connect television viewers to the products they see on TV so that they can instantly purchase those products through their smart TV using the TV's remote control or another device.

3.     From at least May 2014 through and including April 2016, Delivery Agent directly issued and sold securities to investors, including Plaintiffs, in the form of preferred stock, stock warrants, convertible promissory notes, and other securities, all with the goal of covering what was represented as short-term cash-flow negatives (a "burn rate") that was to end by both positive cash flow from operations and an Initial Public Offering ("IPO").

4.     At all times relevant, Delivery Agent claimed through its officers and/or directors that Delivery Agent's interactive technology worked, that it had been proven to be accepted by and used in market tests, and was proprietary.  Relying on those representations, Plaintiffs purchased $18 million in securities from Delivery Agent from May 2014 through and including April 2016.

5.     In truth and fact, Delivery Agent's officers and/or directors concealed and failed to timely disclose to Plaintiffs highly damaging information about the functionality and proprietary nature of Delivery Agent's core technology and the trustworthiness of its most senior executives.  Specifically,

    a) Delivery Agent's officers and directors failed to timely disclose to Plaintiffs that the first-ever live demonstration of its core technology in a television commercial during the February 2014 Super Bowl was a

2.

complete failure because viewers were unable to use Delivery Agent's technology to purchase products featured in the commercial directly from their TVs as Delivery Agent intended and represented they would;

b) Compounding the technological failure, Delivery Agent's officers and directors failed to timely disclose that Fitzsimmons, Delivery Agent's CEO, directed corporate officers and others to purchase the products featured in the Super Bowl commercial and subsequently disseminated false and fabricated sales reports claiming that the Super Bowl advertising campaign was a success, when it was actually an abject failure;

c) As a result of the Super Bowl advertisement fraud perpetrated by Fitzsimmons and the other defendants, Delivery Agent's then-auditor informed Delivery Agent that it could no longer rely on the representations of certain senior officers in its audits of the company's books, which led Delivery Agent to fire the auditor and all but ensure that Delivery Agent could never complete an IPO and become a publicly traded company; and

d) Representations that Delivery Agent's technology was proprietary were false and/or misleading.

6.      In furtherance of their fraudulent scheme, the Defendants continued raising cash through securities offerings even though the Defendants knew that the Super Bowl ad failure and the subsequent corporate cover-up all but ensured that Delivery Agent could never sell stock to the public in an IPO.

7.      As a result of the Super Bowl failure and subsequent omissions and/or false and misleading statements made by the Defendants, Delivery Agent never went public.  Without a public offering and without functioning, proprietary technology, Delivery Agent was unable to attract a buyer or raise more cash, leading Delivery Agent to file for Chapter 11 bankruptcy protection in September 2016.

8.      As a direct and proximate result of this fraudulent scheme, Plaintiffs' securities are now worthless.

## PARTIES

9.      Plaintiff John E. Abdo brings this lawsuit as the Trustee of the John E. Abdo Trust Dated June 11, 2014 (the "Abdo 2014 Trust").  The Abdo 2014 Trust is an express, legal trust that purchased $15 million in securities from Delivery Agent.

10.     Plaintiff John E. Abdo brings this lawsuit as the Trustee of the John E. Abdo

3.

1   Trust Dated March 15, 1976 (the "Abdo 1976 Trust").  The Abdo 1976 Trust is an express, legal

2   trust that purchased $3 million in securities from Delivery Agent.

3         11.     John E. Abdo is domiciled in and is a citizen of Florida.

4         12.     The Abdo 2014 Trust and the Abdo 1976 Trust are collectively referred to herein

5   as "the Plaintiffs."

6         13.     Defendant Michael R. Fitzsimmons ("Fitzsimmons") was at all relevant times

7   Delivery Agent's Chief Executive Officer and a member of Delivery Agent's Board of

8   Directors.  Fitzsimmons is domiciled in and is a citizen of California.

9         14.     Defendant Peter Lai ("Lai") was at all relevant times Delivery Agent's President

10  and Chief Operating Officer until approximately January 2015 and thereafter was Delivery

11  Agent's President of Ecommerce.  Upon information and belief, Lai is currently domiciled in

12  and is a citizen of California, but his last known address is in the State of Washington.

13        15.     Defendant Christopher G. Power ("Power") was at all relevant times a member of

14  Delivery Agent's Board of Directors and the Chairman of the Audit Committee.  Power is

15  domiciled in and is a citizen of Colorado.

16        16.     Defendant Peter J. Goetner ("Goetner") was at all relevant times a member of

17  Delivery Agent's Board of Directors, a member of the Audit Committee, and a member of the

18  Nominating and Governance Committee.  Goetner is domiciled in and is a citizen of California.

19        17.     Defendant Christian Borcher ("Borcher") was at all relevant times a member of

20  Delivery Agent's Board of Directors, a member of the Audit Committee, and Chairman of the

21  Nominating and Governance Committee.  Borcher is domiciled in and is a citizen of California.

22        18.     Defendant Ernest D. Del ("Del") was at all relevant times a member of Delivery

23  Agent's Board of Directors.  Del is domiciled in and is a citizen of California.

24        19.     Defendant Marc S. Yi ("Yi") was at all relevant times a member of Delivery

25  Agent's Board of Directors and a member of the Nominating and Governance Committee.  Yi is

26  domiciled in and is a citizen of California.

27  ///

28

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION,
& NEGLIGENT MISREPRESENTATION

20.     Defendant James C. Peters ("Peters") was at all relevant times a member of Delivery Agent's Board of Directors and Delivery Agent's Chief Operating Officer beginning January 7, 2015.  Peters is domiciled in and is a citizen of California.

21.     Defendant Souheil S. Badran ("Badran") was at all relevant times a member of Delivery Agent's Board of Directors.  Badran is domiciled in and is a citizen of Wisconsin.

22.     Fitzsimmons, Lai, Power, Goetner, Borcher, Del, Yi, Peters, and Badran are herein referred to collectively as "the Defendants."

23.     The Defendants, because of their positions in Delivery Agent, had the power and authority to control the content of any of Delivery Agent's securities offerings.  Because of their positions in Delivery Agent and their access to the facts recited in this Complaint, the Defendants knew that the securities offerings that are the subject of this Complaint contained material omissions of fact that were required to be disclosed and/or contained false and misleading statements.  The Defendants are thus liable for the omissions and false statements pleaded in this Complaint.

## JURISDICTION

24.     This Court has jurisdiction over this matter pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331.  The federal securities law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.

25.     This Court has supplemental jurisdiction over the common-law claims asserted in this Complaint pursuant to 28 U.S.C. § 1367.  This Court also has jurisdiction because there is complete diversity between the parties and the amount in controversy exceeds the jurisdictional amount as set forth in 28 U.S.C. § 1332.

26.     In connection with the acts, transactions, and conduct alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

///

///

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION

**VENUE**

27.     At all times relevant, Delivery Agent maintained its principal office and place of business in San Francisco, California.

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  The securities that are the subject of this lawsuit and the alleged omissions of material fact, as well as false and misleading statements, were made in or issued from this District.  In addition, upon information and belief, at least one of the Defendants resides in this District.

**INTRADISTRICT ASSIGNMENT**

29.     A substantial part of the events and omissions giving rise to this action occurred in San Francisco, California.  This action should therefore be assigned to the San Francisco Division pursuant to Civil Local Rules 3-2(c) and (d).

**SUBSTANTIVE ALLEGATIONS**

**Background**

30.     Delivery Agent is a "t-commerce," or television-commerce, company founded in 2005 that claimed to interactively connect TV viewers to the products they see on their smart televisions.  The core of Delivery Agent's purportedly groundbreaking business is an allegedly proprietary technology that allows a TV viewer to instantly and directly purchase goods, such as an article of clothing appearing in a TV commercial or worn by an actor in a TV show, using a smart television's remote control or a mobile device.

31.     Super Bowl XLVIII, which was played on February 2, 2014, was the first time that Delivery Agent's interactive technology was used in a TV commercial broadcast to the general public.  Delivery Agent partnered with popular clothing retailer H&M for the Super Bowl commercial that featured international soccer star David Beckham's clothing line.  According to Delivery Agent, anyone watching that commercial would be able to use Delivery Agent's interactive technology to order the clothing items in the commercial directly from their smart TV using their remote control.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION

32.     In a press release issued prior to the Super Bowl, Fitzsimmons described Delivery Agent's interactive technology as a "game-changer for the advertising industry."  (Delivery Agent Press Release, *Delivery Agent Powers the First Shoppable TV Commercial Bringing T-Commerce to Life at CES 2014*, Jan. 6, 2014, *available at* http://www.deliveryagent.com/press-releases/hm-and-david-beckham-are-back-in-action-at-the-super-bowl-with-groundbreaking-campaign).

33.     Fitzsimmons further described the Super Bowl commercial as an "industry first" and groundbreaking:  "Years ago, the world talked about the potential associated with buying Jennifer Aniston's sweater.  H&M, in an industry first, will now realize that potential by making their Super Bowl XLVIII ad actionable and directly measurable."  (Delivery Agent Press Release, *Delivery Agent Powers the First Shoppable TV Commercial Bringing T-Commerce to Life at CES 2014*, Jan. 6, 2014, *available at* http://www.deliveryagent.com/press-releases/hm-and-david-beckham-are-back-in-action-at-the-super-bowl-with-groundbreaking-campaign).

**In Preparing to Go Public, Delivery Agent Directly Sold Securities to Plaintiffs**

34.     In or about 2014, the same year that the Super Bowl H&M commercial aired to the public, Fitzsimmons represented to Plaintiffs and others that Delivery Agent planned on going public before the end of 2014.  To that end, Delivery Agent directly sold securities to Plaintiffs and others to raise funds to establish a viable business that would be attractive to public investors in the planned IPO.  This action arises from Delivery Agent's sale of Series F Preferred Stock, Series G Preferred Stock, Stock Warrants, and Convertible Promissory Notes (collectively, the "Securities") to Plaintiffs from 2014 through and including 2016.

35.     Preferred Stock is kind of stock or equity that gives the holder certain rights superior to those of common stock owners.  The Series F and Series G Preferred Stock sold by Delivery Agent to Plaintiffs are securities.

36.     A Stock Warrant is a security that allows the holder of the warrant to buy stock of the underlying company at a fixed price during a fixed time period.  The Stock Warrants sold by Delivery Agent to Plaintiff Abdo 2014 Trust are securities.

///

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION

37.     A Convertible Promissory Note is a debt instrument that is convertible into equity securities upon the occurrence of certain defined events.  The Convertible Promissory Notes sold by Delivery Agent to Plaintiffs are securities.

38.     Delivery Agent sold the Securities to Plaintiffs pursuant to Rule 506 of Regulation D of the Securities Act of 1933 ("Securities Act"), which creates an exemption to registration requirements for the sale of securities.  Securities offerings under Rule 506 are commonly referred to a "private placements."

39.     Specifically, Plaintiffs purchased securities totaling $18,000,000 from Delivery Agent as set forth below:

| Purchase Date | Purchaser | Amount Paid | No. of Shares | Security Purchased |
|---|---|---|---|---|
| 6/18/14 | Abdo 2014 Trust | $5 million | 5,504,789 | Series F Preferred Stock and Warrant Purchase Agreement |
| 9/24/14 | Abdo 2014 Trust | $5 million | 5,504,789 | Series F Preferred Stock |
| 1/13/15 | Abdo 2014 Trust | $5 million | 5,504,789 | Series F Preferred Stock with 120-Day Warrant |
| 5/13/15 | Abdo 1976 Trust | $1 million | 1,320,132 | Series G Preferred Stock and Warrant Purchase Agreement |
| 7/20/15 | Abdo 1976 Trust | $1 million | N/A | Convertible Promissory Note |
| 4/20/16 | Abdo 1976 Trust | $1 million | N/A | Convertible Promissory Note |

40.     All of the Securities were issued by Delivery Agent pursuant to a vote of the Board of Directors.

41.     The Series F Preferred Stock offerings were approved by a vote of Delivery Agent's Board of Directors on or about March 14, 2014.

42.     The Series G Preferred Stock and Convertible Promissory Note offerings were approved by a vote of Delivery Agent's Board of Directors subsequent to the Series F Preferred Stock offerings.

///

///

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION

1

2

### Delivery Agent and the Defendants Represented
### to Plaintiffs That Its Core Technology Worked

3

4       43.     In connection with the first sale of securities to Plaintiff Abdo 2014 Trust on June

5   18, 2014, and subsequent sales of securities to Plaintiffs, the Defendants prepared and

6   disseminated or caused to be disseminated in interstate commerce certain written materials to

7   Plaintiffs and others on or about May 12, 2014.   Among those written materials was a

    PowerPoint presentation (the "PowerPoint") describing Delivery Agent and its technology.

8       44.     The PowerPoint prominently featured portions of articles from AdAge and

9   Variety published in January 2014 that described how Delivery Agent's technology would

10  appear in a televised Super Bowl commercial the following month.  The articles explained that

11  Delivery Agent had partnered with H&M to use Delivery Agent's technology in connection with

12  the sale of an H&M clothing line featuring products associated with international soccer star

13  David Beckham. The articles said that TV viewers would be able to use their television's remote

14  control to purchase items from David Beckham's clothing line from H&M.

15      45.     The PowerPoint also explicitly linked Delivery Agent's desire to raise capital to

16  preparing for the impending IPO.  Under the heading "Capital Raise," the PowerPoint said that

17  "Delivery Agent is seeking to raise $35 million in a pre-IPO round to fund its key growth

18  initiatives."  Under the heading "Use of Proceeds," Delivery Agent listed the first item as "IPO

19  readiness."

20      46.     Also in connection with the first sale of securities to Plaintiff Abdo 2014 Trust on

21  June 18, 2014, the Defendants prepared and/or approved a draft S-1 statement (the "Draft S-1")

22  and disseminated a portion of it or caused it to be disseminated in interstate commerce to

23  potential investors, including Plaintiffs.

24      47.     "S-1" refers to Form S-1, a filing with the U.S. Securities and Exchange

25  Commission ("SEC") required of companies that plan on an IPO.  Form S-1 is also known as the

26  registration statement.

27  ///

28  ///

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION,
& NEGLIGENT MISREPRESENTATION

48.     The Draft S-1 says, among other things, that Delivery Agent's "technology and relationships enable viewers to engage with, and transact in response to television content anytime, anywhere and on any connected device."

49.     The Defendants claimed in the Draft S-1 that through Delivery Agent's "end-to-end engagement and commerce solution, we handle the entire transaction process for our partners on a white-label basis, enabling viewers to . . . purchase products seen on TV shows, sporting events, commercials and infomercials."

50.     In 2013, Delivery Agent's technology "drove more than 75 million viewer engagements with products and information from our partners' content," according to the Draft S-1.

51.     The Draft S-1 goes on to identify five examples of "how viewers interact and engage with television content" through Delivery Agent's "platform." The first example was the February 2014 Super Bowl campaign with H&M.

52.     The Draft S-1 also says that the Super Bowl ad with H&M was a success and it fails to mention any technical problems encountered with the technology: "[D]uring *Super Bowl XLVIII*, viewers of H&M's Super Bowl advertisement featuring David Beckham *were able to buy the clothing featured in the advertisement directly from their remote control on enabled TV's*." (Emphasis added).

53.     In several places throughout the PowerPoint and the Draft S-1, the Defendants claimed that Delivery Agent's technology was proprietary. For example, the Draft S-1 described Delivery Agent's technology as its "proprietary omni-screen technology platform" and an "integrated proprietary technology platform." Delivery Agent even listed "[a]dvanced proprietary technology" as one of its "Competitive Strengths" in the Draft S-1. The Draft S-1 further says, "Our solutions leverage proprietary technologies and data to enable real-time transactions, engagements and optimizations across devices and platforms."

54.     The vast majority of Delivery Agent's revenue for 2013 and 2014 was generated by what Delivery Agent called "e-Commerce" or selling goods to TV viewers. According to the PowerPoint, in 2013 and 2014, Delivery Agent generated 79.2% and 76.5% of its revenue from

10.

e-commerce respectively, compared to 20.8% and 23.5% of revenue for those same years, respectively, from advertising.

55.     On January 9, 2015, the Defendants disseminated or caused to be disseminated to two Delivery Agent investors an updated draft S-1 (the "Updated Draft S-1") that continued to claim that the February 2014 Super Bowl advertising demonstration was a success.

56.     That same day, Plaintiff Abdo 2014 Trust received a copy of the Updated Draft S-1 and relied upon the representations therein before purchasing $5 million in securities from Delivery Agent on January 13, 2015.

57.     Plaintiffs reasonably relied on the statements in the PowerPoint, the Draft S-1, the Updated Draft S-1, and other representations made by the Defendants through Delivery Agent.

**Delivery Agent and the Defendants Failed to Disclose and
Concealed from Plaintiffs Material Information about the Failed
<u>Super Bowl Commercial and a Subsequent Attempted Cover-up</u>**

58.     The day after the Super Bowl, Delivery Agent issued a press release in which Fitzsimmons claimed that the H&M ad was a success:   "'H&M kicked-off a great campaign during Super Bowl XLVIII to promote their David Beckham Bodywear Collection,' said Mike Fitzsimmons, Delivery Agent CEO.   'That same campaign kicked-off a new paradigm for advertising, fundamentally changing the discipline by making television advertising actionable and measureable.'"   (Delivery Agent Press Release, *Delivery Agent Extends Partnership with H&M to Shop-enable Ad Campaign*, Feb. 3, 2104, *available at* http://www.deliveryagent.com/press-releases/delivery-agent-extends-partnership-with-hm-to-shop-enable-ad-campaign).

59.     Unbeknownst to Plaintiffs, Delivery Agent's high-profile demonstration of its technology during Super Bowl XLVIII on February 2, 2014, more than four months before Plaintiff Abdo 2014 Trust's first investment in Delivery Agent, was a complete failure. Fitzsimmons's claim the day after the Super Bowl that the ad campaign was a success was intentionally false.   Even worse, Delivery Agent and its most senior officers were directly

1  involved in a substantial corporate fraud and cover-up designed to hide the truth about the Super

2  Bowl ad campaign from Plaintiffs and others to induce Plaintiffs to purchase the Securities.

3      60.    A few days after the Super Bowl, a whistleblower (the "Whistleblower") came

4  forward to Delivery Agent's then-auditor (the "Auditor") with the truth about the H&M

5  commercial.

6      61.    The Auditor is one of the "Big Four" accounting firms.

7      62.    At the time, Delivery Agent had engaged the Auditor to audit Delivery Agent's

8  consolidated financial statements as of December 31, 2012.  The Auditor issued its report on

9  February 5, 2014, three days after Super Bowl XLVIII.

10     63.    Among other things, the Whistleblower told the Auditor that:

a) The Super Bowl H&M campaign failed because TV viewers were
   unable to buy items from David Beckham's clothing line through their
   TVs;

b) Fitzsimmons directed high-ranking Delivery Agent officers to
   purchase the items featured in the commercial to give the appearance
   that Delivery Agent's technology had worked, when it had not; and

c) False and fabricated sales reports touting the H&M commercial a
   success were generated and disseminated to third parties by Delivery
   Agent and its officers and directors.

18     64.    The Auditor subsequently informed Delivery Agent's Audit Committee of the

19  allegations.  The Audit Committee conducted an investigation and retained an outside law firm

20  (the "Law Firm") to investigate the allegations.  The Audit Committee's and the Law Firm's

21  findings were presented to the Audit Committee and the Board of Directors.

22     65.    The Audit Committee and the Board of Directors agreed with the gravamen of the

23  Whistleblower's allegations, finding that Delivery Agent's senior management, including

24  Fitzsimmons and Lai, instructed other employees to purchase the items featured in the Super

25  Bowl ad because Delivery Agent's interactive technology did not function properly.  They also

26  agreed with the Whistleblower that Delivery Agent executives were involved in or aware of the

27  preparation of information containing fabricated data regarding the Super Bowl ad, including

28

information about performance and sales, which was provided to an advertising campaign partner and third parties.

66.    Although the Audit Committee and the Board of Directors basically substantiated the Whistleblower's allegations, the Audit Committee and the Board of Directors concluded that "the financial impact of the purchases was not material from a financial standpoint and had no material adverse impact on the business or operations of the company," "there was no impact on the integrity of our financial statements as a result of the matter" and "our current Chief Executive Officer was not involved in the fabrication of data . . . ."

67.    The Board of Directors also implemented the Audit Committee's recommended remediation plan, which included "the adoption of more stringent business practices, policies and procedures, including an ethics policy," "the establishment of stricter internal controls," "the initiation of additional employee training," and "other personnel remedial measures, including written warnings and/or the demotion or reduction in responsibilities for certain employees, lost bonus awards for certain employees, and the termination of our then head of internet advertising."

68.    The Auditor was subsequently presented with reports of the Audit Committee's and Law Firm's investigations and Delivery Agent's remedial actions.

69.    The Auditor, however, rejected the Defendants' and Delivery Agent's attempt to make light of a material breach of ethics by senior corporate officers.  The ability of the Auditor to rely on those officers ended, and with it, the willingness of the Auditor to provide the accounting and auditing functions necessary to issue the audit opinions in connection with an IPO also ended.  The Auditor concluded in writing that it was "not willing to rely on the representations" of Delivery Agent management involved in the Super Bowl debacle, including Fitzsimmons and Lai, "for purposes of [the Auditor's] previously-completed audit" of Delivery Agent's consolidated financial statements.

70.    The Auditor further informed Delivery Agent that it would not be able to reissue its previously issued audit report or continue with the December 31, 2013 audit if the persons involved in fabricating data were involved with the accounting or internal controls, were in a

13.

financial role at Delivery Agent, or in a supervisory role or a position to influence those in such roles.

71.     The Auditor also informed Delivery Agent that to complete its audit as of and for the year ended in December 31, 2103, it would need to significantly expand the scope of its previously completed 2012 audit and the incomplete 2013 audit to determine if any Delivery Agent personnel inappropriately influenced the accounting or financial reporting.

72.     Power, the Chairman of the Audit Committee, subsequently discussed the Auditor's position with the Auditor.  After that discussion, it was apparent that the Auditor would not pay any heed to the conclusions of Delivery Agent's internal and external "investigations."

73.     The response of the Board of Directors was unanimous.  It terminated the Auditor on July 29, 2014.  Delivery Agent subsequently dismissed the Auditor as its independent auditor on August 4, 2014.

74.     The obvious consequence of the termination of the Auditor was that Delivery Agent could not complete an IPO.  By terminating the Auditor, Delivery Agent triggered an obligation under the federal securities laws for the company to explain the circumstances and bases for terminating the Auditor.  That explanation, known as Item 304, is required of all companies that intend to go public.  Even worse for Delivery Agent, the law governing Item 304 disclosures requires the dismissed auditor to write a response to the company's Item 304 disclosure.  Both Item 304 and the Auditor's response are filed with and reviewed by the SEC prior to an IPO.

75.     Fitzsimmons, however, intentionally misled Plaintiffs about the reason the IPO was continually delayed to fraudulently induce Plaintiffs to purchase the Securities.  On October 13, 2014, eight months after the Super Bowl, Trustee for the Plaintiffs wrote an email to Fitzsimmons to inquire if Delivery Agent intended to file the S-1 in November 2014 so that the IPO could proceed in February 2015.  That same day, Fitzsimmons replied as follows:  "We are having to do a carve-out audit of Music Today from Live Nation which is taking some time but all good.  The current plan is to confidential file in December [2014] and go out in March."

14.

76.     Fitzsimmons's response was intentionally false and misleading because it was calculated to lead Plaintiffs to believe that an audit for Music Today that was "all good" was the reason the IPO was delayed, when the truthful reason was that the IPO was effectively dead after the disastrous H&M Super Bowl commercial and ensuing attempt to cover up the failure.

77.     Even though the Defendants knew that an IPO was all but impossible, Delivery Agent prepared a draft Item 304 (the "Draft Item 304") in July 2015 and sent it to the Auditor for its response.  In an email dated August 5, 2015, Fitzsimmons wrote to Plaintiffs that Delivery Agent would be able to file for the IPO as soon as August 12th, "[a]ssuming [the Auditor] plays along . . . ."

78.     But the Auditor did not play along.  Instead, the true extent of the fraud perpetrated by Delivery Agent and the Defendants came to light.  The Auditor's draft response to Delivery Agent's Draft Item 304 filing was highly critical of Delivery Agent's portrayal of the facts and its omission of several key facts.

79.     Delivery Agent's Draft Item 304 attempted to downplay the significance of the Super Bowl failure and subsequent acts by senior management that were intended to cover it up. The Draft Item 304 said, in relevant part, only the following:

> In February 2014, in connection with an interactive advertising campaign involving the Company's technology, certain current and former employees, and members of our senior management (including our current Chief Executive Officer, our current President of eCommerce and our former head of interactive advertising) instructed other employees to purchase, or make purchases themselves, of merchandise that was offered for sale online as part of the interactive advertising campaign on behalf of our advertising campaign partner.  These purchases involved merchandise owned by and held in inventory of the Company, were in the amount of less than $10,000, had no financial impact, and were never recorded in the Company's books and records.
>
> In addition, within two business days, it was determined that some of the Company's current and former employees and members of our senior management also prepared information, or were involved in or aware of the preparation of information, that contained fabricated data regarding the performance of the advertising campaign, including regarding the sales of merchandise during the campaign.  The fabricated data was provided to one of our advertising campaign partners and certain other third parties.  When our Chief Executive Officer learned that the data had been fabricated, he retracted it from all recipients and instructed them that the data should not be relied upon for any purposes.  The Company believes that the data was not relied

15.

upon by its advertising campaign partner or any third party, and the Company maintains an ongoing business relationship with this advertising campaign partner.

80.    The Auditor's response to the Draft Item 304, by contrast, provided much more damaging information describing an intentional effort by Delivery Agent's most senior officers to conceal a catastrophic failure of Delivery Agent's core interactive technology, an effort to falsify and fabricate data to make that failure appear like a success, and repeated attempts by Fitzsimmons to obstruct the internal and external investigations into the Super Bowl fiasco.

81.    The Auditor's response also made clear that several high-ranking corporate officers purchased nearly all of the items advertised during the Super Bowl and did so to conceal the fact that Delivery Agent's technology had failed and that TV viewers were unable to buy nearly any of the advertised items:

> In February 2014, in connection with the first interactive advertising campaign to market merchandise offered for sale online on behalf of one of the Company's advertising partners on super bowl Sunday, certain current and former employees of the Company, and certain members of the Company's senior management (including the current Chief Executive Officer (CEO), the Company's current President of eCommerce and the Company's former head of interactive advertising), instructed other employees of the Company to purchase, or made purchases themselves, of 585 of 600 pieces of the advertising partners' merchandise that was offered for sale as part of the campaign. After receiving an update that only 15 pieces of merchandise had been purchased hours into the super bowl, the current CEO directed the former President and COO to "buy all remaining" merchandise.

> Further, the CEO received an email during super bowl Sunday indicating the advertising partners' representatives tried but could not access technology to purchase their merchandise. The next day, the Chief Executive Officer agreed to have the former President and COO email the advertising partner that they sold out of all 1,100 pieces of merchandise (600 pieces of merchandise offered for sale and 500 pieces of the same merchandise available for giveaway). The same day, the CEO emailed the Board communicating purchases of 711 pieces of their advertising partners' merchandise (which unknown to the Board included the 585 of 600 merchandise pieces bought by employees directed to do so by the CEO and other members of Senior Management and 139 of 500 merchandise pieces available for the giveaway). Two days after the advertising campaign, the CEO gave an update at a Board meeting communicating the advertising campaign was a great success with no discussion of the technology problems encountered or the 585 of 600 pieces sold being acquired by Company personnel at the CEO's direction.

82.     Upon information and belief, Lai is the "the former President and COO" referenced in the Auditor's response above.  Lai is also referred to as the "current President of eCommerce" in the Draft Item 304.

83.     The Auditor's response established that Fitzsimmons personally directed other employees to make the purchases, that Fitzsimmons knew that the subsequent sales reports were false, that the fabricated data was provided to an advertising partner, and that there was no evidence that the fabricated data was withdrawn after it was disseminated:

> We disagree with the implication in the third sentence in the fourth paragraph where the Company's disclosure states that "When our Chief Executive Officer was advised that some of the data had been fabricated[,]" as he would have known that data was fabricated in that it would either include employee purchases he directed or included purchases to the advertising partner, Board of Directors and later a potential investor or have required alteration to remove the effect of these and he was made aware of the technology issues from the advertising partner. As previously noted, subsequent to the conclusion of the campaign the Chief Executive Officer reported the Board that the campaign was a success, no mention of him directing employees to make purchases or the inability of advertising partners and some employees to access technology to purchase merchandise was mentioned.

> Further, we understand that the Audit Committee's external investigation team later obtained evidence indicating that the CEO and others in Senior Management directed the metrics to be altered further as 361 of 500 free units offered in the campaign were not given away and sent the altered metrics to the advertiser and potential investors. It was subsequently determined that some of the Company's current and former employees and certain members of the Company's senior management had prepared, or were aware of the preparation of, information that contained fabricated data regarding the performance of the above-referenced interactive advertising campaign, including fabricated data regarding the amount of merchandise purchased during the campaign. The fabricated data was provided to the advertising campaign partner and to certain other third parties at the direction of the Chief Executive Officer and others in Senior Management. Days after the campaign, the CEO sent a potential investor the same report sent to the advertising partner originally and stated 'campaign massive success and is leading to an extension[.]

> We disagree with the statement that "When our Chief Executive Officer was advised that some of the data had been fabricated, the data was promptly retracted from the recipients[.]" The investigation found no evidence that such data was retracted and our Partner was told such had not been prior to our termination. We have no basis to agree or disagree as to what has been communicated since our termination, or whether the fabricated data was relied upon by its advertising campaign partner or any third party or if the Company maintains an ongoing business relationship with this advertising campaign partner. We were told that that the investigation found that at the time of the advertising campaign the CEO and members of Senior Management's actions

17.

demonstrated that the success of the super bowl Sunday advertising campaign from a technological feasibility perspective was very important to the Board, advertising campaign partners and potential investors at that time.

84.     The Auditor went on to explain that the Draft Item 304 omitted that Fitzsimmons improperly interfered with Delivery Agent's internal and external investigations into the Super Bowl matter:

> The allegation of fabricated data was brought to the attention of [the Auditor] by an employee in senior management, and we in turn informed the Audit Committee Chairman. Omitted from the Disclosure in fifth paragraph is that, the Audit Committee investigated the matter, initially using internal resources however, the internal investigation team experienced repeated interference from the Chief Executive Officer. Despite clear communication from the Audit committee of who was responsible for the investigation, the Chief Executive Officer wanted certain individuals not to be a part of the internal investigation team, tried to influence the scope of the investigation and caused there to be delays in conducting email and other electronic searches.
>
> Subsequently, the Audit Committee engaged an outside law firm to conduct an independent investigation and prepare a report to the Audit Committee regarding its findings. The scope of the Audit Committee's investigation was (a) to investigate management's actions and conduct during the advertising campaign, and also specifically (b) to investigate allegations of interference with the audit committee's internal investigation by the Chief Executive Officer and Senior management. Based upon the external investigation team, we understand that the Audit Committee concluded that (a) the Chief Executive Officer acknowledged his involvement in the purchase of products by employees along with other members of Senior Management. While there was evidence indicating the Chief Executive Officer's involvement in further manipulation of data provided to advertising partners and others to make the employee purchases appear as though they had come from customers the Audit Committee believes such was inconclusive.
>
> However, the Audit Committee believed conclusive evidence indicated that certain members of senior management and employees were found to have knowledge and involvement in the further manipulation of the advertising data beyond the purchase of products and initial reporting of those purchases and (iv) The Chief Executive Officer made repeated attempts to influence the scope and composition of the Audit Committee's original internal investigation prior to the Audit Committee engaging an external investigation team and we were informed the CEO even tried to influence the scope with the external investigation team.

85.     All of the foregoing facts were material to any reasonable investor, including Plaintiffs, engaged in making a decision to invest or not invest in Delivery Agent.

///

///

18.

86.     The Defendants either directly concealed from Plaintiffs these facts or participated in encouraging the additional investments in Delivery Agent knowing that these facts were being concealed.

87.     Had Plaintiffs known that the Super Bowl ad was a failure, that the Auditor had been terminated because it refused to go along with the Defendants' fraud and declined to accept the representations of managers who participated in it, or had Plaintiffs learned that an IPO could not proceed under these circumstances, Plaintiffs would not have invested the first dollar into the purchase of the Securities.

**In Furtherance of the Scheme, Delivery Agent and the Defendants**
**Made Misleading and Incomplete Disclosure of the Super Bowl Incident**
**to Induce Plaintiffs to Buy More Securities**

88.     Plaintiffs first learned of a potential dispute with the Auditor on or about March 9, 2015, after Plaintiff Abdo 2014 Trust had already purchased $15 million in securities from Delivery Agent.  But even then, neither Delivery Agent nor the Defendants made a complete and fair disclosure to Plaintiffs about the true nature and extent of the Super Bowl advertising failure or the conduct of senior management following it.  For example, on March 9, 2015, Fitzsimmons falsely represented to Plaintiffs in a telephone call that the Super Bowl debacle was immaterial and that the Auditor's position was unreasonable.

89.     Instead of fully and fairly disclosing the relevant facts to Plaintiffs, Delivery Agent and the Defendants embarked on a campaign to continue raising funds through the sale of securities to Plaintiffs by falsely and fraudulently continuing to claim that Delivery Agent's IPO was imminent.

90.     On March 11, 2015, a few days after Plaintiffs learned of the potential dispute with the Auditor,  Delivery Agent released an investor update entitled "Q1 2015 Mid Q Investor Update" (the "March 2015 Investor Update").  The March 2015 Investor Update stated that the "IPO process [was] progressing with continued audit delays," but it did not disclose the nature or

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION

severity of those "audit delays," nor did it disclose the Super Bowl ad failure or the subsequent cover-up.

91.    More to the point, and in furtherance of the scheme to continue selling securities to Plaintiffs without full and fair disclosure of the Super Bowl catastrophe, the March 2015 Investor Update said that Delivery Agent, "Need[ed] to solve immediate cash issue."  It went on to say that Delivery Agent was raising $12 million in "Pre-IPO Bridge" funds.

92.    On April 4, 2015, Fitzsimmons wrote in an email to Plaintiffs and others that Delivery Agent "continue[s] to battle through roadblocks heading towards our IPO." Fitzsimmons identified "general market conditions" and the following "3 key issues" holding up the IPO:  an "SEC ruling on revenue recognition, 2014 audits and 304 disclosure."  Fitzsimmons further added, "[t]here is nothing more humanly possible our team could be doing to achieve this important milestone and we are working around the clock to resolve." As a result of the IPO's delay, Fitzsimmons added that Delivery Agent was raising "additional equity financing" in the form of Series G Convertible Preferred Stock.

93.    It was not until August 19, 2015, that Plaintiffs obtained a copy of the Draft Item 304 and the Auditor's response.  By that point, Plaintiffs had purchased $17 million in Securities offered by Delivery Agent because Fitzsimmons and Delivery Agent continued to represent that the IPO was still achievable and Plaintiffs had no reason to believe at that point that the Super Bowl ad catastrophe would all but ensure that Delivery Agent would never go public.

94.    Nonetheless, Delivery Agent continued telling Plaintiffs and others that an IPO was still imminent.  On January 14, 2016, Delivery Agent sent an update to key investors, including Plaintiffs.  The update stated that "304 nearing resolution," meaning that Delivery Agent had somehow worked out a solution to the Item 304 problem and that Delivery Agent had a meeting with the Auditor the first week of February 2016.  The update further stated that Delivery Agent needed more cash and that Delivery Agent was exploring selling the company.

95.    Plaintiff Abdo 1976 Trust purchased $1 million in Convertible Note Financing from Delivery Agent on April 20, 2016, in reliance on Delivery Agent's representations that it

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION

needed more cash to survive and that it was seeking to sell the company, which if successful could have salvaged Plaintiffs' investments.

96.     But that too was just another step in the scheme to defraud Plaintiffs. The Defendants knew that a sale of the company was highly unlikely to generate enough cash to pay Plaintiffs because Delivery Agent's supposedly proprietary technology was not proprietary and was therefore far less valuable than the Defendants led Plaintiffs to believe.

**Delivery Agent's and the Defendants' Omissions and False Statements
Caused Plaintiffs to Lose the Entire Value of Their Investments**

97.     In the end, Delivery Agent was unable to persuade the Auditor to retreat from or soften the substance of its response to Delivery Agent's Draft Item 304. As a direct and proximate result, the probability of an IPO was zero. The IPO was dead. Delivery Agent was dead.

98.     Delivery Agent employed investment bankers to broker a sale of Delivery Agent, but learned that there were no buyers because Delivery Agent had no meaningful intellectual property or ongoing business establishing any meaningful value.

99.     Because Delivery Agent and the Defendants were revealed to have misled investors who had previously provided Delivery Agent with the capital to meet its burn rate, no additional investment was realized and Delivery Agent ran out of cash to operate the business.

100.     On September 15, 2016, Delivery Agent filed for bankruptcy under Chapter 11 of the Bankruptcy Code.

101.     Plaintiffs' $18 million investment in the Securities is now worthless.

**No Safe Harbor**

102.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements and omissions pleaded in this Complaint because those statements and omissions are factual and relate to events in the past rather than forward-looking events.

///

103.    None of the statements alleged herein are "forward-looking" statements, and no such statement was identified as "forward looking" when it was made.

104.    In the alternative, to the extent that the statutory safe harbor does apply, the Defendants are still liable under federal securities laws for any forward-looking statements because the speaker actually knew that the forward-looking statement was false, misleading, or omitted facts necessary to make statements previously made not materially false or misleading.

### COUNT I

For Violation of § 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants

105.    Plaintiffs incorporate ¶¶ 1 through 104 by reference.

106.    This Count is asserted against all Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated by the SEC under 17 C.F.R. § 240.10b-5.

107.    The Defendants employed devices, schemes, and artifices to defraud.

108.    The Defendants failed to disclose material facts specified above that they had a duty to disclose.

109.    The Defendants made or approved the false and misleading statements specified above, which they knew were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

110.    The Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Delivery Agent, its IPO prospects, and the proprietary nature of its intellectual property, as described herein.

111.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   The

Defendants' material misrepresentations and/or omissions were done knowingly and recklessly and for the purpose and effect of concealing negative information that assured that Delivery Agent could not go public, that no buyer would buy Delivery Agent, and that bankruptcy was highly likely.

112.    Plaintiffs would not have purchased the Securities if they had been aware of the material information omitted by the Defendants and/or known the truth about the false and misleading statements made by the Defendants.

113.    Plaintiffs' damages were directly and proximately caused by Defendants' wrongful conduct in that the actions that were the subject of Defendants' omissions and false statements ensured that Delivery Agent could not go public and that Delivery Agent would have no value to a prospective buyer.

114.    Plaintiffs have suffered damages in that they paid $18 million for the Securities that are now worthless.

115.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of the Securities.

## COUNT II

For Violation of § 20(a) of the Exchange Act
Against All Defendants

116.    Plaintiffs incorporate ¶¶ 1 through 104 and 107 through 115 by reference.

117.    This Count is brought against all Defendants pursuant to Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

118.    The Defendants exercised their power and authority to engage in the wrongful acts alleged herein.  The Defendants were "controlling persons" of Delivery Agent within the meaning of Section 20(a) of the Exchange Act.  In that capacity, they participated in the unlawful conduct alleged that caused Plaintiffs the damages alleged herein.  Each of the Defendants, therefore, acted as a controlling person of Delivery Agent.

119.    By virtue of their high-level positions, their participation in and/or awareness of Delivery Agent's operations, and their ability to influence and control Delivery Agent's

operations and business, including securities offerings, the Defendants had the ability and authority to influence and control, and did influence and control, directly and indirectly, decision-making at Delivery Agent, including the content of and dissemination of materials containing the statements and omissions described herein in connection with the offer for sale and sale of the Securities.

120.    Because of their senior positions at Delivery Agent and/or their direct personal involvement in the matters described in the Complaint, Defendants had knowledge of the material omissions of fact and false representations described in this Complaint before they were disseminated to Plaintiffs and others.

121.    As Delivery Agent's officers and/or directors, the Defendants had a duty to disseminate accurate and truthful information with respect to Delivery Agent's business and affairs.

122.    By reason of their positions as senior management and/or directors of Delivery Agent, each of the Defendants had the power to direct the actions of, and exercised the same to cause, Delivery Agent to engage in the unlawful acts and conduct complained of herein.  Each of the Defendants exercised control over the general operations of Delivery Agent and possessed the power to control the specific activities that comprise the primary violations described in the Complaint.

**COUNT III**

Fraud – Intentional Misrepresentation or Omission
Against All Defendants

123.    Plaintiffs incorporate ¶¶ 1 through 104 by reference.

124.    This Count is brought against all Defendants.

125.    The Defendants made or approved the false and/or misleading statements described in the Complaint.  The Defendants knew the statements were false and/or misleading when they made them in that they contained material misrepresentation, concealed material facts, and failed to disclose material facts necessary to make statements that were made, in light of the circumstances under which they were made, not misleading.

126.    The Defendants knowingly and intentionally made the false and/or misleading statements described herein.  The Defendants also knowingly and intentionally failed to disclose material information to Plaintiffs.  In the alternative, the Defendants acted recklessly when they made the false and/or misleading statements and/or and the omissions described herein.

127.    It was the Defendants' intent that Plaintiffs would rely on the Defendants' false and/or misleading statements and omissions.  Plaintiffs reasonably relied on the Defendants' false and/or misleading statements and omissions.  Plaintiffs, as investors, were entitled to rely on the Defendants' representations.    Plaintiffs reasonably believed that Defendants' representations were truthful, accurate, and did not omit any material information.

128.    Plaintiffs would not have purchased the Securities if they had known that Defendants' representations were false and/or misleading or that Defendants had omitted material facts.  Plaintiffs' reliance on the Defendants' representations and omitted material facts were a substantial factor in causing Plaintiffs' injuries.

129.    Plaintiffs' damages were directly and proximately caused by the Defendants' conduct in that the Securities are worthless because Delivery Agent never filed for an IPO and attempts to sell Delivery Agent were unsuccessful because the company's core technology did not work and was not proprietary.

130.    Plaintiffs have suffered damages because the $18 million in Securities Plaintiffs purchased are now worthless.

131.    The Defendants' conduct was malicious, fraudulent, and oppressive within the meaning of California Civil Code § 3294 and was undertaken by the Defendants with the intent to deprive Plaintiffs of property, money, and/or legal rights and constitutes conduct that is despicable, subjecting Plaintiffs to a cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages according to proof.

132.    This action was filed within three years of discovery of the fraud.

///

///

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION

## COUNT IV

Negligent Misrepresentation
Against All Defendants

133.    Plaintiffs incorporate ¶¶ 1 through 104 by reference.

134.    This Count is brought against all Defendants.

135.    The Defendants made or approved the false and/or misleading statements described in this Complaint.

136.    The Defendants lacked reasonable grounds to believe that the alleged false and/or misleading statements were true.

137.    Plaintiffs would not have purchased the Securities if they had known that Defendants' representations were false and/or misleading.

138.    Plaintiffs' damages were directly and proximately caused by the Defendants' negligent conduct in that the Securities are worthless because Delivery Agent never filed for an IPO and attempts to sell Delivery Agent were unsuccessful because the company's core technology did not work and was not proprietary.

139.    Plaintiffs have suffered damages because the $18 million in Securities Plaintiffs purchased are now worthless.

140.    This action was filed within three years of discovery of the negligent misrepresentations.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.      Awarding Plaintiffs damages, including interest;

B.      Punitive damages in an amount to be determined at trial; and

C.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION, & NEGLIGENT MISREPRESENTATION

1

## DEMAND FOR JURY TRIAL

2
      Plaintiffs demand a jury trial.

3

DATED: February 21, 2017

4

**TAYLOR & PATCHEN, LLP**

5

*/s/ Jonathan A. Patchen*
Jonathan A. Patchen
Max Baba Twine

6

7

One Ferry Building, Suite 355
San Francisco, CA 94111
Telephone:  (415) 788-8200

8

Facsimile:  (415) 788-8208

9

-and-

10

**STEARNS WEAVER MILLER**
**WEISSLER ALHADEFF &**

11

**SITTERSON, P.A.**

12

Eugene E. Stearns
Jason P. Hernandez

13

14

150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone:  (305) 789-3200

15

Facsimile:  (305) 789-3395

16

Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, INTENTIONAL MISREPRESENTATION,
& NEGLIGENT MISREPRESENTATION