UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. ABDO, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>MICHAEL FITZSIMMONS, et al.,<br><br>    Defendants. | Case No. 17-cv-00851-EDL<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL AND FOR LIMITED DISCOVERY** |

Before the Court is Defendants Michael R. Fitzsimmons ("Fitzsimmons"), Peter Lai, Chris G. Power, Peter J. Goettner, Christian Borcher, Ernest D. Del., Marc S. Yi, James C. Peters ("Peters"), Souheil S. Badran's (collectively, "Defendants") motion to disqualify Plaintiff's counsel Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. ("SWMWAS") and for limited discovery in this securities fraud action. Plaintiff John E. Abdo ("Plaintiff")[1] opposes Defendants' motion. For the reasons discussed below, the motion is DENIED.

**I.    FACTUAL BACKGROUND**

    **A.    Parties**

Plaintiff is Vice President of BBX Capital ("BBX"), a real estate investment corporation. Fitzsimmons Decl. ¶ 10; Miller Decl. ¶ 2. In that role, he works closely with the CEO of BBX, Alan Levan ("Levan"). Fitzsimmons Decl. ¶ 5; Miller Decl. ¶ 2. Delivery Agent, Inc. ("Delivery Agent") is a California corporation founded in 2005 to develop technology that would allow viewers to purchase products directly though their televisions. See Fitzsimmons Decl. ¶ 2. It filed for Chapter 11 bankruptcy on September 15, 2016, and the bankruptcy court ordered conversion to

---

[1] John E. Abdo brings this case as trustee of both the John E. Abdo Trust Dated March 15, 1976, and the John E. Abdo Trust Dated June 11, 2014.

Chapter 7 bankruptcy by June 6, 2017. Hernandez Decl. ¶¶ 2, 5, 12; Fitzsimmons Decl. ¶ 2. Defendant Fitzsimmons was Delivery Agent's CEO, as well as a director, until its bankruptcy. Fitzsimmons Decl. ¶ 1. Defendant Peters was Delivery Agent's COO and President, Miller Decl. ¶ 8, and the remaining defendants were other Delivery Agent officers and directors. Hernandez Decl. Ex. A at 1, 2.

SWMWAS is a law firm based in Miami, Florida. Miller Decl. ¶ 1. Alison Miller ("Miller") is the head of SWMWAS's corporate law and securities practice and has represented both Plaintiff and Levan for more than thirty years, although she has not appeared on their behalf in this action. Miller Decl. ¶ 2. In this action, Plaintiff is represented by Eugene Stearns ("Stearns"), a partner at SWMWAS licensed to practice law in Florida, and Jason Hernandez ("Hernandez"), a partner at SWMWAS licensed to practice in California and Florida. Hernandez Decl. ¶ 1.

### B. Defendants' Alleged Fraud

The underlying dispute in this case centers on Plaintiff's purchase of $18 million in securities from Delivery Agent between June 2014 and April 2016, and Defendants' subsequent fraud. Plaintiff alleges that Defendants unlawfully concealed Delivery Agent's failed attempt to use its technology in a TV commercial broadcast during the February 2, 2014 Super Bowl. Complaint ("Cmpl.") ¶ 5. Had the technology functioned properly, TV viewers would have been able to use their television's remote control to purchase items from David Beckham's clothing line from H&M. Id. ¶ 44. Plaintiff alleges that, in response to the technology's failure, Defendants directed Delivery Agent's employees to purchase the items advertised during the commercial themselves to make it appear that the technology had functioned properly. Id. ¶ 63. Plaintiff alleges that Defendants' conduct has rendered his securities worthless. Id. ¶¶ 5, 8.

### C. Deloitte Audit and Draft Item 304

At some point between 2012 and 2014, Delivery Agent contracted with accounting firm Deloitte to audit Delivery Agent's consolidated financial statements as of December 31, 2012. See id. ¶ 62. Plaintiff's complaint alleges that, in February 2014, a Delivery Agent whistleblower approached Deloitte and informed it of Delivery Agent's Super Bowl cover-up. Id. The

1   complaint further alleges that Defendants unanimously voted to terminate Deloitte when they were
2   informed that, in order to complete its audit for 2013, Deloitte would need to "significantly expand
3   the scope" of its previous audit. Id. ¶¶ 71, 73
4         In order to terminate an auditor relationship, the SEC requires a corporation to issue a
5   written statement, known as an Item 304, explaining, among other things: (i) whether the auditor
6   was dismissed or resigned; (ii) whether the auditor's report on the corporation's financial
7   statements contained an adverse opinion; and (iii) who recommended and approved the decision to
8   terminate the auditor. 17 C.F.R. § 229.304(a)(1)(i-iii). The SEC requires the corporation to
9   provide the auditor with a copy of the Item 304, and the auditor must then respond by letter,
10  known as an Auditor's Response, stating whether it agreed with the contents of the Item 304. See
11  17 C.F.R. § 229.304(a)(3). Delivery Agent provided Deloitte with its Item 304 ("Draft Item 304")
12  in July 2015, and Deloitte provided Delivery Agent with its Auditor's Response ("Auditor's
13  Response") shortly after. Fitzsimmons Decl. ¶ 3.

### D. Fitzsimmons's Correspondence with Alison Miller

15        On August 19, 2015, Fitzsimmons emailed Levan to request assistance in obtaining legal
16  advice regarding Delivery Agent's Draft Item 304. Fitzsimmons Decl. ¶ 2. Fitzsimmons's email
17  stated: "Alan -- are your lawyers worth us considering for the Deloitte issue? It sounds like they
18  know the game on the 304 topic." Fitzsimmons Decl., Ex. A. Later that day, Fitzsimmons sent
19  Levan the Draft Item 304 and the Auditor's Response and thanked him for his help. Fitzsimmons
20  Decl. ¶ 6. Levan responded on August 25, 2015, instructing Fitzsimmons to call "Alison Miller of
21  Sterns Weaver Miller." Fitzsimmons Decl. ¶ 7. Plaintiff also emailed Fitzsimmons stating,
22  "When you asked me for our lawyers, I mentioned that Alison Miller has been representing us in
23  these issues for about 40 years . . . she is the best because her heart and soul are engaged on behalf
24  of her clients." Fitzsimmons Decl. ¶ 10.
25        Fitzsimmons then emailed Miller, "Nice to meet you. What time suits for a call this
26  morning?" Fitzsimmons Decl. ¶ 8. On August 26, 2015, Miller and Fitzsimmons spoke briefly by
27  phone. Miller Decl. ¶ 8; Fitzsimmons Decl. ¶ 11. Fitzsimmons provided what he characterizes as
28  confidential information during that phone call. Fitzsimmons Decl. ¶ 11. Following the phone

1    call, Peters sent a copy of both the Draft Item 304 and Auditor's Response to Miller.  Id.  Miller

2    read both documents.  Miller Decl. ¶ 8.  That same day, Miller emailed Fitzsimmons informing

3    him that she "reread everything last night and . . . it would be helpful for me to read the Final

4    Report - Would it be possible to send me a copy? Thanks - we just need to get through this!"

5    Fitzsimmons Decl. ¶ 9.

      After August 26, 2015, Miller and Fitzsimmons exchanged a few emails attempting to arrange a follow-up conversation.  Miller Decl. ¶ 13.  In one of those emails, on September 11, 2015, Miller wrote to Fitzsimmons, asking, "What's happening?  Do you have anything for me to see?  I'd like to try to help."  Id.  The next day, Fitzsimmons wrote back: "We are close to having something to share" and that "maybe" they should have a quick call on Monday; Miller responded to that email on September 13, 2015, stating that Fitzsimmons should try to reach her on Monday when he was available.  Miller Decl. ¶ 13. Fitzsimmons and Miller never spoke after that email exchange.  Id.  Fitzsimmons never sent Miller a retainer agreement, and Miller never sent a bill for legal services to Delivery Agent or any of its employees.  Miller Decl. ¶ 14.

## II. PROCEDURAL HISTORY

      Plaintiff filed his complaint for violation of federal securities laws and intentional and negligent misrepresentation on February 21, 2017.  That Complaint alleges that Defendants: (i) downplayed the significance of a failure of their technology during a Super Bowl advertisement and (ii) subsequently covered up their failure in the Draft Item 304 they submitted to Deloitte.  Cmpl. ¶ 79.  The Complaint also points to the Auditor's Response to support its contention that, "Delivery Agent's most senior officers" attempted to cover up "a catastrophic failure of Delivery Agent's core interactive technology."  Cmpl. ¶ 81.

      On February 27, 2017, Plaintiff's attorney Stearns, a member of the Florida but not the California bar, was admitted to this Court pro hac vice.  On March 15, 2017, the Court granted Rising Tide's request to relate Rising Tide I, LLC v. Fitzsimmons, et al., Case No. 4:17-cv-01232 -- in which the plaintiffs raise similar allegations regarding securities law violations surrounding their pre-IPO investments in Delivery Agent from 2014 to 2016 -- to this matter.  Dkt. 9.

      Defendants filed this motion to disqualify SWMWAS on May 23, 2017.  On June 6, 2017,

1   Plaintiff filed his opposition.  Defendants filed their reply on June 13, 2017.  The Court held a

2   hearing on June 27, 2017.

3   **III.   LEGAL STANDARD**

4   A threshold question in this case is whether California or Florida ethical rules apply.

5   Although California ethical rules arguably apply under American Bar Association ("ABA") choice

6   of law rules, see ABA Model Rules of Prof'l Conduct r. 8.5 (Am. Bar Ass'n 2017) ("For conduct

7   in connection with a matter pending before a tribunal, the rules [of professional conduct] of the

8   jurisdiction in which the tribunal sits [shall apply]"), parties may stipulate to the application of

9   another forum's law.  Cf. Dimidowich v. Bell & Howell, 803 F.2d 1473, 1477 n.1. (9th Cir. 1986)

10  ("parties may, in absence of strong contrary public policy, choose which forum's law will govern

11  an action").  Here, the Parties have agreed to application of Florida ethical rules in the pleadings

12  and during oral argument, Mot. at 5; Opp. at 6, n.1.; Dkt. 32 at 10:4-5, 15,  and thus the Court will

13  apply Florida ethical rules.

14  Under Florida rules, "[t]he party bringing the motion to disqualify bears the burden of

15  proving the grounds for disqualification."  Fenik v. One Water Place, No. 3:06cv514/RV/EMT,

16  207 WL 527997, at *4 (N.D. Fla. Feb. 14, 2007).  Disqualification is warranted where an attorney

17  violates Rule 4-1.9 or Rule 4-1.18 of the Rules Regulating Florida Bar. Rule 4-1.10.

18  Rule 4-1.9 provides:

19  > A lawyer who has formerly represented a client in a matter must not
20  > . . . represent another person in . . . a substantially related matter in
    > which that person's interests are materially adverse to the interests
21  > of the former client unless the former client gives informed consent.

22  R. Regulating Fla. Bar 4-1.9.  In addition, the lawyer may not "use information relating to the

23  representation to the disadvantage of the former client."  Id.

24  Rule 4-1.18 governs the conduct of attorneys who have formed prospective attorney-client

25  relationships.  It provides:

26  > [An attorney who has formed a prospective attorney-client
27  > relationship] may not represent a client with interests materially
    > adverse to those of a prospective client in the same or a substantially
    > related matter if the lawyer received information from the
28  > prospective client that could be used to the disadvantage of that

United States District Court
Northern District of California

person in the matter.

R. Regulating Fla. Bar 4-1.18(c). In addition, "a lawyer who has learned information from a prospective client may not use or reveal that information." R. Regulating Fla. Bar 4-1.18.

## IV.   DISCUSSION

Defendants seek to disqualify SWMWAS on the grounds that Stearns and Hernandez violated Rule 4-1.9 by representing Plaintiff in spite of Miller's prior attorney-client relationship with Defendants. In the alternative, Defendants contend that SWMWAS violated Rule 4-1.18 by representing Plaintiff in spite of the fact that Defendants were a former prospective client. Defendants also contend that SWMWAS should be disqualified based on the appearance of impropriety. Defendants also request limited discovery regarding the recipients of any privileged, confidential information regarding Defendants within or outside of SWMWAS.

### A.   Motion to Disqualify

#### 1.   Defendants' Standing To Bring Motion To Disqualify SWMWAS

It is undisputed that, if Miller formed any attorney-client relationship through her August 2015 phone calls and emails with Fitzsimmons and Peters, it was with Delivery Agent the corporation, and not Defendants the individuals. Reply at 4, n.4 ("Defendants acknowledge that Fitzsimmons did not establish an attorney-client relationship with Miller in his individual capacity, and seek disqualification based on Miller's attorney-client relationship with Delivery Agent and Fitzsimmons acting on Delivery Agent's behalf."); Razin v. A Milestone, LLC, 67 So. 3d 391, 398 (Fla. Dist. Ct. App. 2011) (entity's attorney does not owe duties to the corporate client's directors or officers individually). Accordingly, none of the Defendants were themselves actual or potential clients of Miller. Plaintiff argues that Defendants therefore lack standing to now seek SWMWAS's disqualification.

Plaintiff argues that only an attorney's current or former client has standing to bring a motion to disqualify. See THI Holdings, LLC v. Shattuck, 93 So. 3d 419, 424 (Fla. Dist. Ct. App. 2012) ("As a general proposition, a party . . . does not have standing to seek disqualification where, as here, there is no privity of contract between the attorney and the party claiming a conflict of interest."). According to Plaintiff, only Delivery Agent or those who control Delivery

Agent's attorney-client privilege have standing to bring the instant motion. And, as Plaintiff points out, Delivery Agent is not a defendant in this case, nor are Defendants authorized to represent it in light of Delivery Agent's bankruptcy. See Opposition ("Opp.") at 15 (citing Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349, 105 S. Ct. 1986, 1991, 85 L. Ed. 2d 372 (1985) ("power [to control attorney-client privilege] passes to the trustee [upon bankruptcy]")).

However, as Defendants point out, Florida courts recognize an exception to this rule: a party has standing to seek disqualification on behalf of another party if the two parties are closely related such that the former "stands in the shoes" of the latter. See State Farm Mut. Automobile Ins. Co.v. K.A.W, 575 So. 2d 630, 632-33 (Fla. 1991) (moving party may "'stand in the shoes' [of the former client] . . . for purposes of seeking disqualification on the grounds of conflict of interest" where a party has sufficient interest in the outcome of litigation).

State Farm was the second of two lawsuits stemming from a car accident that involved a husband (the driver), his wife (a passenger), and his daughter (also a passenger). In the first lawsuit, the husband, wife, and daughter were all represented by the Schlesinger firm. In the second lawsuit, the wife and daughter sued the husband, and they were again represented by the Schlesinger firm. For purposes of the second lawsuit, the husband was insured by State Farm.

State Farm brought a disqualification motion, arguing that the Schlesinger firm should be disqualified from representing the wife and daughter. The wife and daughter argued that, because State Farm was not a former client of the Schlesinger firm, it lacked standing to bring the motion. The court disagreed. It held that, because the husband had potentially shared confidential information with the Schlesinger firm during the first lawsuit, and because the Schlesinger firm was in a position to use that confidential information in the subsequent lawsuit against State Farm to State Farm's detriment, State Farm had standing to move to disqualify. Id. at 633.

Here, as in State Farm, the former client (Delivery Agent) shared potentially confidential information in the form of the Draft Item 304 and the Auditor's Response with counsel (SWMWAS), and SWMWAS could use that information against the parties now bringing the motion to disqualify (Defendants). Since the information at issue is directly related to the conduct

that Plaintiff alleges was wrongful, Defendants possess the "personal stake" required to stand in the shoes of Delivery Agent and have standing to bring this motion.

### 2. Rule 4-1.9

In order to prevail under Rule 4-1.9, Defendants must show: (i) that the subject matter of the current case substantially relates to that of the prior representation;[2] (ii) the existence of a prior attorney-client relationship; and (iii) that the new client's interests are materially adverse to the interests of the former client. See R. Regulating Fla. Bar 4-1.9. Because Defendants cannot establish material adversity, their argument fails.

#### a. Attorney-Client Relationship Between SWMWAS And Delivery Agent

An attorney-client relationship is formed when a client consults an attorney with the intention of employing him, even if the client does not formally hire the attorney. See Metcalf v. Metcalf, 785 So. 2d 747, 750 (Fla. Dist. Ct. App. 2001). The existence of the relationship depends on "the perspective of the person seeking out the lawyer, not on what the lawyer does after the consultation." See Bartholomew v. Bartholomew, 611 So.2d 85, 86 (Fla. Dist. Ct. App. 1992) (existence of attorney-client relationship based on the subjective intent of client).[3]

Defendants argue that the August and September 2015 communications between Fitzsimmons and Peters on the one hand, and Miller on the other, gave rise to an attorney-client relationship between Delivery Agent and Miller because Fitzsimmons and Peters had a subjective, reasonable belief that such relationship existed. According to Defendants, it is evident that Fitzsimmons and Miller had such a subjective belief because they asked Levan to assist them in obtaining legal advice, and they thereafter divulged confidential information -- the Draft Item 304

---

[2] Plaintiff does not dispute that the matters involved in this case are substantially related to those at issue during Miller's potential representation of Delivery Agent. Indeed, it would be difficult for Plaintiff to dispute this fact, since Plaintiff's complaint relies on the Draft Item 304 and Auditor's Response -- i.e., the same documents that Miller reviewed for Fitzsimmons -- as evidence that Defendants violated the law and are liable for Plaintiff's now "worthless" investment. Cmpl. ¶¶ 79, 81.

[3] For this reason, Plaintiff's argument that there was no attorney-client relationship because "Miller was merely looking out for her clients' financial interests by gaining a better understanding of the dispute with the Auditor," Miller Decl. ¶ 3, fails.

8

and Auditor's Response -- to Miller, which they would not have done unless they believed that their communications were privileged. Fitzsimmons Decl. ¶12.

Plaintiff responds that, even if Fitzsimmons and Peters subjectively believed that Miller was Delivery Agent's attorney, that belief was unreasonable in light of Miller's prior, long-standing relationship with Plaintiff and Levan. In support of this argument, Plaintiff relies on two New York district court cases holding that counsel "could not be disqualified from representing "long-standing client" because defendant "could not reasonably expect confidences imparted during joint representation to be withheld from [long-standing client]." Simply Fit of N. Am., Inc. v. Poyner, 579 F. Supp. 2d 371, 385 (E.D.N.Y. 2008); see also Cohen v. Acorn Int'l Ltd., 921 F. Supp. 1062, 1064 (S.D.N.Y. 1995) (same).

Plaintiff also contends that Fitzsimmons and Peters' belief that Miller represented Delivery Agent was unreasonable because Miller never actually provided legal services to Delivery Agent. As Plaintiff observes, "whether or not an attorney actually rendered legal services can be considered in connection with whether or not a putative client's subjective belief is reasonable." In re Lentek Int'l, Inc., 377 B.R. 396, 401 (Bankr. M.D. Fla. 2007), aff'd, 346 F. App'x 430 (11th Cir. 2009).

Defendants respond that, in August and September 2015, while Fitzsimmons and Miller were communicating, "there was no reason for Fitzsimmons to think that Stearns Weaver Miller could not represent . . . both [Plaintiff and Delivery Agent] in different matters." Reply at 5. The Court is not persuaded by this argument. At that time, Fitzsimmons was already aware that Deloitte "did not agree with certain statements" in Delivery Agent's Draft Item 304 and knew that Plaintiff's investment was in jeopardy. Fitzsimmons Decl. ¶ 2; Miller Decl. ¶ 3. Even though Plaintiff and Delivery Agent were still working together in an attempt to "get through" the Draft Item 304 issues, Fitzsimmons and Peters could have reasonably foreseen the ultimate adversity between themselves and Plaintiff.

At the same time, as Defendants point out, it is ordinarily the attorney's burden to identify potential conflicts and inform new clients of them. The comment to Rule 4-1.18 states, "Where . . . information indicates that a conflict of interest . . . exists, the lawyer should so inform the

9

prospective client." R. Regulating Fla. Bar 4-1.18. Because Miller did not identify and inform Delivery Agent of the potential conflict, it was arguably reasonable for Fitzsimmons and Peters to believe that Miller represented Delivery Agent. Because the Court finds no material adversity between Delivery Agent and Plaintiff (as discussed below), it assumes that Delivery Agent formed an attorney-client relationship with Miller when Fitzsimmons and Peters communicated with her in August and September of 2015, as this determination does not affect the outcome of this motion.

### b. Lack of Material Adversity Between Plaintiff and Delivery Agent

Even if Delivery Agent and SWMWAS formed an attorney-client relationship, there is no conflict under Rule 4-1.9 due to lack of material adversity. Rule 4-1.9 prohibits an attorney from "represent[ing] another person in . . . a substantially related matter in which that person's interests are materially adverse to the interests of *the former client*" (emphasis added). R. Regulating Fla. Bar 4-1.9. Here, Plaintiff is the new client. Assuming that an attorney-client relationship was formed by the August and September 2015 communications, there is no dispute that the client was Delivery Agent, not any of the Defendants. Accordingly, the relevant adversity for purposes of this disqualification motion is between Plaintiff and Delivery Agent.[4]

Defendants first contend that, because Plaintiff's complaint alleges wrongful conduct by Defendants based on Delivery Agent's SEC filings, Plaintiff and Delivery Agent are adverse. However, as Plaintiff points out, Plaintiff did not sue Delivery Agent, and his complaint does not allege wrongdoing by *Delivery Agent*, but rather by *Defendants*. Cmpl. ¶¶ 1, 5. Plaintiff argues that, in fact, Plaintiff and Delivery Agent are currently aligned. In support of this argument, Plaintiff points to the motion to serve subpoenas and conduct depositions of the Delivery Agent's former directors and officers ("Motion to Examine D&O's") brought by Delivery Agent's Creditors Committee in order to gain information from Defendants regarding the same misconduct

---

[4] During the hearing, the Court provided Defendants with the opportunity to explain why the relevant adversity would be between Plaintiff and Defendants, rather than Plaintiff and Delivery Agent. Defendants did not do so.

10

alleged in Plaintiff's and Rising Tide's complaints. Hernandez Decl. Ex. A. ¶ 22.

Defendants respond that, as of Delivery Agent's conversion to Chapter 7 bankruptcy, the Creditors Committee had ceased to control Delivery Agent. According to Defendants, following this conversion, 'it is unknown' whether the Chapter 7 trustee will pursue the same discovery sought in the Creditors Committee motion and thus whether Plaintiff and Delivery Agent are aligned. Dkt. 32 at 6:4. During the hearing, Defendants described the relationship between Plaintiff and Delivery Agent's estate as follows: there is "no indication that the [estate] . . . is aligned or adverse, it is unknown . . . it may be neutral or adverse." Id. at 6:1-9. Defendants further stated that they "don't know" what [Deliver Agent's] position is" vis-à-vis Plaintiff. Id. at 6:10-11.

This is not sufficient. Defendants carry the burden of proving that the elements of either Rule 4-1.9 or 4-1.18 are satisfied, including the element of material adversity. "Neutrality" is not the same thing as "adversity," and if Defendants "don't know" whether Delivery Agent is adverse to Plaintiff, then they have not shown that it is. Accordingly, Defendants' motion fails under Rules 4-1.9.

### 3. Rule 4-1.18

Disqualification under Rule 4-1.18, like Rule 4-1.9, requires that the interests of the new client (Plaintiff) be materially adverse to the interests of the former prospective client (Delivery Agent). Accordingly, the Court denies Defendants' motion to disqualify under Rule 4-1.18 for the same reasons as under Rule 1-1.9.

### 4. Appearance of Impropriety

Defendants argue that Florida law requires disqualification of SWMWAS even absent violation of the Rules Regulating the Florida Bar due to the "appearance of impropriety" resulting from the fact that Fitzsimmons and Peters provided confidential information to SWMWAS. Prior to the 1987 amendments to the Florida ethical rules,[5] the Eleventh Circuit held that counsel must

---

[5] Florida's ethical rules are based on the ABA model rules. Canon 9 of the prior version of the ABA model rules prohibited "appearance of impropriety." The rules were amended in 1983 and deleted that language. Florida amended its own rules accordingly in 1987.

11

be disqualified based on an "appearance of impropriety," which exists where there is: "(i) a reasonable possibility that some specifically identifiable impropriety did occur; and (ii) the likelihood of suspicion or obloquy outweighs the social interest that will be served by the attorney's continued participation in the case." United States v. Hobson, 672 F.2d 825, 828 (11th Cir. 1982). Plaintiff contends that this "appearance of impropriety" is no longer a viable grounds for disqualification because that language was removed from the Florida ethical rules in 1987, and that, even if it is, the standard is not met here.

### a. Viability of Standard

Defendants contend that, although the Florida ethical rules excised the term "appearance of impropriety" when they were amended in January 1987, Florida courts have retained "appearance of impropriety" as grounds for disqualification. For this proposition, Defendants cite to cases decided after January 1987 that continue to apply the "appearance of impropriety" standard, including State Farm., 575 So. 2d at 630.

As noted above, State Farm involved a potential conflict based on the Schlesinger firm's prior representation of a husband, wife, and daughter, and subsequent representation of the wife and daughter in a lawsuit against the husband. Id. at 631. State Farm, the husband's insurer, argued that the Schlesinger firm should be disqualified from representing the wife and daughter for several reasons, including (i) the conflict between the firm's prior representation of the husband and current representation of parties adverse to the husband (his wife and daughter); (ii) the possibility that the firm would use confidential information gained during its prior representation of the husband against him; and (iii) the appearance of impropriety. Id.

The Florida Supreme Court reversed the lower court's decision not to disqualify the attorney based on his prior representation of the husband. Id. at 634. However, it also considered the continued applicability of the "appearance of impropriety" standard in light of the 1987 change in Florida's ethical rules. It stated:

> We next address the issue of the appropriate standard to apply to determine whether the Schlesinger firm should be disqualified. In conflict-of-interest cases such as this arising under the former Code of Professional Responsibility, one seeking to disqualify opposing counsel was required to show that (1) an attorney-client relationship

12

> existed, thereby giving rise to an irrefutable presumption that confidences were disclosed during the relationship, and (2) the matter in which the law firm subsequently represented the interest adverse to the former client was the same or substantially related to the matter in which it represented the former client. Ford v. Piper Aircraft Corp., 436 So.2d at 305; Sears, Roebuck & Co. v. Stansbury, 374 So.2d at 1051. This standard was based on the Code of Professional Responsibility, Canon 4, which provided that an attorney should preserve the confidences and secrets of a client. Id. at 1053.
>
> In Junger Utility & Paving Co. v. Myers, 14 F.L.W. 2650 (Fla. 1st DCA, Nov. 15, 1989), the court applied the same standard to a question of disqualification arising under the new Rules of Professional Conduct. Like the Junger court, we do not believe that a different standard now applies because the specific admonition to avoid the appearance of impropriety does not appear in the Rules of Professional Conduct. See also Brent v. Smathers, 529 So.2d 1267 (Fla. 3d DCA 1988) (disqualification required under current Rules of Professional Conduct to avoid appearance of impropriety). The Rules of Professional Conduct requiring confidentiality serve the same purposes as the confidentiality requirements of the Code of Professional Responsibility. Similarly, the need for the irrefutable presumption continues to exist, just as under the former code. The presumption acknowledges the difficulty of proving that confidential information useful to the attorney's current client was given to the attorney. It also protects the client by not requiring disclosure of confidences previously given to the attorney. See Government of India v. Cook Indus., Inc., 422 F.Supp. 1057, 1060 (S.D.N.Y.1976) (if two actions are substantially related, court will not require proof that attorney had access to confidential information, nor give weight to attorney's assertion that he had no access to and did not possess confidential information), aff'd, 569 F.2d 737 (2d Cir.1978).

State Farm, 575 So. 2d at 633.

Another case decided after the 1987 rule change that Defendants cite for the proposition that the "appearance of impropriety" standard remains viable is Rentclub, Inc. v. Transamerica Rental Fin. Corp., 811 F. Supp. 651, 654 (M.D. Fla. 1992). There, counsel paid the opposing party's former employee to disclose confidential information, which the federal district court for the Middle District of Florida found created an "appearance of impropriety" that warranted disqualification. The court relied on State Farm for the continued viability of the "appearance of impropriety" standard: even though Florida ethical rules no longer contained an express provision prohibiting the "appearance of impropriety," the court held that "Florida law clearly retains this requirement." Id.

Plaintiff responds that the "appearance of impropriety" is no longer grounds for

13

disqualification after its excision from the Florida ethical rules in 1987 in spite of these cases. He correctly argues that State Farm's discussion of the "appearance of impropriety" standard was dicta. The court's decision to disqualify counsel in State Farm was based on the existence of a prior, adverse representation, and its discussion of "appearance of impropriety" was not central to its holding. State Farm, 575 So. 2d at 633. This was the same conclusion that the Florida court of appeal reached in Anderson Trucking Serv., Inc. v. Gibson, 884 So. 2d 1046, 1049-51 (Fla. Dist. Ct. App. 2004) (disqualification in State Farm was based on fact that counsel could use confidential information gained during the course of the prior representation in the subsequent action, not on "appearance of impropriety"), and that the bankruptcy court for the Southern District of Florida reached in In re Patrick Power Corp., No. 06-12423 BKCJKO, 2007 WL 2883179, at *3-4 (Bankr. S.D. Fla. Sept. 26, 2007) ("relevant legal analysis" used by State Farm comported with Rule 4-1.9 and did not "involve an 'appearance of impropriety' analysis").

Waters v. Kemp further supports this conclusion. There, the Eleventh Circuit reviewed a decision by the Southern District of Georgia. 845 F.2d 260 (11th Cir. 1988). Georgia, like Florida, tracked the revision to the Model Code of Professional Responsibility by eliminating the "appearance of impropriety" grounds for disqualification. Id. The Eleventh Circuit concluded that "appearance of impropriety" was no longer grounds for disqualification. Id. at 265. Another case from the Southern District of Florida relied in part on Waters to reach the same result under Florida law. Armor Screen Corp. v. Storm Catcher, Inc., 709 F. Supp. 2d 1309 (S.D. Fla. 2010). The decision contains the following analysis of the continued viability of the "appearance of impropriety" standard:

> "Under the Model Rules, the appearance of impropriety is not a ground for disqualifying a lawyer from representing a party to a lawsuit." Waters v. Kemp, 845 F.2d 260, 265 (11th Cir.1988). The "appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases. This is particularly true where ... the appearance of impropriety is not very clear." Id. at 265 n. 12 (quoting Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1247 (2d Cir.1979)).
>
> Four years ago, the Eleventh Circuit again . . . held that because Georgia's State Bar no longer expressly prohibited the appearance of impropriety, the "court was under no obligation to perform the [appearance of impropriety] balancing test." Herrmann v.

14

> GutterGuard, Inc., 199 Fed. App'x 745, 754 (11th Cir.2006). Thus, the district court "properly applied the conflict of interest standard and did not apply the outdated appearance of impropriety standard." Id. at 755.
>
> Despite the foregoing authority and Florida's adoption of the [revised] Model Rules, numerous federal district courts in Florida continue to apply the [appearance of impropriety] test. These decisions rely on State Farm Mut. Auto. Ins. Co. v. K.A.W., 575 So.2d 630 (Fla.1991), and its progeny, for the proposition that while Florida's professional rules no longer prohibit the appearance of impropriety, Florida law retains the requirement.
>
> This interpretation, however, does not follow. The State Farm reference to appearance of impropriety was made only in the context of affirming the same [conflict-of-interest] test, and particularly the irrefutable presumption, that was applied prior to Florida's adoption of the new rules. This Court does not read the decision as retaining the appearance of impropriety standard and respectfully disagrees with those courts that do.

Id. at 1318-20 (S.D. Fla. 2010).

This logic is persuasive. Defendant's reliance on State Farm for the proposition that "appearance of impropriety" warrants disqualification is not mandated by the holding of State Farm itself and does not comport with more recent decisions by Florida district courts and the Eleventh Circuit. Accordingly, the Court concludes that "appearance of impropriety" is no longer a viable standard under the Florida ethical rules.

### b. Application of Standard

Even if "appearance of impropriety" were a valid basis to disqualify SWMWAS, the standard is not met here. Defendants contend that the "appearance of impropriety" exists because Miller's communication with Fitzsimmons created an irrefutable presumption that confidences were shared throughout SWMWAS. They note that, in State Farm, the court found that, in light of the past relationship between the husband and his attorney, it was not possible for the attorney to "erase from his mind the confidences he received from his former client" and therefore the "administration of justice was compromised." State Farm, 575 So. 2d at 633-34. They argue that the same situation exists here.

However, as Plaintiff pointed out at the hearing, the "appearance of impropriety" standard was intended to address the "egregious case of attorneys switching sides." Dkt. 32 at 22:4-7. Here, there was never any kind of relationship between Defendants and SWMWAS, and

Plaintiff's counsel has not switched sides, since they have long represented Plaintiff. Accordingly, because Defendants were neither former clients nor former prospective clients of SWMWAS, this situation is not analogous to the conduct in State Farm that led to the prevention of the "fair administration of justice."

### B. Request for Limited Discovery

In addition to disqualification of SWMWAS, Defendants seek discovery from both SWMWAS and Rising Tide's counsel, Coblentz Patch Duffy ("Coblentz") in order to ascertain the extent to which the confidential information provided to Miller has been shared both inside and outside of SWMWAS.[6] Defendants maintain that courts frequently allow discovery on "the limited issues concerning a disqualification motion." To support this argument, Defendants cite cases in which Kansas and New York district courts permitted movants to take depositions in order to develop a record to support their motions. Renner v. Townsend Financial Services Corp., 2002 WL 413926 (S.D.N.Y. 2002) (court allowed depositions for purpose of developing record on disqualification motion); Williams v. Kopco, Inc., 162 F.R.D. 670 (D. Kan. 1995) (same).

Plaintiff opposes Defendants' request for discovery from him and from Rising Tide, and Rising Tide opposes Defendants' request for discovery from Coblentz.

#### 1. SWMWAS

Defendant has not established that the limited discovery that they seek from SWMWAS is necessary. The cases cited by Defendants in which courts allowed discovery involved depositions of counsel, not written discovery. See Renner, 2002 WL 413926; Williams, 162 F.R.D. 670. Depositions of counsel are limited to instances where there is no other means to obtain the information and the information is critical to preparation of the case. Kelling v. Bridgestone/Firestone, Inc., 153 F.R.D. 170, 171 (D. Kan. 1994). Here, Defendants' declarations contain extensive facts in support of their arguments, and the Parties do not meaningfully disagree about the facts at issue. Thus, Defendants' request for discovery from SWMWAS is denied.

---

[6] Plaintiff's opposition to Defendant's motion briefly raises the question of the admissibility of these items. However, this question is not properly before the Court on Defendants' motion for disqualification and need not be resolved at this time.

16

### 2. Rising Tide

As noted, Defendants seek discovery from Coblentz regarding what confidential information, if any, SWMWAS shared with Coblentz or the Rising Tide plaintiffs. However, Defendants failed to raise this issue in the Rising Tide case, and Defendants have not properly served Rising Tide -- a nonparty in the Abdo case -- with their request for discovery. Accordingly, in addition to the reasons discussed above, Defendants' request for discovery from Coblentz is denied on this bases.

## V.  CONCLUSION

For the reasons discussed above, Defendants' motion is DENIED.

**IT IS SO ORDERED.**

Dated:  July 7, 2017



ELIZABETH D. LAPORTE
United States Magistrate Judge