UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. ABDO, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL FITZSIMMONS, et al., <br><br> Defendants. | Case No.17-cv-00851-EDL <br><br> Related to Case No. 17-cv-01232-EDL <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** |
| RISING TIDE I, LLC, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL FITZSIMMONS, et al., <br><br> Defendants. | |

Before the Court are six motions to dismiss the complaints in two related cases, Abdo v. Fitzsimmons, et al., 17-cv-00851 ("Abdo"), and Rising Tide I, LLC; Rising Tide II, LLC v. Fitzsimmons, et al., 17-cv-01232 ("Rising Tide") (together, "Plaintiffs"). Plaintiffs allegedly invested millions of dollars in a technology company, Delivery Agent, Inc., that was preparing to issue an initial public offering, investments which Plaintiffs claim were made in reliance on intentional misrepresentations by various officers and directors of the company, and, in one case, a partner at another investor. The company never went public and has initiated bankruptcy proceedings. Plaintiffs have brought these cases to recover their losses. For the reasons set forth below, the Court GRANTS in part and DENIES in part the motions to dismiss.

## I.    FACTUAL BACKGROUND

### A.    Parties

Plaintiff John E. Abdo ("Abdo") is the Trustee of the John E. Abdo Trustee Dated June 11,

2014, and John E. Abdo, as Trustee of the John E. Abdo Trust Dated March 15, 1976.  Abdo Compl., ¶¶ 9-10.  Abdo, through these two trusts, purchased $18 million in securities from Delivery Agent, Inc. ("Delivery Agent") on 6 separate occasions between June 2014 and April 2016.  Abdo Compl., ¶¶ 9-10, 39.  Plaintiff Rising Tide I, LLC and Rising Tide II, LLC ("Rising Tide") purchased $17 million in securities from Delivery Agent on 4 separate occasions between September 2014 and March 2016.  Rising Tide Compl., ¶¶ 4, 33.

Defendant Michael Fitzsimmons was Delivery Agent's Chief Executive Officer and a member of the Board of Directors.  Abdo Compl., ¶ 13; Rising Tide Compl., ¶ 11.  Defendant Peter Lai was the company's President and Chief Operating Officer until January 2015 when he became the company's President of Ecommerce.  Abdo Compl., ¶ 14; Rising Tide Compl., ¶ 12.  Defendants Christopher Power, Peter Goetner, [1] and Christian Borcher were members the Audit Committee.  Abdo Compl., ¶¶ 15-17; Rising Tide Compl., ¶¶ 13-15.  Defendants Christopher Power, Peter Goetner, Christian Borcher, Ernest Del, Marc Yi, James Peters, and Souheil Badran were members of the Board of Directors.  Abdo Compl., ¶¶ 15-21; Rising Tide Compl., ¶¶ 13-19.  Defendant Peters also became the Chief Operating Officer on January 7, 2015.  Abdo Compl., ¶ 20; Rising Tide Compl., ¶ 18.  Defendant David Cowan[2] was a partner at Bessemer Venture Partners.  Rising Tide Compl., ¶ 20.  Defendant Borcher was appointed by Defendant Cowan's investment firm to represent that investor on the Board of Directors.  Rising Tide Compl., ¶ 66.

### B.    Securities Purchases and Representations

These two related lawsuits were brought by investors who allege that they purchased millions of dollars in securities from the company Delivery Agent in reliance on Defendants' fraudulent misrepresentations.  The conduct underlying the claims in both cases is generally similar, although the following recitation of the facts will note differences between the cases where relevant.

---

[1] The two complaints spell this Defendant's name differently (Goetner in Abdo and Goettner in Rising Tide).  For the sake of consistency, the Court will adopt the Abdo spelling of Goetner throughout this Order.

[2] Cowan is not named as a Defendant in the Abdo complaint.

Delivery Agent operated in the television-commerce space. Abdo Compl., ¶ 2; Rising Tide Compl., ¶ 2. Delivery Agent's product was an interactive technology it claimed to have developed which allowed television viewers to instantly purchase products they saw in the programs they were watching, such as a piece of clothing worn by an actor in a show, using the remote control connected to their smart TV. Abdo Compl., ¶¶ 2, 30; Rising Tide Compl., ¶¶ 2, 27. The company was preparing to make an initial public offering ("IPO"). To cover expenses before it issued the IPO, the company issued and sold securities to investors in the form of preferred stock, stock warrants, convertible promissory notes, and other securities. Abdo Compl., ¶ 3; Rising Tide Compl., ¶3.

Rising Tide began contemplating an investment in Delivery Agent in late 2013 or early 2014. Rising Tide Compl., ¶ 37. On January 12, 2014, Rising Tide received a "Management Presentation" (dated September 13, 2013) about Delivery Agent. Rising Tide Compl., ¶ 37. The presentation discussed the proprietary nature of Delivery Agent's interactive technology and described Delivery Agent's plans for a "pre-IPO" funding round to ensure "IPO readiness." Rising Tide Compl., ¶ 37.

Many of Plaintiffs' allegations flow from Delivery Agent's attempt to use its interactive technology in a television commercial broadcast during the 2014 Super Bowl. Abdo Compl., ¶ 31; Rising Tide Compl., ¶ 38. For that commercial, Delivery Agent partnered with clothing retailer H&M to allow viewers to purchase directly the clothing items featured in the commercial from their smart TV using their remote control. Abdo Compl., ¶ 31; Rising Tide Compl., ¶ 38.

Prior to the airing of the Super Bowl commercial, Delivery Agent issued a press release touting the importance of the commercial. Abdo Compl., ¶ 32; Rising Tide Compl., ¶ 39. Michael Fitzsimmons, Delivery Agent's Chief Executive Officer and a member of the Board of Directors, was quoted in the press release calling Delivery Agent's interactive technology a "game-changer for the advertising industry" and calling the commercial an "industry first" that would allow H&M to "mak[e] their Super Bowl XLVIII ad actionable and directly measureable." Abdo Compl. ¶¶ 32-33; Rising Tide Compl., ¶ 40. Delivery Agent issued another press release, in which Fitzsimmons was quoted as extolling the Super Bowl advertisement as "an important day

3

for marketers" and saying that it would involve "the launch of the first fully enabled t-commerce advertising campaign powered by Delivery Agent." Rising Tide Compl., ¶ 42.

After the Super Bowl, Delivery Agent published a press release with quotes from Fitzsimmons. He was quoted as stating: "H&M kicked-off a great campaign during Super Bowl XLVIII to promote their David Beckham Bodywear Collection. That same campaign kicked-off a new paradigm for advertising, fundamentally changing the discipline by making television advertising actionable and measurable." Abdo Compl., ¶ 58; Rising Tide Compl., ¶ 46.

Although Delivery Agent issued statements about the purported success of the Super Bowl commercial, soon after the Super Bowl advertisement aired, a whistleblower approached Delivery Agent's auditor with details about a cover-up to hide the actual failure of the Super Bowl advertisement. Abdo Compl., ¶ 60; Rising Tide Compl., ¶ 47. The whistleblower told the auditor that when the Super Bowl advertisement failed because viewers were unable to buy the clothing items through their televisions, Fitzsimmons directed senior Delivery Agent officers to purchase the items to give the appearance that Delivery Agent's technology had worked, and Delivery Agent created false sales reports to indicate that the Super Bowl advertisement had been successful. Abdo Compl., ¶ 63; Rising Tide Compl., ¶ 47. The auditor then informed Delivery Agent's Audit Committee of the whistleblower's allegations. Abdo Compl., ¶ 64; Rising Tide Compl., ¶ 48.

Before the Audit Committed acted on the whistleblower's allegations, however, Delivery Agent continued to highlight the success of the Super Bowl advertisement as an example of Delivery Agent's success. Rising Tide Compl., ¶ 49. On February 6, 2014, Rising Tide's representative spoke with Fitzsimmons and one of Delivery Agent's investment bankers to further explore the possibility of an investment. Fitzsimmons and the investment banker pointed to the Super Bowl advertisement as emblematic of Delivery Agent's success. Rising Tide Compl., ¶ 49. The investment banker also provided an "Executive Summary of Delivery Agent" and a term sheet. Rising Tide Compl., ¶ 49. The Executive Summary described Delivery Agent's "proprietary software" and stated that the company was "planning to go public in April 2014" and was seeking pre-IPO funding for "IPO readiness." Rising Tide Compl., ¶ 49. Delivery Agent also

4

provided a copy of the Business Section of Delivery Agent's draft Form S-1 on February 6, 2014. Rising Tide Compl., ¶ 50. The draft Form S-1 included the representation that "during Super Bowl XLVIII viewers of H&M's Super Bowl ad featuring David Beckham, were able to buy the clothing featured in the ad directly from their remote control on an enabled TV." Rising Tide Compl., ¶ 50. It also described the technology as "proprietary" in multiple instances. Rising Tide Compl., ¶ 50. Fitzsimmons delivered another draft of the Form S-1 to Rising Tide on February 20, 2014, which contained the same general representations about the Super Bowl advertisement. Rising Tide Compl., ¶ 52.

Between February 13 and February 22, 2014, Fitzsimmons spoke with Rising Tide's representative another five times. Rising Tide Compl., ¶ 51. During those conversations, Fitzsimmons reiterated the company's success during the Super Bowl commercial, described its proprietary, interactive technology, and discussed the need for pre-IPO funding. Rising Tide Compl., ¶ 51. During these discussions, Fitzsimmons did not mention the technical issues that hampered the Super Bowl advertisement's success or the subsequent cover-up. Rising Tide Compl., ¶ 51.

In March and April of 2014, Rising Tide's representative met numerous times with Cowan and Borcher to discuss investing in Delivery Agent. Rising Tide Compl., ¶ 66. During these meetings, Cowan and Borcher made "glowing reports" about Delivery Agent to Rising Tide's representative--Cowan in phone calls on March 12 and April 13, 2014, and Borcher in a call on June 11, 2014. Rising Tide Compl., ¶ 67. Both Defendants told Rising Tide's representative that the IPO was "imminent" and the current financing round was the final round of private fundraising the company needed to reach an IPO. Rising Tide Compl., ¶ 67.

In the meantime, as a result of the whistleblower's allegations, the Audit Committee conducted an internal investigation, whose results were presented to the Audit Committee and the Board of Directors. Abdo Compl., ¶ 64; Rising Tide Compl., ¶¶ 53, 55. The Audit Committee and the Board of Directors ultimately concluded that the whistleblower's allegations were essentially accurate. Abdo Compl., ¶ 65. See also Rising Tide Compl., ¶ 53. Although they accepted the whistleblower's allegations, the Audit Committee and the Board of Directors

concluded that "the financial impact of the purchases was not material from a financial standpoint" and did not have a "material adverse impact on the business" or an "impact on the integrity of our financial statements" and that the "current Chief Executive Officer was not involved in the fabrication of data." Abdo Compl., ¶ 66. See also Rising Tide, ¶ 55.

Although Delivery Agent implemented a remediation plan and presented the internal investigation reports to the auditor, the auditor determined that it could not rely on the representations of Delivery Agent's management for purposes of completing audits of Delivery Agent's consolidated financial statements. Abdo Compl., ¶¶ 69-70. See also Rising Tide Compl., ¶ 56. Thus, the auditor announced that it would not be able to reissue its previously issued audit report or continue with its audit of the December 31, 2013 financial statement if the executives involved in the alleged cover-up were involved in the accounting or internal controls of the company, were in a financial role, or were in a supervisory role or position to influence those in such positions. Abdo Compl., ¶ 70; Rising Tide Compl., ¶ 57. The auditor also informed Delivery Agent that it would need to expand the scope of its previously completed 2012 audit and the incomplete 2013 audit to determine if there were any issues with the accounting or financial reporting. Abdo Compl., ¶ 71; Rising Tide Compl., ¶ 58.

On July 29, 2014, the Board of Directors terminated the auditor, and Delivery Agent formally dismissed the auditor on August 4, 2014. Abdo Compl., ¶ 73; Rising Tide Compl., ¶ 60. The consequence of the decision to terminate the auditor was that Delivery Agent could not complete the contemplated IPO until it met its obligation triggered by the termination under the federal securities laws to file an Item 304 explaining the basis for terminating the auditor and allowing the auditor an opportunity to respond to the company's explanation. Abdo Compl., ¶ 74; Rising Tide Compl., ¶ 61.

Shortly after the firing of the auditor, Rising Tide's representative exchanged emails with Fitzsimmons on August 11, 2014, about further investments with the company. Rising Tide Compl., ¶ 76. Rising Tide's representative asked about the changing dates for launching the IPO and the reason for the change as well as management's outlook for a future IPO. Rising Tide Compl., ¶ 76. Fitzsimmons replied: "We made a significant acquisition at the end of Q'2 (Music

Today). This was fully vetted with both Credit Suisse and Deutsche Bank who jointly advised the company to fully integrate and execute at least one quarter as a merged entity before going public." Rising Tide Compl., ¶ 76. Fitzsimmons encouraged Rising Tide to make another investment in Delivery Agent, claiming that Rising Tide would have "2.0X upside protection in IPO." Rising Tide Compl., ¶ 76.

In connection with the sale of securities to both Abdo and Rising Tide, Delivery Agent provided written materials on or about May 12, 2014, including a PowerPoint presentation describing Delivery Agent and its interactive technology. Abdo Compl., ¶ 43; Rising Tide Compl., ¶ 69. The PowerPoint highlighted the Super Bowl commercial by incorporating articles written by third parties in January 2014, which described Delivery Agent's partnership with H&M and how the interactive technology would be used to purchase clothing items in the commercial. Abdo Compl., ¶ 44; Rising Tide Compl., ¶ 70. The PowerPoint also expressly stated that Delivery Agent was raising money from investors for "IPO readiness." Abdo Compl., ¶ 45; Rising Tide Compl., ¶ 70. A Management Presentation, dated July 18, 2014, was provided to Rising Tide, which again lauded the Super Bowl advertisement and the proprietary nature of the technology. Rising Tide Compl., ¶ 75.

On October 13, 2014, Abdo wrote an email to Fitzsimmons to ask if Delivery Agent intended to file the Form S-1 in November 2014 so that Delivery Agent could proceed with an IPO in February 2015. Abdo Compl., ¶ 75. Fitzsimmons replied that same day: "We are having to do a carve-out audit of Music Today from Live Nation which is taking some time but all good. The current plan is to confidential file in December [2014] and go out in March." Abdo Compl., ¶ 75. Delivery Agent sent an updated draft Form S-1 to two investors on January 9, 2015, that continued to claim that the February 2014 Super Bowl advertisement was a success. Abdo Compl., ¶ 55. Abdo received a copy of the updated draft Form S-1 that same day. Abdo Compl., ¶ 56.

On or about March 9, 2015, Abdo first learned of the dispute with the auditor. Abdo Compl., ¶ 88. Around that time, however, Fitzsimmons represented to Abdo in a phone call that the Super Bowl events were immaterial and that the auditor's position was unreasonable. Abdo

7

Compl., ¶ 88.  Still, Delivery Agent continued its efforts to raise funds through the sale of securities to investors, including Abdo, by claiming that the company's IPO was imminent.  Abdo Compl., ¶ 89.  On March 11, 2015, Delivery Agent released an investor update that stated that the "IPO process [was] progressing with continued audit delays," although it did not explain the nature of the delays.  Abdo Compl., ¶ 90; Rising Tide Compl., ¶ 86.  On April 4, 2015, Fitzsimmons sent an email to Abdo and other investors explaining that Delivery Agent "continue[s] to battle through roadblocks heading towards our IPO," including "general market conditions" and an "SEC ruling on revenue recognition, 2014 audits and 304 disclosure."  Abdo Compl., ¶ 92.  Fitzsimmons further stated that "[t]here is nothing more humanly possible our team could be doing to achieve this important milestone and we are working around the clock to resolve."  Abdo Compl., ¶ 92.

Rising Tide also first learned of the "304 issue" in March 2015.  Rising Tide Compl., ¶ 82.  On March 10, 2015, Rising Tide's representative sent an email to Power, chair of the Audit Committee, asking why there had been a delay in obtaining the 2012 and 2013 audits needed for the IPO and what else could delay the IPO.  Rising Tide Compl., ¶ 82.  Power responded that: "The main delay driver was the treatment of the revenue on a gross versus net basis.  Since [Grant Thornton] was taking a position that was counter to that taken by [the auditor], they spent additional time within [Grant Thornton] to run it all the way up their chain of command."  Rising Tide Compl., ¶ 82.  Defendant Power further stated that "I believe you are now up to speed on the 304 issue with [the auditor] that we are currently working through—there is definite risk on that front but we are actively working it."  Rising Tide Compl., ¶ 83.  He concluded that "[w]e are currently on pace to receive the reports for all three years by the end of March which is in line with the current late June IPO timeline."  Rising Tide Compl., ¶ 83.  Rising Tide previously learned of the "304 issue" before this email with Power when he explained that the Item 304 related to certain internal financial control issues the auditor had identified in connection with the company's former CFO.  Rising Tide Compl., ¶ 84.  Power gave the impression to Rising Tide that the issue was relatively minor and would be resolved easily, without ever mentioning the Super Bowl advertisement or the subsequent cover-up.  Rising Tide Compl., ¶ 84.  On or about

March 18, 2015, Rising Tide's representative met with Borcher, who informed him that Delivery Agent was still going out to an IPO but needed additional money to reach the delayed IPO. Rising Tide Compl., ¶ 87. Borcher did not offer the reasons for the delay. Rising Tide Compl., ¶ 87.

At the April 28, 2015 Board of Directors meeting, Rising Tide's representative--now a member of the Delivery Agent Board of Directors--requested a copy of the draft Item 304. Rising Tide Compl., ¶ 89. Fitzsimmons responded that it was being kept confidential and Plaintiff's representative would receive it in due course, and that the Item 304 was immaterial to the company's financial statements. Rising Tide Compl., ¶ 89. Rising Tide's representative followed up with email requests for the draft language on May 8 and May 11, 2015, but did not receive it. Rising Tide Compl., ¶ 89.

In July 2015, Delivery Agent prepared a draft Item 304 and sent it to the auditor for its response. Abdo Compl., ¶ 77. On August 5, 2015, Fitzsimmons wrote to Abdo that Delivery Agent would be able to file for an IPO as soon as August 12, 2015, "[a]ssuming [the Auditor] plays along . . . " Abdo Compl., ¶ 77. The auditor prepared a response to Delivery Agent's Item 304, which set forth Fitzsimmons' involvement in the cover-up. Abdo Compl., ¶¶ 80-84. On the same day that Rising Tide made another investment--July 21, 2015--Rising Tide finally received the draft Item 304 language. Rising Tide Compl., ¶ 92. On August 16, 2015, Fitzsimmons told Rising Tide's representative that the auditor's response was a "major setback" that may render Delivery Agent "unmarketable." Rising Tide Compl., ¶ 94. On August 19, 2015, Abdo obtained a copy of the draft Item 304 and the auditor's response. Abdo Compl., ¶ 93.

On January 14, 2016, Delivery Agent sent an update to certain investors, including Abdo, stating that the "304 [was] nearing resolution." Abdo Compl., ¶ 94. The update also stated that Delivery Agent needed more cash and was exploring selling the company. Abdo Compl., ¶ 94.

Even though it had received the draft Item 304 language and Fitzsimmons had acknowledged the issues that it potentially created, Rising Tide purchased a convertible note from Delivery Agent on March 30, 2016. Rising Tide Compl., ¶ 100. Rising Tide made the purchase in reliance on Defendants' representations that the company needed more money to survive until management could find a buyer or launch an IPO. Rising Tide Compl., ¶ 100. On April 20, 2016,

9

Abdo purchased another $1 million in a convertible note from Delivery Agent in reliance on similar representations that the company needed more cash to survive. Abdo Compl., ¶ 95.

Ultimately, Delivery Agent never went public. Abdo Compl., ¶ 7; Rising Tide Compl., ¶ 7. Delivery Agent was unable to attract a buyer or raise more cash, which led Delivery Agent to file for Chapter 11 bankruptcy in September 2016. Abdo Compl., ¶ 7; Rising Tide Compl., ¶ 7. As a result, Plaintiffs claim that their securities are now worthless. Abdo Compl., ¶ 8; Rising Tide Compl., ¶ 8.

## II.      PROCEDURAL HISTORY

Abdo filed his complaint against Defendants for violation of federal securities laws and intentional and negligent misrepresentation on February 21, 2017. Specifically, Abdo raises the following claims against all Defendants: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5; (2) violation of Section 20(a) of the Exchange Act; (3) intentional misrepresentation or omission; and (4) negligent misrepresentation. Rising Tide filed its complaint on March 8, 2017, raising the same claims. On March 15, 2017, the Court granted Rising Tide's administrative motion to relate the two cases.

On May 23, 2017, Defendants filed a motion to disqualify Abdo's counsel Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. and for limited discovery. The Court denied the motion.

On June 2, 2017, Defendants filed a total of six simultaneous motions to dismiss the two complaints. Case No. 17-cv-00851, Dkt. Nos. 21, 22; Case No. 17-cv-01232, Dkt. Nos. 19, 20, 22, 23. Defendants also filed a request for judicial notice in each case.[3] Case No. 17-cv-00851, Dkt. No. 23; Case No. 17-cv-01232, Dkt. No. 21. Plaintiffs opposed all six motions.

---

[3] Defendants have requested judicial notice of fourteen documents, which Plaintiffs oppose. Some of these are appropriate for the Court to consider on a motion to dismiss, including the draft Form S-1s, the February 3, 2014 Delivery Agent press release, and the purchase agreements that were expressly referenced and relied upon in the complaint. See Knievel v. ESPN, Inc., 393 F.3d 1068, 1076 (9th Cir. 2005) (explaining that incorporation by reference allows district courts to consider the contents of documents upon which a plaintiff's claim relies on a motion to dismiss). The Court will not take judicial notice of the remaining documents, such as the New York Times article about the Super Bowl advertisement, which are not necessary to decide these motions.

United States District Court
Northern District of California

### III.   LEGAL STANDARD

A complaint will survive a Rule 12(b)(6) motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." Lazy Y Ranch LTD v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 556 U.S. at 678.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679.  Thus, a reviewing court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.  Further, courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998).

Claims alleging federal securities fraud or state intentional misrepresentation must also satisfy Rule 9(b), which requires that the circumstances constituting the alleged fraud be "state[d] with particularity." Fed. R. Civ. P. 9(b).  Moreover, a federal securities fraud claim must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, which requires that the complaint set forth particular facts regarding each of the alleged misstatements or omissions, as well as particular facts that give rise to a "strong inference" that the defendant acted with the requisite scienter.

### IV.   DISCUSSION

#### A.   Section 10(b) and Rule 10b-5 Claims

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts establishing: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).  A securities fraud claim under Section 10(b) must meet the heightened pleading requirements of Rule 9(b), which requires

11

a party to "state with particularity the circumstances constituting fraud or mistake." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009), as amended Feb. 10, 2009. "Thus, Rule 9(b) requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 876 (9th Cir. 2012). The PSLRA further heightened these pleading standards by requiring plaintiffs bringing securities fraud claims to "plead with particularity both falsity and scienter." Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir. 2002) (quoting Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)). Thus, a securities fraud complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . " Id.

The PSLRA's pleading standards are "exacting." Zucco, 552 F.3d at 990. To establish the "required state of mind," a complaint must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." Zucco, 552 F.3d at 991 (quoting In re Daou Sys., Inc., 411 F.3d 1006, 1014-15 (9th Cir. 2005)). In the Ninth Circuit, "deliberate recklessness" is "view[ed] . . . as a form of intentional or knowing misconduct," requiring the plaintiff to plead "a highly unreasonable omission, involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Zucco, 552 F.3d at 991 (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974, 976 (9th Cir. 1999)).

A securities fraud claim will only survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues Rights, Ltd., 551 U.S. 308, 324 (2007). In light of Tellabs, the Ninth Circuit has engaged in a "dual inquiry": (1) the Court must "determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter"; and (2) "if no individual allegations are sufficient, [the court must] conduct a 'holistic' review of the same allegations to determine whether the insufficient

12

allegations combine to create a strong inference of intentional conduct or deliberate recklessness." Zucco, 552 F.3d at 992. Because falsity and scienter in securities fraud cases are generally strongly inferred from the same set of facts, the Ninth Circuit has incorporated the falsity and scienter requirements into a single inquiry. See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Co., 320 F.3d 920, 932 (9th Cir. 2003).

### 1.    Puzzle Pleading

Defendants argue that the complaints should be dismissed in their entirety because Plaintiffs rely on "puzzle pleading" to allege their claims. According to Defendants, this impermissible pleading strategy requires the Court to "'match up' the statements that form the basis of the plaintiff's claim with the reasons why those statements are misleading," which violates Rule 8 and the PSLRA by failing to plead with particularity why each alleged statement was false or misleading. Mauss v. NuVasive, Inc., 2014 WL 4161431, at *6 (S.D. Cal. Aug. 19, 2014) and Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998). Plaintiffs respond that the complaint complies with Rule 8 because it is a "short and plain statement of the claim showing that the pleader is entitled to relief" and adequately puts the Defendants on notice of the claims.

These two complaints are not comparable to the type of "puzzle" pleading that has been found to be impermissible. For instance, in Mauss v. NuVasive, Inc., which Defendants cite, the court concluded that the complaint "contains a great deal of back-drop relative to Plaintiff's claims and the Defendant's alleged violations of applicable healthcare laws . . . [but it] simply does not sufficiently link the many statements at issue to the reasons why Plaintiff believes they were impermissible misrepresentations and omissions." 2014 WL 4161431, at *6. By contrast, Plaintiffs' complaints are well-structured, logical, and clearly lay out the relevant events and misstatements and why Plaintiffs allege that those misstatements were misleading. This is not an adequate basis to dismiss either complaint.

### 2.    Group Pleading

Throughout the complaints, the vast majority of the allegations are made against Defendants as a group. Only a small number of allegations specifically plead representations that

United States District Court
Northern District of California

13

were made by Defendants Fitzsimmons, Power, Borcher, and Cowan, which are discussed separately below.[4] As a result, Defendants argue that Plaintiffs have failed to meet the heightened pleading standard as to falsity and scienter because group pleading is not permitted under the PSLRA.

Many circuits have rejected the use of group pleading after the enactment of the PSLRA, particularly following the Supreme Court's decision in Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135 (2011). See Winer Family Trust v. Queen, 503 F.3d 319, 337 (3d Cir. 2007) ("group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA"); Southland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 365 (5th Cir. 2004) ("[W]e do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded."). See also Tellabs, 551 U.S. at 326 n.6. Other courts, however, have held that group pleading survived the PSLRA. See City of Pontiac General Employees' Retirement Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) (collecting cases).

The Ninth Circuit has not addressed the issue, and district courts within the Ninth Circuit have come out on both sides. Cf. Reed v. Amira Nature Foods Ltd., 2016 WL 6571281, at *10 (C.D. Cal. July 18, 2016) (dismissing Section 10(b) claims where "plaintiffs' allegations primarily rely on group pleading"); In re Hansen Nat. Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1153-54 (C.D. Cal. 2007) ("[b]ased on the Supreme Court's refusal to overturn the Seventh Circuit's

---

[4] At the hearing, Plaintiffs also stated that there were specific allegations against Lai. They pointed to an allegation about a PowerPoint presentation that specifically included his picture and name, which, Plaintiffs contend, indicated that he was a maker of the statements in the presentation. Both complaints made several references to PowerPoints that allegedly contained misrepresentations. The complaints discuss a January 12, 2014 "Management Presentation" (Rising Tide Compl., ¶ 37), a May 12, 2014 PowerPoint presentation (Rising Tide Compl., ¶ 69; Abdo Compl., ¶ 43), and a July 18, 2014 PowerPoint presentation (Rising Tide Compl., ¶ 75). The July 18, 2014 PowerPoint presentation is the only version that was provided to the Court. The only reference to Lai is on the slide at page 46 entitled "Visionary Leadership with Seasoned Team." His picture and job title are included alongside those of ten other high-level employees of Delivery Agent. Accordingly, this slide appears to be an introduction to the company's leadership, rather than an indication of authorship of the presentation. For purposes of deciding the motions to dismiss, these PowerPoint presentations do not show statements made by Lai on an individual basis, as alleged and as provided to the Court.

14

determination . . . that the group pleading doctrine did not survive the PSLRA," the court dismissed the plaintiff's Section 10(b) claim); with In re Rocket Fuel, Inc. Sec. Litig., 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (rejecting argument that an unsigned website posting lacked attribution because the complaint adequately alleged that the defendants "possessed the power and authority to control the contents of the Company's press releases [and] investor and media presentations").

The Court need not weigh in on this disagreement because the group pleaded allegations in the Abdo and Rising Tide complaints do not meet the standard required under the group pleading doctrine for securities fraud claims. The group pleading doctrine allows a plaintiff to hold an individual liable for statements that were published as a group or by an organization. See In re ESS Tech., Inc. Sec. Litig., 2004 WL 3030058, at *12 (N.D. Cal. Dec. 1, 2004). However, courts have recognized that, in light of the PSLRA, even allegations that are made under the group pleading doctrine must "state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements." Id.[5] For example, in In re Tibco Software Secs. Litig., the court dismissed the Section 10(b) claim against an individual defendant because plaintiffs "failed to provide any particulars regarding [the defendant's] involvement in preparing any of the challenged statements." 2006 WL 1469654, at *28 (N.D. Cal. May 25, 2006). Instead, the complaint only made "conclusory allegations that 'defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements,' and that they 'participated in drafting, preparation, and/or approval of the various

---

[5] The courts in the Second Circuit have explained the doctrine similarly. In City of Pontiac, for instance, the court explained that the doctrine "allows a plaintiff to rely on a presumption that *written* statements that are 'group published,' e.g., SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'" 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (quoting Camofi Master LDC v. Riptide Worldwide, Inc., 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011)) (emphasis in original). The court explained in City of Pontiac that "there is no tension between requiring a plaintiff to allege specific facts for individual defendants and presuming that multiple corporate officers may work as a group to produce particular documents," which it concluded was in keeping with the "PSLRA's requirement that a plaintiff plead securities fraud with specificity as to each defendant." 875 F. Supp. 2d at 374 (reasoning that the plaintiff's "conclusory pleading that each defendant had 'ultimate authority' over the statements is clearly insufficient to adequately plead [defendant] made these statements").

United States District Court
Northern District of California

Case 3:17-cv-00851-TSH   Document 57   Filed 11/03/17   Page 16 of 43

public and shareholder and investor reports.'" Id.

Here, the allegations against Defendants as a group are similarly deficient. The Court will not set forth an exhaustive assessment of the complaints' allegations, as a few examples should suffice. In the Abdo complaint, Plaintiff alleges without further elaboration that "Defendants prepared and disseminated or caused to be disseminated in interstate commerce certain written materials to Plaintiffs and others on or about May 12, 2014," including a PowerPoint presentation describing the company. Abdo Compl., ¶ 43. Similarly, in the Rising Tide complaint, Plaintiff vaguely alleges that "Delivery Agent sent Plaintiffs' representative the Business Section of Delivery's draft Form S-1 . . . , which Defendants had prepared and/or approved for the Company's purportedly imminent IPO and to share with investors." Rising Tide Compl., ¶ 50. Rising Tide also alleges that it received the draft Item 304 language on July 21, 2015, and the "Company's language, prepared and/or approved by Defendants, downplayed the Super Bowl advertising campaign failure and subsequent acts by senior management to cover-up the failure." Rising Tide Compl., ¶ 92. In Abdo, Plaintiff also alleged that "Defendants prepared and/or approved a draft S-1 statement . . . and disseminated a portion of it or caused it to be disseminated in interstate commerce to potential investors, including Plaintiffs." Abdo Compl., ¶ 46. In Rising Tide, the complaint alleges that the "Series F closing materials--which were prepared, reviewed and/or approved by Defendants and sent in interstate commerce to Plaintiffs on or about March 18, 2014--did not list any of these material issues in its Schedule of Exceptions." Rising Tide Compl., ¶ 54. The Rising Tide complaint made similarly vague allegations about the creation of Series F closing documents that "Defendants provided Plaintiffs" on August 25, 2014. Rising Tide Compl., ¶ 78.

These allegations are devoid of any particular factual allegations tying the individual Defendants to the statements that were published by the company. Instead, the allegations are based on the imprecise allegations that all Defendants were somehow involved in creating the documents in an undefined way, or had even more attenuated control over statements of the company, such as: "Defendants, because of their positions in Delivery Agent, had the power and authority to control the content of any of Delivery Agent's securities offering." Abdo Compl., ¶

16

23. See also Rising Tide Compl., ¶ 22. To survive a motion to dismiss, Plaintiffs must specifically allege how any particular Defendant was connected to the making of a particular statement.[6] As they are currently drafted, neither complaint meets this standard and, as a result, the Section 10(b) and Rule 10b-5 claims are dismissed against all Defendants, with the exception of Fitzsimmons and Power, who are discussed further below. Although Defendants did not raise the question of whether the group pleaded allegations meet the pleading standard of Rule 9(b), the Court concludes that these allegations also fail that standard for the same reasons, as discussed below regarding the state law claims. Plaintiffs may amend their complaints if they believe they have a good faith basis for repleading the allegations to specify which Defendants were specifically involved in preparing the alleged misrepresentations.

### 3. Adequacy of Allegations Against Fitzsimmons

Setting aside the group pleaded allegations, most of the two complaints' remaining allegedly false statements are ascribed to Fitzsimmons. Because the allegations differ between the two complaints, the Court considers each complaint's allegations against Fitzsimmons in turn.

### a. Abdo Complaint Allegations Against Fitzsimmons

Abdo alleges that Fitzsimmons made the following misrepresentations:

- Sometime in 2014, Fitzsimmons represented to Abdo and others that Delivery Agent planned on going public before the end of 2014 (Abdo Compl., ¶ 34);

- On January 6, 2014, Delivery Agent issued a press release prior to the Super Bowl Advertisement in which Fitzsimmons is quoted as describing Delivery Agent's technology as a "game-changer for the advertising industry" and explaining that "[y]ears ago, the world talked about the potential associated with buying Jennifer Aniston's sweater. H&M, in an industry first, will now realize that potential by making their Super Bowl XLVIII ad actionable and directly measurable." (Abdo Compl., ¶¶ 32-33);[7]

---

[6] The lack of particularity as to the group pleaded Defendants also raises serious questions about the sufficiency of the complaints' scienter allegations.

[7] Abdo also made allegations regarding quotations from Fitzsimmons that were included in a February 3, 2014 press release after the Super Bowl advertisement aired. See Abdo Compl., ¶ 58. In its opposition to Fitzsimmons' motion to dismiss, Abdo conceded that these allegedly false

17

- On October 13, 2014, Fitzsimmons wrote in an email to Abdo that the explanation for the delay in the IPO was that, "We are having to do a carve-out audit of Music Today from Live Nation which is taking some time but all good.  The current plan is to confidential file in December [2014] and go out in March." (Abdo Compl., ¶75);

- On March 9, 2015, Fitzsimmons represented in a call with Abdo that the Super Bowl result was immaterial and that the auditor's position was unreasonable (Abdo Compl., ¶ 88);

- On April 4, 2015, Fitzsimmons wrote an email to Abdo and others that the company "continue[s] to battle through roadblocks heading towards our IPO," describing the reasons for the delay as "general market conditions" and the "3 key issues" of an "SEC ruling on revenue recognition, 2014 audits and 304 disclosure" and that "[t]here is nothing more humanly possible our team could be doing to achieve this important milestone and we are working around the clock to resolve" (Abdo Compl., ¶ 92); and

- On August 5, 2015, Fitzsimmons wrote an email to Abdo that Delivery Agent would file for the IPO as soon as August 12th, "[a]ssuming [the Auditor] plays along . . ." (Abdo Compl., ¶ 77).

### i.        Falsity

In his separate motion to dismiss, Fitzsimmons challenges each of these allegedly false or misleading statements as inadequate to support a federal securities fraud claim.  Three of the allegations relate to emails Fitzsimmons sent to Plaintiff about the reason the IPO was delayed, and Fitzsimmons' principal argument regarding the emailed statements is that they were non-actionable opinions under Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, __ U.S. __, 135 S. Ct. 1318 (2015).  Under Omnicare, a statement of opinion is actionable under the following circumstances: (1) where the defendant did not believe the opinion; (2) where the statement of opinion contains false embedded statements of fact; and (3) where the defendant omitted a material fact regarding the basis for the opinion that rendered it misleading to a reasonable investor "reading the statement fairly and in context."  Omnicare, Inc. v. Laborers Dist.

statements were not read and relied upon but were instead pleaded to serve as evidence of scienter.

18

Council Cost. Indus. Pension Fund, __ U.S. __, 135 S. Ct. 1318, 1326-27, 1332 (2015).

According to Fitzsimmons, those statements represent his opinions about the timing of the IPO and "[a]n opinion statement . . . is not necessarily misleading when [a speaker] knows, but fails to disclose, some fact cutting the other way." Id. at 1329. To support his argument that these emails contained non-actionable opinions he relies on Tongue v. Sanofi, 816 F.3d 199, 202 (2d Cir. 2016), in which the Second Circuit affirmed the district court's dismissal of a securities fraud claim because, under Omnicare, the defendants did not need to disclose the allegedly concealed or omitted FDA feedback "merely because it tended to cut against their projections." Id. at 212. In contrast to Sanofi, Abdo does not merely allege negative feedback from the auditor or even from the SEC for that matter. Abdo alleges that the auditor's termination and response to the Item 304 ended any possibility that Delivery Agent had for issuing an IPO and that Fitzsimmons, as a top executive of the company, was aware of that consequence. This allegation does not merely cut against Fitzsimmons' explanations for the delayed IPO but renders them false or misleading.

Two of the statements regarding the reasons for the delayed IPO—one on October 13, 2014 and one on April 4, 2015—contain statements that were not only facts but were also, according to Abdo's allegations, misleading because of the information the statements omitted. Any "reasonable investor" would certainly want to know about the auditor's firing and the reasons for the firing. For instance, while it might have been true that Delivery Agent was doing a "carve-out audit of Music Today from Live Nation," that did not inform Abdo of the crucial, relevant facts that a reasonable investor would expect to receive as to the true reason for the delayed IPO, at least as alleged in the complaint.

The remaining false statements alleged to have been made by Fitzsimmons do not adequately plead falsity. For example, Abdo vaguely alleges that Fitzsimmons stated at some point in 2014 that Delivery Agent planned to go public by the end of the year. There is no indication that this statement was false at the time it was made. See Reese v. BP Exploration (Alaska) Inc., 643 F.3d 681, 693 (9th Cir. 2011) (explaining that, "[t]o be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events") (citation omitted). Indeed, the complaint does not even specify

19

whether the statement was made before or after the Super Bowl commercial aired and the alleged cover-up took place, which could be relevant to whether Fitzsimmons sincerely held his belief that the company would go public in 2014. Moreover, the complaint's failure to allege when this statement was made renders the allegation insufficiently particular to open Fitzsimmons up to Section 10 liability.

Fitzsimmons' statements in the January 6, 2014, press release that Delivery Agent's technology is a "game-changer" and that it would mobilize H&M's potential to enable customers' real-time purchases of products in advertisements are all by themselves inactionable puffery. See In re Yahoo! Inc. Sec. Litig., 2012 WL 3282819, at *18 (N.D. Cal. Aug. 10, 2012), aff'd, 611 Fed. App'x 387 (9th Cir. 2015) (holding that statements such as "great investment" and "bright future" are "mere puffery"); In re Siebel Sys., Inc. Sec. Litig., 2005 WL 3555718, at *3 (N.D. Cal. Dec. 28, 2005) (statements "tout[ing] new products as 'technological advancements'" and asserting a company as a market leader or as "set[ting] the standard" as inactionable). The August 5, 2015, statement that the IPO would take place as soon as August 13th "[a]ssuming [the Auditor] plays along" is also too qualified to give rise to liability under the Rule 9(b) and PSLRA standards. Finally, Fitzsimmons' statement during his March 9, 2015 call with Abdo that the Super Bowl result was "immaterial" and the auditor's position was "unreasonable" is properly categorized as an opinion that does not meet Omnicare's standard for being actionable because, as pleaded, it does not contain a false embedded statement of fact. See Omnicare, 135 S. Ct. at 1326-27.

### ii.    Scienter

Fitzsimmons also argues that the allegations in the complaint do not plead a sufficient inference of scienter. To support this argument, Fitzsimmons relies on only those specific allegations in the complaint that describe his state of mind. Specifically, Fitzsimmons focuses on the allegation that he intentionally misrepresented that the Super Bowl ad campaign was a success in the February 3, 2014 press release (Abdo Compl., ¶¶ 58-59) and that he intentionally misled Abdo as to why the IPO was delayed in order to induce additional purchases of securities (Abdo Compl., ¶¶ 74-76, 92-93).

In so arguing, however, Fitzsimmons focuses solely on those allegations that use the

precise term "intentionally" and ignores the many other allegations that may be considered when assessing whether Abdo's allegations sufficiently allege his knowledge that the statements he made were false and, thus, give rise to a strong inference of scienter.  In discussing the court's inquiry when evaluating scienter on a motion to dismiss, the Supreme Court has explained that a court reviewing scienter allegations under the PSLRA must "consider the complaint in its entirety" and determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23 (emphasis in original).

Taken together, the complaint's allegations give rise to a strong inference of Fitzsimmons' scienter that is at least as compelling as the opposing inference that the allegedly false statements were made innocently.  Abdo alleges that after the Super Bowl commercial ran, Fitzsimmons was not only involved in the subsequent cover-up of the alleged failure of Delivery Agent's technology during the commercial but actually spearheaded those efforts.  Abdo Compl., ¶ 63.  As a member of Delivery Agent's Board of Directors, Fitzsimmons is also alleged to have received the findings from the Audit Committee's investigation of the cover-up, and, in that capacity, was aware that the Audit Committee and Board of Directors largely substantiated the whistleblower's claims about the cover-up and implemented a remediation plan.  Abdo Compl., ¶¶64-67. Also in his role as a member of the Board of Directors, Fitzsimmons voted to terminate the auditor after the auditor determined that it could no longer rely on management's representations in light of the Audit Committee's investigation findings.  Abdo Compl., ¶¶ 68-73.  Fitzsimmons argues that his position in the company "does not, without more, create a strong inference of scienter" (In re Dura Pharm., Inc. Sec. Litig., 452 F. Supp. 2d 1005, 1032 (S.D. Cal. 2006)), but Abdo has alleged significantly more than Fitzsimmons' position at the company to support the strong inference of scienter against him, including his personal involvement and knowledge of the circumstances that rendered his statements misleading.  In addition, although motive standing alone is not sufficient to plead scienter (see Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1166 (9th Cir. 2009)), the fact that Fitzsimmons made these alleged misrepresentations while soliciting funds from investors adds to the strength of the allegations, taken collectively, that Fitzsimmons had knowledge that his

21

statements to Abdo were misleading at the time he made them.

Contrary to Fitzsimmons' assertion that the complaint has not adequately pleaded his knowledge of the auditor issues, the complaint adequately alleges that Fitzsimmons was aware of the Item 304 disclosure issue and the auditor's response to the company's draft of the Item 304 that disclosed the auditor's termination. Abdo Compl., ¶¶ 88, 92. As Fitzsimmons points out, Abdo must plead that Fitzsimmons "knew the statements were false, or knew facts 'so obvious that [he] must have been aware' [he was] misleading the public." In re Am. Apparel, Inc. Shareholder Litig., 2013 WL 174119, at *17 (C.D. Cal. Jan. 16, 2013) (citing Zucco, 552 F.3d at 991). For all of the reasons discussed above, Abdo has met the burden of alleging facts so obvious that he must have known he was misleading Abdo. These allegations, coupled with the allegations of falsity, create a cogent inference of Fitzsimmons' scienter. As alleged in the complaint, Fitzsimmons had at least the knowledge that his statements to Abdo were false and, by making those false statements he acted, at a minimum, with "deliberate recklessness" that constituted "an extreme departure from the standards of ordinary care" and "present[ ] a danger of misleading buyers or sellers that is either known to [him] or is so obvious that [he] must have been aware of it." Zucco, 552 F.3d at 991.

#### b.    Rising Tide Complaint Allegations Against Fitzsimmons

The Rising Tide complaint also alleges that Fitzsimmons made misrepresentations to Rising Tide that subject him to Section 10(b) and Rule 10b-5 liability:

- On January 6, 2014, Delivery Agent issued a press release prior to the Super Bowl Advertisement in which Fitzsimmons is quoted as describing Delivery Agent's technology as a "game-changer for the advertising industry" and explaining that "[y]ears ago, the world talked about the potential associated with buying Jennifer Aniston's sweater. H&M, in an industry first, will now realize that potential by making their Super Bowl XLVIII ad actionable and directly measurable." (Rising Tide Compl., ¶ 40);

- On January 31, 2014, Delivery Agent issued a press release, which quoted Fitzsimmons as saying that the Super Bowl is "an important day for marketers to

22

deliver and leverage their investment in media in a meaningful way. [Delivery Agent's] part of the equation is to connect the viewer with the products seen on TV and provide robust analytics that combine viewership data with purchase data. We believe this Super Bowl will be a watershed event for the marketers we're engaged with." (Rising Tide Compl., ¶ 42);

- On February 3, 2014, the day after the Super Bowl advertisement ran, Delivery Agent quoted Fitzsimmons in another press release as saying that "H&M kicked-off a great campaign during Super Bowl XLVIII to promote their David Beckham Bodywear Collection. That same campaign kicked-off a new paradigm for advertising, fundamentally changing the discipline by making television advertising actionable and measurable." (Rising Tide Compl., ¶ 46);

- On February 6, 2014, Fitzsimmons told a representative of Rising Tide that Delivery Agent was poised for success, referred to an IPO planned for later that year, and referred to the Super Bowl advertisement as emblematic of that success (Rising Tide Compl., ¶ 49);

- Between February 13 and February 22, 2014, Fitzsimmons spoke with Rising Tide's representative five times. During those conversations, he represented that Delivery Agent's technology was proprietary, and described the Super Bowl advertisement as a success without any qualifications. Fitzsimmons told Rising Tide's representative that Delivery Agent was seeking a final round of pre-IPO funding to bridge a short cash-flow issue in anticipation of the IPO, which he said the company was on course to pursue by the end of 2014 (Rising Tide Compl., ¶ 51);

- On August 11, 2014, Fitzsimmons sent emails to Rising Tide's representative, noting that the date for Delivery Agent's IPO had changed from July 2014 to September 2014. Rising Tide's representative asked, "What is the reason for this change and management's outlook for IPO in the future?" Fitzsimmons responded, "We made a significant acquisition at the end of Q'2 (Music Today). This was

23

fully vetted with both Credit Suisse and Deutsche Bank who jointly advised the company to fully integrate and execute at least one quarter as a merged entity before going public." In this email exchange, Fitzsimmons encouraged another investment by Rising Tide, stating that Rising Tide would have "2.0X upside protection in IPO." (Rising Tide Compl., ¶ 76);

- On April 28, 2015, Rising Tide's representative requested a copy of the draft Item 304 language that was being prepared. Fitzsimmons told Rising Tide's representative that the language was being kept confidential and that he would receive it in due course. He also said that the draft Item 304 language was immaterial to the financial statements of Delivery Agent. (Rising Tide Compl., ¶ 89); and

- On August 16, 2015, after the company received the auditor's response to the Item 304 disclosure, Fitzsimmons told Rising Tide's representative that the auditor's response to the Item 304 was a "major setback" that may render Delivery Agent "unmarketable" without providing a copy of the auditor's response. (Rising Tide Compl., ¶ 94).[8]

### i.    Falsity

As in his motion to dismiss the Abdo complaint, Fitzsimmons principally argues that these statements were either nonactionable opinions under Omnicare or were not false. Fitzsimmons argues persuasively that some of these statements are not actionable.

As discussed above, the statements in the January 6, 2014 press statement are nonactionable puffery. For the very same reason, the statements attributed to Fitzsimmons in the January 31, 2014 press statement are also nonactionable puffery. Most of Fitzsimmons'

---

[8] The Rising Tide complaint also alleges, like the Abdo complaint, that Fitzsimmons sent an email dated August 5, 2015, in which he said that Delivery Agent would be able to file for an IPO as soon as August 12, "[a]ssuming [the Auditor] plays along . . ." Rising Tide Compl., ¶ 93. Unlike the Abdo complaint, however, the Rising Tide complaint does not indicate that Rising Tide received the email or had any knowledge of it at the time. Indeed, Rising Tide conceded in its opposition that it does not contend that it relied on this August 5, 2015 email from Fitzsimmons, but that it was pleaded to support the scienter allegations.

24

United States District Court
Northern District of California

statements in the February 3, 2014, are also nonactionable puffery and are not false. The only statement in the February 3, 2014 press release that is actionable is the statement that the Super Bowl commercial made television advertisement "actionable and measurable." Rising Tide Compl., ¶ 46. This statement, as alleged, while not completely false, was misleading by omission. The complaint alleges that "585 of the 600 pieces of the H&M merchandise available for sale through the Super Bowl campaign had been purchased by Delivery Agent employees." Rising Tide Compl., ¶ 44. This allegation that 15 pieces of clothing were successfully purchased using the company's technology during the Super Bowl commercial supports the inference that Delivery Agent's technology worked for at least some small number of consumers, which made the technology at least technically "actionable and measurable." However, the comment fails to account for the fact that Fitzsimmons is alleged to have orchestrated a scheme to significantly increase the number of sales during the Super Bowl commercial by directing Delivery Agent employees to make purchases of the items for sale and make false sales reports to create the false impression that the commercial was more successful than it actually was. These allegations of falsity render Fitzsimmons' statement in the February 3, 2014 press release actionable.

The April 28, 2015, statements to Rising Tide's representative during the Board of Directors meeting that the Item 304 draft language was being kept confidential and was immaterial to the financial statements of the company are not actionable. The statement that the language was being kept confidential was not false; in fact, Rising Tide alleges that it did not receive the draft Item 304 language until July 21, 2015, approximately three months later. Rising Tide Compl., ¶ 92. Regarding the issue of materiality, there is no specific allegation that the draft Item 304 language was material to the company's financial statements, although it seems obvious that the issues raised in the Item 304 and the auditor's response would be material and significantly impact the company's financial statement in the near future. Therefore, Fitzsimmons' statements on April 28, 2015 are not actionable under Section 10(b).

The August 16, 2015 statements that Fitzsimmons made to Rising Tide's representative that the auditor's response to the company's Item 304 disclosure was a "major setback" that may render Delivery Agent "unmarketable" are also not actionable. These are statements of opinion

25

and Rising Tide has alleged no basis for liability under Omnicare.  The statements that Fitzsimmons made to Rising Tide on February 6, 2014, and between February 13 and February 22, 2014, are examples of vague corporate puffery and, in the case of the statement that the company was on course for an IPO by the end of 2014, were not necessarily false at the time.  For example, Fitzsimmons' statement that the company was "poised for success" is the type of vague corporate optimism that courts routinely reject as a basis for establishing securities fraud liability.  See In re Caerre Corp. Sec. Litig., 837 F. Supp. 1054, 1057-58 (N.D. Cal. 1993).  See also Callan v. Motricity, Inc., 2013 WL 5492957, at *7 (W.D. Wash. Oct. 1, 2013), aff'd sub nom. Mosco v. Motricity, Inc., 649 Fed. App'x 526 (9th Cir. 2016) ("[M]any courts have deemed statements indicating a company is 'on track' too vague to be actionable.").  The statement that Delivery Agent's technology was "proprietary" was also not false according to Rising Tide's allegations.  "Proprietary" signifies that Delivery Agent owned the technology that was used in the Super Bowl commercial.  Merriam-Webster defines "proprietary" as meaning "of, relating to, or characteristic of an owner or title holder."  MERRIAM-WEBSTER'S DICTIONARY (online edition, accessed Oct. 12, 2017)).  The complaint merely alleges that the technology did not work, not that Delivery Agent did not own it.  Thus, the allegations relating to the proprietary nature of the technology are not false.

However, Fitzsimmons' statements in the August 11, 2014 email exchange with Rising Tide's representative do adequately allege falsity.  In response to a question from Rising Tide's representative about the reason for the delay in the Delivery Agent IPO, Fitzsimmons responded that the delay was the result of the acquisition of Q'2 (Music Today).  According to the complaint's allegations, Fitzsimmons made this statement shortly after the company's Board of Directors voted unanimously to fire the auditor on July 29, 2014, which triggered the need to file an Item 304 about the reasons for the auditor's termination and request a response from the auditor.  Rising Tide Compl., ¶¶ 60-61.  Fitzsimmons argues that Rising Tide cannot impose Section 10(b) liability for these statements because they were not false and Rising Tide has made no showing to the contrary beyond conjecture or assumption.  While it may have been true that the delay was partially attributable to the integration of a newly acquired company (Music Today), the

26

Court must accept as true Rising Tide's allegations that the IPO was effectively impossible because of the company fired the auditor and the company would be unable to issue an IPO after the Item 304 and the auditor's response were made public.  By alleging that Fitzsimmons withheld information from Plaintiff about the Super Bowl cover-up and dispute with the auditor, the complaint alleges with particularity that Fitzsimmons misrepresented the reason for the delay.

### ii.      Scienter

Fitzsimmons also argues that the Rising Tide complaint has not adequately alleged that Fitzsimmons made these statements, including the August 11, 2014 statement about the delay in the IPO, with scienter.  Because the two complaints make practically identical allegations about the overall circumstances of Fitzsimmons' role in the Super Bowl commercial, the subsequent cover-up, and the dispute with the auditor, the Court's discussion of the adequacy of the scienter allegations in the Abdo complaint is equally applicable to the Rising Tide complaint.  Accordingly, for the reasons stated above, the Rising Tide complaint's allegations give rise to a strong inference that Fitzsimmons acted with scienter when he made the allegedly false statements discussed above.

### 4.      Adequacy of Allegations Against Borcher

Only the Rising Tide complaint makes allegations that Borcher personally made false or misleading statements.  Specifically, the complaint alleges that he made false statements about an imminent IPO in June 2014 and March 2015.  On June 11, 2014, he gave glowing reports regarding Delivery Agent and stated that an IPO was imminent.  Rising Tide Compl., ¶¶ 66-67.[9] On or about March 18, 2015, Borcher met with Plaintiff's representative and stated that Delivery Agent was still going to launch an IPO but it needed short-term bridge financing in the meantime. Rising Tide Compl., ¶ 87.  During that meeting, Rising Tide alleges that Borcher "did not provide

---

[9] With respect to Borcher's contacts with Rising Tide in 2014, Borcher's reply brief states that the Court should ignore the alleged statements made in March and April 2014 because the complaint alleges only a June 2014 statement by Borcher and instead attributes the March and April 2014 statements to Cowan.  Although the complaint alleges that both Cowan and Borcher "met repeatedly" with Plaintiff's representative in March and April 2014, the Court reads the complaint to only allege that Borcher made statements to Plaintiff's representative during a call on June 11, 2014.  Compare Rising Tide Compl., ¶ 66 with Rising Tide Compl., ¶67.

United States District Court
Northern District of California

the full reasons for the delay in proceeding with the IPO, or that an IPO likely would never be possible . . . " Rising Tide Compl., ¶ 87.

Borcher filed a separate motion to dismiss to address the specific allegations made against him as a member of the Audit Committee. Like Fitzsimmons, he challenges the allegations on the grounds that they fail to meet the heightened pleading requirements for falsity and scienter.

### i.    Falsity

Borcher cites Omnicare for the position that he cannot face liability for nonactionable opinions, and he also argues that his alleged statements were not false. As an initial matter, the allegations in paragraph 67 that Borcher made "glowing reports" to Rising Tide and represented that the IPO was "imminent" fail to allege the false statements he made with particularity, as required under Rule 9(b) and the PSLRA. Without any detail as to what Borcher is alleged to have actually said to Rising Tide, there is no basis for allowing a claim against him to proceed past the motion to dismiss stage. The same is true of the vaguely paraphrased statement in paragraph 87 in which Borcher allegedly told Rising Tide's representative that Delivery Agent was still going to issue an IPO but needed an additional round of short-term bridge financing to allow the company to continue operating in the meantime. Without more detail, it is impossible for the Court evaluate, based on these summarized statements, whether the alleged statements can be properly characterized as false for purposes of this motion to dismiss.

Even assuming these allegations were pleaded with sufficient particularity, Rising Tide's reliance on Warshaw to support its allegations about Borcher's statements that an IPO was "imminent" is unavailing. There, the defendant repeatedly issued "misleading, optimistic public statements" that the FDA approval for a drug was "progressing positively" and "imminent," even though the defendant knew approval was far-fetched. See Warshaw v. Xoma Corp., 74 F.3d 955, 958-59 (9th Cir. 1996). The court found that these "general statements of optimism, when taken in context, may form a basis for a securities fraud claim[.]" Id. at 959. Borcher responds that he cannot face securities fraud liability for predictions that later prove to have been "overly optimistic" because they "do not rise to the level of a material misrepresentation actionable under the securities laws." Browning v. Amyris, Inc. , 2014 WL 1285175, at *11 (N.D. Cal. Mar. 24,

2014) (quoting In re Daou Sys., 411 F.3d at 1021).

The "context" in Warshaw was that the statements about imminent approval were made on the same day that a report issued saying that there was no hope of FDA approval. Id. at 957-58. Rising Tide has not alleged a similarly close nexus between Borcher's statements of optimism and contemporaneous events that unequivocally provided a basis for terminating that optimism, as the court found in Warshaw. Here, the statements were made in June 2014, before Delivery Agent had terminated the auditor. Accordingly, in the context of this case, these statements are insufficiently precise statements of corporate optimism without a context that nullifies any basis for optimism. See In re Dot Hill Sys. Corp. Sec. Litig., 594 F. Supp. 2d 1150, 1159-60. Accordingly, Rising Tide's Section 10 claims against Borcher are dismissed. Rising Tide may amend the complaint as to these claims if it has a good faith basis for doing so.

### ii.    Scienter

Borcher also contends that the Section 10 claims against him must fail because the complaint's allegations do not establish scienter. The Court notes that Borcher was a member of the Board of Directors and the Audit Committee and would have had detailed knowledge of the Audit Committee's investigation of the cover-up and the Board of Directors' subsequent termination of the auditor. Contrary to Borcher's argument, Rising Tide's allegation that Borcher knew his statements were false when made is consistent with the overall facts alleged about his role in the investigation of the cover-up and subsequent events that, according to Rising Tide's allegations, made it obvious that "an IPO was almost certainly impossible in light of the Auditor's position and the coming Item 304." Rising Tide Compl., ¶ 68. However, because Rising Tide has not adequately alleged plausible misrepresentations against Borcher, the federal securities fraud claim against Borcher fails. See No. 84 Employer-Teamster Joint Council, 320 F.3d at 932 (incorporating the falsity and scienter requirements into a single inquiry).

### 5.    Adequacy of Allegations Against Power

The Rising Tide complaint also made two specific allegations attributing misrepresentations to Power. The first statement was contained in a March 10, 2015 email from Power to Rising Tide stating that the IPO had been delayed because of an issue regarding the

United States District Court
Northern District of California

29

company's audited financial statements.  Specifically, he said that "[t]he main delay driver was the treatment of the revenue on a gross versus net basis.  Since [Grant Thornton] was taking a position that was counter to that taken by [the Auditor], they spent additional time within [Grant Thornton] to run it all the way up their chain of command."  Rising Tide Compl., ¶ 82.  The same email contained his second statement in which he stated that Rising Tide had been brought "up to speed on the 304 issue" and that "[w]e are currently on pace to receive the reports for all three years by the end of March which is in line with the current late June IPO timeline."  Rising Tide Compl., ¶ 83.  The complaint also alleges that in a separate conversation before this March 10, 2015 email exchange, Power told Rising Tide that the "304 issue" was related to internal financial control issues in connection with the company's former Chief Financial Officer and that, while Delivery Agent would need to file an Item 304, the issue was relatively minor and easily resolved.  Rising Tide Compl., ¶ 84.

### i.      Falsity

Although Power relies on Omnicare to argue that these statements were nonactionable opinions, Rising Tide persuasively responds that Power's statements about the IPO's delay were statements of fact that were false when made.  Power was not merely stating his opinion that the IPO was delayed because of the revenue recognition issue.  Instead, he represented that the proffered reason for the delay (*i.e.*, the revenue recognition issue) was fact, which Rising Tide adequately alleges was false because the true reason for the delay at this point in time was the issue with the Super Bowl cover-up and subsequent dispute with the auditor.  Power further argues that his "main delay driver" statement cannot give rise to Section 10(b) liability because the complaint does not allege that the statement was false, but simply alleges that it was misleading because it did not also disclose "the Super Bowl campaign failure, its cover-up, and the Auditor's complete lack of faith in management."  Rising Tide Compl., ¶ 84.

It is true that the complaint does not allege that Power was incorrect that there was a revenue recognition issue.  As Power seems to recognize, that is because Rising Tide seeks to impose liability on the basis of an omission that rendered his statement misleading. The question is whether Rising Tide has alleged that this omission was a "highly unreasonable omission" or "an

30

extreme departure from the standards of ordinary care." Zucco, 552 F.3d at 991. The Court concludes that Rising Tide has met this standard, as providing investors with only one minor, rectifiable excuse for the delay while omitting other much more serious and calamitous reasons for the delay is a "highly unreasonable omission."

### ii. Scienter

As with Fitzsimmons and Borcher, Power argues that the complaint fails to plead scienter. However, during the entire relevant period, Power was a member of the Board of Directors and Chairman of the Audit Committee. Upon learning of an alleged cover-up of the Super Bowl campaign from a whistleblower, the Audit Committee conducted both internal and external investigations of the allegations. These investigations' findings largely substantiated the whistleblower's allegations. After the Board of Directors attempted to characterize these findings as financially immaterial and the company's auditor challenged this characterization, the Board of Directors unanimously terminated the auditor, which triggered the obligation to file an Item 304 with the Securities and Exchange Commission.

As Chairman of the Audit Committee and a member of the Board of Directors, Rising Tide has specifically and plausibly alleged that Power was aware of these events. Power relies on Jacobs v. Coopers & Lybrand, L.L.P, 1999 WL 101772, at *16 (S.D.N.Y. 1999), in which the court held that a member of the audit committee could not be charged with implied knowledge of the company's finances. In contrast, here, Rising Tide has alleged that as a Chairman of the Audit Committee and member of the Board of Directors Power was personally involved in each step outlined above and therefore had express knowledge. Power's misleading statements and personal involvement in the omitted events that made those statements misleading give rise to a strong inference of scienter.

### 6.    Adequacy of Allegations Against Cowan

The Rising Tide complaint alleges two instances in which Cowan made statements to Rising Tide, through Rising Tide's representative,[10] in phone calls on March 12 and April 14,

---

[10] With respect to the allegedly false or misleading statements that Rising Tide alleges that it learned of through "Plaintiff's representative," Defendant argues that these allegations fail to

31

2014. Rising Tide Compl., ¶ 67. According to the complaint, Cowan gave "glowing reports" about the company, encouraged Rising Tide to invest, assured Rising Tide that an IPO was "imminent," and that additional funds were needed to get the company to the IPO. Rising Tide Compl., ¶ 67. The complaint further alleges that these representations were false and misleading. Rising Tide Compl., ¶ 68. The complaint makes no other allegations about representations made by Cowan.

As to his knowledge and scienter, the complaint alleged that he was "intimately involved in the Company's affairs" and "frequently" attended meetings of the Board of Directors, even though he was merely a partner at one of Delivery Agent's large investors and had no formal role with the company. Rising Tide Compl., ¶ 66. The complaint further alleges that he was "heavily involved in recruiting additional investments as the Company burned through capital in 2014." Rising Tide Compl., ¶ 66. Aside from these vague allegations that Cowan was "intimately involved" with the company, the complaint otherwise provides no allegations as to how Cowan allegedly became aware of the H&M advertisement, the subsequent cover-up, and the dispute with the auditor. Rising Tide Compl., ¶ 68.

Regardless of whether these allegations sufficiently plead falsity, the complaint plainly fails to allege Cowan's scienter with the requisite specificity. Rising Tide has only made general assertions that Cowan was aware of these events, but those general assertions of knowledge are not sufficiently particular to raise a "strong inference" of Cowan's scienter. Cowan is an outsider--merely a partner of one of Delivery Agent's large investors. Vague allegations that Cowan gained intimate knowledge of the company and attended some Board of Directors meetings do not suffice, particularly where the allegations do not indicate that any of the relevant events were imparted through that intimate knowledge or discussed in the Board of Directors meetings at

satisfy Rule 9(b)'s heightened pleading standard for allegations of fraud because they do not adequately inform Defendants of the "'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (quoting Edwards v. Marin Park, Inc., 356 F.3d 1058, 1066 (9th Cir. 2004)). Consistent with the notice principle that underlies the particularity requirement, Rule 9(b) only requires the identification of the *parties* to the misrepresentation. These allegations identify the parties to the statements and give Defendants notice of the claims against them. The Swartz case upon which Defendants rely requires nothing more.

32

which Cowan was in attendance.  To meet their burden to allege scienter, significantly more detail would be required to show that Cowan obtained relevant information and how he obtained it. Accordingly, the Section 10 claims against Cowan are dismissed.  Rising Tide is granted leave to amend the complaint as to these claims, although the Court is skeptical that it would be able to adequately amend.

### 7.      Allegations of Reliance

Defendants challenge the adequacy of Plaintiffs' reliance allegations on several grounds, each of which the Court will address in turn.  First, Defendants argue that provisions of the purchase agreements included a representation that "no public market now exists for any of the securities issued by the Company, and that the Company has made no assurances that a public market will ever exist for the Securities or any Common Stock shares issuable upon conversion or exercise thereof."  Request for Judicial Notice, Exs. A, B, G, & H § 3.9.  Those same purchase agreements also include an integration clause.  Id., Ex. A & G.  Accordingly, Defendants contend that sophisticated investors, such as Plaintiffs, could not reasonably rely on alleged misrepresentations that are contrary to the representations and warranties to which they agreed to in the purchase agreements.

It is generally inappropriate to decide the question of whether a party relied on the alleged representations at the motion to dismiss stage.  See Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615, 619 (9th Cir. 1981).  It is too early to tell whether a representation in the purchase agreements that "no public market now exists for any of the securities issued by the Company, and that the Company has made no assurances that a public market will ever exist" rendered Plaintiffs' reliance on the alleged misrepresentations unreasonable.

Furthermore, the cases Defendants cite for this argument are distinguishable.  In the case that addressed a disclaimer in the context of a federal securities fraud claim, Harsco Corp. v. Segui, 91 F.3d 337 (2d Cir. 1996), the court examined the effect of certain representations and warranties in an arms-length purchase of a company where the parties engaged in disclosures and due diligence.  There are no claims by either side that the parties to this case engaged in any similar negotiations or due diligence.  The other cases Defendants rely upon are similarly

33

distinguishable. For instance, in <u>Frati v. Saltzstein</u>, the court granted the defendant's motion to dismiss the federal securities claims because the misrepresentations that the plaintiff allegedly relied upon were "patently unreasonable," such as whether the defendant's sister also invested in the fund. 2011 WL 1002417, at *4. The Court cannot make a similar conclusion that any reliance on the alleged misrepresentations by Fitzsimmons and Power was "patently unreasonable" under these circumstances. The <u>Frati</u> case is also distinguishable because the integration clause barred reliance on any oral *representations or warranties* (<u>id</u>.), whereas the integration clause in the purchase agreements in this case barred reliance on "any and all other written or oral *agreements*." <u>See</u> Request for Judicial Notice, Ex. A & G § 7.10 (emphasis added).

Second, Defendants argue that the claims based on Abdo's final purchase of $1 million of a convertible note for the Abdo 1976 Trust on April 20, 2016 must be dismissed because the purchase was made after disclosure of the alleged misstatements and omissions. Defendants argue that any such reliance was unreasonable. They further argue that an additional purchase of Delivery Agent's securities after disclosure calls into question whether Abdo relied on any of the statements that were allegedly false. This is a factual issue that cannot be resolved on a motion to dismiss because, as Abdo points out, it has alleged that Fitzsimmons continued to represent that an IPO was still possible (Abdo Compl., ¶¶ 93-96), such as in his April 4, 2015 email to Abdo about the reasons for the delayed IPO (Abdo Compl., ¶ 92). These allegations raise a factual question of reliance that cannot be resolved at this point in the litigation.

Defendants make a similar argument with respect to Rising Tide's final purchase of a $650,000 convertible note on March 30, 2016, arguing that any claims relating to that purchase should be dismissed because the purchase was made after disclosure of the alleged misstatements and omissions. Although the Court is not entirely convinced by Rising Tide's argument that the final purchase in March 2016 was necessarily reasonable as a means of mitigating its damages, the Court concludes that the reasonableness of Rising Tide's reliance in March 2016 is a factual issue that cannot be resolved at this stage of the litigation, as the complaint alleges that Rising Tide made the purchase based on continuing representations that the company was still attempting to find a buyer. Rising Tide Compl., ¶ 100. Moreover, even if Rising Tide's reliance was

unreasonable with respect to its last purchase in March 2016, which the Court declines to decide on this motion, that does not resolve the question in Defendants' favor as to Rising Tide's reliance on misrepresentations when purchasing earlier securities.

Third, Defendants challenge Plaintiffs' reliance on the draft Form S-1 because the Ninth Circuit has held that a party cannot reasonably rely on a draft statement. See Shamut Bank, N.A. v. Kress Assocs., 33 F. 3d 1477, 1484 n.1 (9th Cir. 1994). However, as with the other reliance arguments, the reasonableness of Plaintiffs' reliance on these draft documents is an issue of fact that the Court cannot resolve on these motions. In Shamut Bank, which was decided on a motion for summary judgment, the court found that reliance was not justifiable because the defendant ultimately issued a final version that superseded the draft. Id. Whether Plaintiffs were justified in relying on the draft at issue here likely depends on context that is not available to the Court at this time.

Finally, Defendants argue that Plaintiffs failed to allege that they read or relied on a number of statements alleged in the complaints. Specifically, Defendants have raised this argument with respect to the Abdo complaint at paragraphs 32-33 (January 6, 2014 press release), 58 (February 3, 2014 press release), and 90 (March 2015 Investor Update), and that Abdo's conclusory statements that they relied on certain statements (paragraphs 56-57 and 127) are insufficient to plead reliance with particularity. With respect to the Rising Tide complaint, Defendants made the same arguments regarding paragraphs 39-40 (the January 6, 2014 press release), 42 (the January 31, 2014 press release), 46 (the February 3, 2014 press release), and 86 (the March 2015 Investor Update). Defendants also contend that Rising Tide's conclusory statements that they relied on certain statements (paragraphs 80, 90, 91) are insufficient to plead reliance with particularity.

However, essentially none of these allegations have survived the Court's group pleading or falsity analysis and, as pleaded, cannot serve as a basis for Section 10 liability. Even if they could, Plaintiffs have failed to plead reliance as to a number of the challenged statements. With respect to the specific paragraphs challenged in the Abdo complaint, Abdo responds that it did not allege that it relied on the allegations in paragraphs 32-33 and 58, and instead it made those allegations to

United States District Court
Northern District of California

further bolster the complaint's scienter allegations. It also responds that it did rely on the allegations in paragraph 90 about the March 2015 Investor Update, and cites paragraphs 105 and 112 of the complaint to support that reliance. Paragraphs 105 and 112 do not specifically allege that Abdo relied on the March 2015 Investor Update and, therefore, Abdo did not plead reliance on the statements contained in that document. With respect to the challenged paragraphs in the Rising Tide complaint, Rising Tide has not alleged that it relied on the statements in paragraphs 39-40, 42, 46, and 86. However, for paragraphs 80, 90, and 91, Rising Tide specifically states that it relied on the statements. Therefore, Rising Tide has adequately alleged reliance as to the statements referenced in those paragraphs of the complaint. Moreover, these arguments fail more generally because "a presumption [of reliance] is generally available to plaintiffs alleging violations of section 10(b) based on omissions of material fact." Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999).

**B.    Section 20(a) Claims**

In addition to primary violations of the federal securities laws, Plaintiffs also allege that all Defendants are subject to secondary liability for violations under Section 20(a) of the Exchange Act. To state a claim for Section 20(a) liability, a party must "demonstrate 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" Zucco, 552 F.3d at 990. See also Howard v. Everex Sys., Inc., 228 F. 3d 1057, 1065 (9th Cir. 2000). As stated above, Plaintiffs have adequately alleged that Fitzsimmons and Power were primary violators of Section 10.

The question that remains is whether Plaintiffs have sufficiently alleged that any Defendants exercised actual power or control over the primary violator. Generally, "at the motion to dismiss stage, courts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control." In re Montage Tech. Grp. Ltd. Sec. Litig., 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015) (citation and quotation marks omitted); In re Adaptive Broadband Sec. Litig., 2002 WL 989478, at *19 (N.D. Cal. Apr. 2, 2002) ("[t]he fact that the named individual defendants held important positions in the company is sufficient at the pleadings stage"); In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1031-32 (S.D. Cal. 2005)

United States District Court
Northern District of California

36

(allegations of CEO and Chairman's day-to-day involvement with the business were sufficient to establish control).

Here, Defendants, with the exception of Cowan, are all officers or directors *and* Plaintiffs have made numerous allegations about Defendants' involvement in the management of Delivery Agent. According to the allegations, several Defendants were implicated in the alleged cover-up after the 2014 Super Bowl advertisement, and the Board of Directors and the Audit Committee received reports on the Audit Committee's and outside law firm's investigations. The complaints also allege that Defendants voted to approve the security offerings. Regarding a violation of Section 20(a), Plaintiffs allege that Defendants were controlling persons of Delivery Agent, not that they were controlling persons of Fitzsimmons or Power. Abdo Compl., ¶¶ 118-22; Rising Tide Compl., ¶¶ 122-26. Aside from the general presumption of control that arises from Defendants' high-level positions, Plaintiffs have not alleged how the individual Defendants exert or could have exerted control over Fitzsimmons or Power. Fitzsimmons was CEO of the company and a member of the Board of Directors, and Power was Chairman of the Audit Committee and on the Board of Directors. At least one court in the Central District of California dismissed a Section 20(a) claim against an individual defendant who was a Vice President of a company, concluding that he could not have had control person liability over other individual defendant primary violators because they were his "peer Vice Presidents or his supervisors" and the allegations did not clarify how he "was able to exercise control over" those violators given their relative positions at the company. Middlesex Retirement Sys. v. Quest Software Inc., 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007).

At the hearing on the motions to dismiss, Plaintiffs argued that the Section 20 claim against the Defendants should be allowed to survive the motions to dismiss because, as a matter of corporate governance, the CEO and members of the Audit Committee are controlled by the Board of Directors.[11] Plaintiffs have only brought claims against individuals and not the company Delivery Agent and, therefore, only individual directors are the alleged primary violators. All of

[11] At the hearing, the parties represented that the company did not have a chairman of the Board of Directors.

37

the control person allegations in both complaints relate to Defendants' control over Delivery Agent, *not* Fitzsimmons or Power. Further, the relevant allegations do not specifically address the issue of whether the CEO and members of the Audit Committee are controlled by the Board of Directors. To the extent that Plaintiffs allege that the corporate structure of Delivery Agent and each individual Defendant's role in that structure are the sources of Defendants' control over Fitzsimmons and Power, they must specifically allege that basis in their complaints. For that reason, the Section 20(a) allegations are dismissed as to all Defendants with leave to amend.

The Section 20(a) allegations are problematic for other reasons as well. First, with respect to the Rising Tide complaint, the Section 20(a) allegations are made as to all "Defendants," a defined term that includes Cowan, who is not a member of the Board of Directors, the Audit Committee, or even an employee of Delivery Agent. The only allegation that could be construed as specifying his control is that he "was intimately involved in the Company's affairs and frequently attended Board Meetings, even though, on information and belief, he had no formal position at Delivery Agent" and that he "receiv[ed] updates from Borcher." Rising Tide Compl., ¶¶ 66-67. Mere attendance at meetings of the Board of Directors and in-depth knowledge of the company do not plausibly allege that Cowan actually had any control or influence over the actions of the primary violators. See Teamsters Local 617 Pension & Welfare Funds, 690 F. Supp. 2d at 980 (dismissing Section 20(a) claim against a defendant who was neither an officer nor a director because should "could not have 'controlled' Apollo . . . in any way"). Thus, unless Rising Tide can amend its complaint to allege any additional facts demonstrating Cowan's control over Fitzsimmons or Power, the Section 20(a) claim may not proceed against Cowan.

Finally, to the extent that individual Defendants may be subject to Section 20(a) control-person liability, Plaintiffs will also need to allege the time periods during which individual Defendants held their positions at Delivery Agent. As Defendants point out, Badran and Peters apparently did not serve on the Board of Directors for the entire relevant period. Badran resigned from the Board in April 2015 and Peters joined the Board in November 2014. Officers and directors cannot be found "liable as control persons under Section 20(a) for alleged violations that took place before they assumed their positions." Id. at 979.

United States District Court
Northern District of California

## C.    State Law Intentional Misrepresentation Claims

To state a claim for intentional misrepresentation under California law, a plaintiff must plead: (1) a knowingly false representation by the defendant; (2) made with the intent to deceive or induce reliance by the plaintiff; (3) justifiable reliance by the plaintiff; and (4) resulting damage. See Wilkins v. Nat'l Broad. Co., Inc., 71 Cal. App. 4th 1066, 1081 (1999).  As with the federal securities fraud claims, the state law allegations of fraud must be pleaded with particularity.  See Small v. Fritz Companies, Inc., 30 Cal. 4th 167, 184 (2003); Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009).

### 1.    Group Pleading

Once again, Defendants challenge Plaintiffs' reliance on group pleading as the basis for the state law claims and argue that the complaints' allegations fail to specifically identify who made the alleged misrepresentation and what they said.  See Goldrich v. Nat. Y Surgical Specialties, 25 Cal. App. 4th 772, 783 (1994).  As most of the allegations in the complaint group together "Defendants" and "Delivery Agent officers and/or directors," Defendants contend that Plaintiffs' allegations are insufficient to support a fraud claim under California law.

Citing various cases from courts outside of California, Plaintiffs respond that group pleading is viable for state law claims, particularly in light of the fact that liability for fraudulent misrepresentation is not limited to the "maker" of the misrepresentation under California law.  The cases Plaintiffs rely upon to argue that liability is not limited to the "maker" under California law do not squarely support that proposition.  See Frances T. v. Village Green Owners Ass'n, 723 P.2d 573, 580 (1986) (generally addressing the standard for imposing joint liability on corporate directors in negligence case); PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1381-82 (Cal. Ct. App. 2000) (addressing the same in trade secrets case); Hawran v. Hixson, 209 Cal. App. 4th 256, 277 (Cal. Ct. App. 2012) (addressing the same in a defamation, invasion of privacy, and unfair competition law case).  Significantly, these cases do not address directors' liability in the context of a fraud claim where the pleading standard is heightened.

The Court has not identified and Plaintiffs have not cited any California authority permitting the group pleading of fraud allegations, although other states permit group pleading and

39

a complaint could, under the right circumstances, adequately allege a fraud claim through group pleaded allegations. Some federal courts have found that group pleaded claims of fraud are not sufficient to meet Rule 9(b). See, e.g., Buley v. Homecomings Financial LLC, 2015 WL 12683808, at *3 (C.D. Cal. Apr. 9, 2015) (group-pleaded complaint failed to state fraud claim against individual defendants because it failed to allege "which individuals from each corporate entity said or did what"). The Ninth Circuit has held, albeit in a slightly different context regarding group-pleaded allegations of a conspiracy to commit fraud, that "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant[.]'" Swartz v. KPMG LLP, 476 F.3d at 764 (quoting Haskin v. R.J. Reynolds Tobacco Co., 995 F. Supp. 1437, 1439 (M.D. Fla. 1998)). "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, "identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme." Id. at 765 (quoting Moore v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir. 1989)). As discussed above with respect to the federal securities claims, Plaintiffs' group-pleaded allegations against all Defendants fail to allege any detail as to each individual Defendant's role in preparing the various documents, such as the press releases and PowerPoint presentations. The only such detail purporting to establish each Defendant's role in making the statements are allegations about each Defendant's position at Delivery Agent. Under the heightened pleading standards of Rule 9(b), these unsupported allegations are insufficient.

This lack of particularity is highlighted by the fact that the complaints' defined term "Defendants," which is the term used to group-plead representations that were issued by the company, is over-inclusive. As Defendants point out in their motions and as discussed above, Badran and Peters did not serve on the Board of Directors for the entire relevant period, and therefore cannot be held responsible for all group-pleaded statements in the two complaints. Moreover, Cowan, who is not alleged to have been an employee, officer, or director of Delivery Agent, is nevertheless included in the defined term "Defendants" in the Rising Tide complaint. Cowan cannot possibly be held liable for statements from a company in which he had no formal role or control. Accordingly, the state law claims for intentional misrepresentation are dismissed

40

United States District Court
Northern District of California

as to all Defendants, except Fitzsimmons and Power, with leave to amend.

### 2.    Misrepresentation or Omission

To the extent that Defendants argue that the complaints do not state an intentional misrepresentation claim under California state law because they do not allege that Fitzsimmons and Power made intentional misrepresentations or omissions, those arguments fail for the reasons discussed above.

### 3.    Reliance

Defendants provide numerous arguments that Plaintiffs' alleged reliance on Defendants' statements was not reasonable, such as the fact that Plaintiffs are sophisticated venture capital investors or that Plaintiffs' reliance was undercut by their continued investment in Delivery Agent after receiving disclosures about the alleged Super Bowl cover-up and the auditor's firing. However, as Plaintiffs convincingly argue, whether reliance was justified is generally a question of fact that should not be resolved on a motion to dismiss. See Alliance Mortg. Co. v. Rothwell, 900 P.2d 601, 609 (Cal. 1995) ("Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."). This includes the question of whether Plaintiffs' reliance was justified in light of the disclaimer provisions in the purchase agreements, which is a question better resolved on summary judgment.

### D.    State Law Negligent Misrepresentation Claims

Under California law, a Plaintiff must allege the following elements to establish a negligent misrepresentation claim: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) justifiable reliance on the misrepresentation by the party to whom it was directed; and (3) resulting damage. See Small v. Fritz Co., Inc., 30 Cal. 4th 167, 173-74 (2003). "[I]n a claim for negligent misrepresentation, the plaintiff need not allege the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believe the statement to be true." Charnay v. Cobert, 145 Cal. App. 4th 170, 184 (Cal. Ct. App. 2006).

The parties disagree on which pleading standard applies to Plaintiffs' claims--the

41

heightened standard of Rule 9 or the general pleading standard of Rule 8.  While some courts have held that Rule 9 applies to negligent misrepresentation claims, others have held that Rule 8 applies to negligent misrepresentation claims.  See Petersen v. Allstate Indem. Co., 281 F.R.D. 413, 418 (C.D. Cal. 2012).  This Court has addressed the issue on multiple occasions and has concluded that the applicable pleading standard depends on the context of the claim.  See Henderson v. Ocwen Loan Servs., 2014 WL 5461955, at *4 (N.D. Cal. Oct. 27, 2014) (applying the Rule 8 pleading standard to negligent misrepresentation claims in the context of improper late fee charges in foreclosure case); Yates v. Aurora Loan Servs., LLC, 2011 WL 2429376, at *8 (N.D. Cal. June 13, 2011) (applying the Rule 9(b) standard to a claim of negligent misrepresentation that arose in the context of an allegedly fraudulent mortgage transaction).  The California Supreme Court has also held, at least with respect to a shareholder suit alleging that the defendant corporation and its officers distributed a fraudulent financial report, that a negligent misrepresentation claim must be alleged with the same level of particularity demanded of fraud claims.  See Small, 30 Cal. 4th at 184.  That reasoning is equally applicable here and the Court concludes that the Rule 9(b) pleading standard applies to the negligent misrepresentation claim against Defendants.

For the reasons discussed above regarding the group-pleaded allegations, the allegations that support the negligent misrepresentation claim fail, at the very least, to allege with particularity who made those misrepresentations.  Accordingly, the negligent misrepresentation claim is dismissed as to all Defendants, except Fitzsimmons and Power.  As with the federal securities claims and the intentional misrepresentation claims, Plaintiffs are granted leave to amend the negligent misrepresentation claim.

Defendants also argue that liability for a negligent misrepresentation cannot be premised on an implied assertion or omission.  See Wilson v. Century 21 Great Western Realty, 15 Cal. App. 4th 298, 306 (1993).  This is not a full statement of the law, however.  As Plaintiffs note, California law imposes liability under this theory where a defendant "purports to convey the 'whole truth' about a subject" then "'misleading half-truths' about the subject may constitute positive assertions for the purpose of negligent misrepresentation."  OCM Principal Opps. Fund v. CIBC World Markets Corp., 157 Cal. App. 4th 835, 847 (Cal. Ct. App. 2007).  This "misleading

United States District Court
Northern District of California

half-truths" principle applies to the alleged misrepresentations in this case.  For instance, issues about the IPO being delayed were only partially explained and the explanations omitted key information about the termination of the auditor and the reasons for doing so.  The same is true of the incomplete statements made regarding the outcome of the Super Bowl advertisement and the failure to disclose the alleged cover-up by Delivery Agent's senior management.  Therefore, the claim of negligent misrepresentation can proceed against Fitzsimmons and Power.

## V.       CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part the motions to dismiss.  The motions are granted as to all claims against Defendants Goetner, Del, Yi, Peters, Borcher, Badran, and Cowan.  The motions to dismiss are also granted as to Defendants Fitzsimmons and Power on the Section 20(a) claim, but are otherwise denied.  The Court grants Plaintiffs leave to amend all dismissed claims.  Plaintiffs must file their amended complaints by December 1, 2017.

**IT IS SO ORDERED.**

Dated: November 3, 2017

ELIZABETH D. LAPORTE
United States Magistrate Judge

United States District Court
Northern District of California

43