UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. ABDO, ET AL., | Case No. 17-cv-00851-EDL |
| Plaintiffs, | Case No. 17-cv-01232-EDL |
| v. | |
| MICHAEL FITZSIMMONS, et al., | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINTS** |
| Defendants. | |
| RISING TIDE I, LLC, ET AL., | Re: Abdo Dkt. Nos. 66, 67, |
| Plaintiffs, | Rising Tide Dkt. Nos. 57, 58, 59 |
| v. | |
| MICHAEL FITZSIMMONS, et al., | |
| Defendants. | |

Defendants Michael Fitzsimmons, Peter Lai, Chris Power, Peter Goettner, Christian Borcher, Ernest Del, Marc Yi, James Peters, and Souheil Badran (collectively, "Defendants") have filed five motions to dismiss the first amended complaints ("FACs") in two related cases alleging securities fraud, Abdo v. Fitzsimmons, et al., 17-cv-00851, and Rising Tide I, LLC, Rising Tide II, LLC v. Fitzsimmons, et al., 17-cv-01232, (collectively "Plaintiffs"). The Court **GRANTS IN PART** and **DENIES IN PART** those motions. The Court denies Defendants' motions to dismiss Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims, although it notes that some of the alleged misrepresentations and omissions are not actionable. The Court denies Defendants' motions to dismiss Plaintiffs' Section 20(a) claims as to all Defendants except Peters. The Court denies Defendants' motions to dismiss Plaintiffs' claims under California law, except Plaintiffs' claims under the first clause of Cal. Corp. Code § 25504 against Peters.

United States District Court
Northern District of California

## I. FACTUAL BACKGROUND

### A. Parties

Plaintiff John E. Abdo ("Abdo") is the Trustee of the John E. Abdo Trustee Dated June 11, 2014 and the John E. Abdo Trust Dated March 15, 1976. Abdo FAC., ¶¶ 10-11. Abdo, through these two trusts, purchased $18 million in securities from Delivery Agent, Inc. ("Delivery Agent") on six separate occasions between June 2014 and April 2016. Abdo FAC ¶¶ 10-11, 38. Plaintiff Rising Tide I, LLC and Rising Tide II, LLC ("Rising Tide") purchased $17 million in securities from Delivery Agent on 4 separate occasions between September 2014 and March 2016. Rising Tide FAC ¶¶ 4, 36.

Defendant Michael Fitzsimmons was Delivery Agent's Chief Executive Officer ("CEO") and a member of the Board of Directors. Abdo FAC ¶ 14; Rising Tide FAC ¶ 11. Defendant Peter Lai was Delivery Agent's President and Chief Operating Officer until January 2015 when he became the company's President of Ecommerce. Abdo FAC ¶ 15; Rising Tide FAC ¶ 12. Defendant Christopher Power was the Chairman of Delivery Agent's Audit Committee and a member of Delivery Agent's Board of Directors. Abdo FAC ¶ 16; Rising Tide FAC ¶ 13. Peter Goettner was a member of Delivery Agent's Board of Directors, Audit Committee, and Nominating and Governance Committee. Abdo FAC ¶ 17; Rising Tide FAC ¶ 14. Christian Borcher was a member of Delivery Agent's Board of Directors and Audit Committee and Chairman of the Nominating and Governance Committee. Abdo FAC ¶ 18; Rising Tide FAC ¶ 16. Marc Yi was a member of Delivery Agent's Board of Directors and Delivery Agent's Nominating and Governance Committee. Abdo FAC ¶ 19; Rising Tide FAC ¶ 19. Souheil Badran was a member of Delivery Agent's Board of Directors from before January 2014 until April 2015. Abdo FAC ¶ 20; Rising Tide FAC ¶ 21. James Peters was Delivery Agent's Chief Operating Officer from January 2015 until September 15, 2016. Abdo FAC ¶ 21; Rising Tide FAC ¶ 23. Peters was also a member of Delivery Agent's Board of Directors from about December 2014 to September 15, 2016. Abdo FAC ¶ 21; Rising Tide FAC ¶ 23 (states Peters was elected to Board in or about March 2015). Ernest Del was a member of Delivery Agent's Board of Directors. Abdo FAC ¶ 22; Rising Tide FAC ¶ 18.

United States District Court
Northern District of California

2

United States District Court
Northern District of California

### B.    Securities Purchases and Representations

These two related lawsuits were brought by investors who allege that they purchased millions of dollars in securities from the company Delivery Agent in reliance on Defendants' fraudulent misrepresentations.  The conduct alleged in both cases is generally similar, but relevant differences are noted.

Delivery Agent operated in the television-commerce ("t-commerce") space.  Abdo FAC ¶ 2; Rising Tide FAC ¶ 2.  Delivery Agent's product was an interactive technology it claimed to have developed to enable television viewers to instantly purchase products they saw in the programs they were watching, such as a piece of clothing worn by an actor in a show, using the remote control connected to their smart TV.  Abdo FAC ¶¶ 2, 30; Rising Tide FAC ¶¶ 2, 28.  This technology was the "core of Delivery Agent's purportedly ground-breaking business."  Abdo FAC ¶ 30; Rising Tide FAC ¶ 28.  Beginning in May 2014 through and including April 2016, Delivery Agent directly issued and sold securities to investors, including Plaintiffs, to raise funds in anticipation of an initial public offering ("IPO").  Rising Tide FAC ¶ 31; Abdo FAC ¶¶ 3, 33.  Delivery Agent engaged the services of an auditor ("the Auditor") from one of the "Big Four" accounting firms to audit Delivery Agent's consolidated financial statements for the year 2012 and 2013.  Abdo FAC ¶¶ 42-44; Rising Tide FAC ¶¶ 53-54.

Rising Tide began contemplating an investment in Delivery Agent in late 2013 or early 2014.  Rising Tide FAC ¶ 42.  On January 12, 2014, Rising Tide received a "Management Presentation" (dated September 13, 2013) about Delivery Agent.  Rising Tide FAC ¶ 42.  The presentation discussed the proprietary nature of Delivery Agent's interactive technology and described Delivery Agent's plans for a "pre-IPO" funding round to ensure "IPO readiness."  Rising Tide FAC ¶  42.

Many of Plaintiffs' allegations stem from Delivery Agent's attempt to use its interactive technology in a television commercial broadcast during Super Bowl XLVIII, on February 2, 2014.  Abdo FAC ¶ 31; Rising Tide FAC ¶ 43.  Delivery Agent partnered with clothing retailer H&M to allow viewers to purchase the clothing items featured in the commercial directly from their smart TV using their remote control.  Abdo FAC ¶ 31; Rising Tide FAC ¶ 43.  Prior to the airing of the

3

Super Bowl commercial, Delivery Agent issued a press release touting the importance of the commercial. Rising Tide FAC ¶¶ 44-45. Michael Fitzsimmons, Delivery Agent's Chief Executive Officer and a member of the Board of Directors, was quoted in the press release calling Delivery Agent's interactive technology a "game-changer for the advertising industry" and calling the commercial an "industry first" that would allow H&M to "mak[e] their Super Bowl XLVIII ad actionable and directly measureable." Rising Tide FAC ¶ 46. On January 31, 2014, Delivery Agent issued another press release, in which Fitzsimmons extolled the Super Bowl advertisement as "an important day for marketers" and said that it would involve "the launch of the first fully enabled t-commerce advertising campaign powered by Delivery Agent." Rising Tide FAC ¶ 48.

Delivery Agent's test of its new technology during the Super Bowl ad "failed spectacularly." Rising Tide FAC ¶ 49. "Most viewers could not or did not make purchases using Delivery Agent's technology." Rising Tide FAC ¶ 49. Fitzsimmons and other members of Delivery Agent's senior management directed Delivery Agent employees to purchase the merchandise themselves. Rising Tide FAC ¶ 50. Delivery Agent employees purchased 585 of the 600 pieces of merchandise available for purchase during the commercial. Rising Tide FAC ¶ 50.

Despite the difficulties with the technology, Delivery Agent publicized the Super Bowl ad's success. After the Super Bowl, Delivery Agent published a press release with quotes from Fitzsimmons. Rising Tide FAC ¶ 51. He was quoted as stating: "H&M kicked-off a great campaign during Super Bowl XLVIII to promote their David Beckham Bodywear Collection. . . That same campaign kicked-off a new paradigm for advertising, fundamentally changing the discipline by making television advertising actionable and measurable." Abdo FAC ¶ 40; Rising Tide FAC ¶ 52.

However, a few days after the Super Bowl, a whistleblower approached Delivery Agent's Auditor with details about a cover-up to hide the failure of the Super Bowl advertisement. Abdo FAC ¶¶ 42-45; Rising Tide FAC ¶ 53. The whistleblower told the Auditor that when the Super Bowl advertisement failed because viewers were unable to buy the clothing items through their televisions, Fitzsimmons "and other high-ranking Delivery Agent officers" directed employees to purchase the items to give the appearance that Delivery Agent's technology had worked and

4

created false sales reports to indicate that the Super Bowl advertisement had been successful. Abdo FAC ¶ 45; Rising Tide FAC ¶ 53 (Rising Tide's alleges: "Fitzsimmons directed high-ranking Delivery Agent officers to purchase . . . ").

In early February 2014, the Auditor informed Delivery Agent's Audit Committee" of the whistleblower's allegations "against Fitzsimmons, Lai and other senior officers." Rising Tide FAC ¶ 55. Abdo FAC ¶ 46 (Abdo does not specify an exact date but states, "Sometime after the Super Bowl in February 2014. . . "). At that time, the Audit Committee consisted of Power, Goettner, and Borcher. Abdo FAC ¶ 46; Rising Tide FAC ¶ 55. The Audit Committee conducted an internal investigation. Abdo FAC ¶ 46; Rising Tide FAC ¶ 55.

In the meantime, Delivery Agent continued to highlight the Super Bowl advertisement as an example of Delivery Agent's success. On February 6, 2014, Rising Tide's representative spoke with Fitzsimmons and one of Delivery Agent's investment bankers to further explore the possibility of an investment. Rising Tide FAC ¶ 76. Fitzsimmons and the investment banker pointed to the Super Bowl advertisement as emblematic of Delivery Agent's success. Rising Tide FAC ¶ 76. The investment banker also provided an "Executive Summary of Delivery Agent" and a term sheet. Rising Tide FAC ¶ 77. The Executive Summary described Delivery Agent's software and stated that the company was "planning to go public in April 2014" and was seeking pre-IPO funding for "IPO readiness." Rising Tide FAC ¶ 77.

Delivery Agent also provided Rising Tide with a copy of the Business Section of Delivery Agent's draft S-1 Form[1] on February 6, 2014. Rising Tide FAC ¶ 71. The draft S-1 Form represented that "during Super Bowl XLVIII viewers of H&M's Super Bowl ad featuring David Beckham, were able to buy the clothing featured in the ad directly from their remote control on an enabled TV." Rising Tide FAC ¶ 72. Fitzsimmons delivered another draft of the Form S-1 to Rising Tide on February 20, 2014, which contained the same general representations about the Super Bowl advertisement. Rising Tide FAC ¶ 75.

Between February 13 and February 22, 2014, Fitzsimmons spoke with Rising Tide's

[1] An S-1 Form, also known as a registration statement, is a filing that the SEC requires of companies that plan on issuing an IPO. Abdo FAC ¶ 62.

5

representative another five times. Rising Tide FAC ¶ 78. During those conversations, Fitzsimmons reiterated the company's success during the Super Bowl commercial, described its proprietary, interactive technology, and discussed the need for pre-IPO funding, without disclosing either the technical issues that hampered its success or the subsequent cover-up. Rising Tide FAC ¶ 78.

On or around March 14, 2014, the Audit Committee shared its findings with the Auditor. Rising Tide FAC ¶ 55. The Audit Committee retained an outside law firm to conduct another investigation into the allegations. Abdo FAC ¶ 46; Rising Tide FAC ¶ 56. Fitzsimmons' repeated efforts to interfere with and influence Delivery Agent's internal investigation was a significant reason for the Audit Committee's decision to retain an outside law firm. Rising Tide ¶ 56.

On or around May 12, 2014, Fitzsimmons disseminated written materials, including a PowerPoint presentation and a Draft S-1 Form that described Delivery Agent's technology, represented that the Super Bowl ad had been a success, and indicated that Delivery Agent was preparing for an IPO. Abdo FAC ¶¶ 56-66. On May 26, 2014, Fitzsimmons and Abdo spoke over the phone about Abdo potentially investing in Delivery Agent. Abdo FAC ¶ 67. Abdo had already received copies of the PowerPoint presentation and the Draft S-1 Form. Abdo FAC ¶ 68. Fitzsimmons discussed Delivery Agent's technology, stated that it was more likely that Delivery Agent would file for an IPO in October 2014 than September 2014, and confirmed that an auditor from one of "'Big Four' accounting firms" was helping Delivery Agent prepare for the IPO. Abdo FAC ¶ 70.

Sometime before June 2014, the findings from the internal investigation and the Law Firm's investigations were presented to the Audit Committee and the Board of Directors. Abdo FAC ¶ 49; Rising Tide FAC ¶ 58. The Audit Committee members at that time were Power, Goettner, and Borcher, while the Board of Directors consisted of Power, Goettner, Borcher, Yi, Badran, and Del. Abdo FAC ¶ 49; Rising Tide FAC ¶ 58 (Rising Tide alleges that Fitzsimmons was also on the Board at that time). The Audit Committee and the Board of Directors ultimately concluded that the whistleblower's allegations were essentially accurate, including that

6

"Fitzsimmons and Lai instructed other employees to purchase the items featured in the Super Bowl ad because Delivery Agent's technology did not function properly" and that Fitzsimmons was involved in or aware of the preparation and dissemination of information containing fabricated data regarding the Super Bowl ad. Abdo FAC ¶ 50; Rising Tide FAC ¶ 59. Although they accepted the whistleblower's allegations, the Audit Committee and the Board of Directors concluded that "the cover-up was not material 'from a financial standpoint.'" Rising Tide FAC ¶ 60. The Board of Directors recommended the implementation of a remediation plan, which provided for:

> "(i) the adoption of more stringent business practices, policies and procedures, including an ethics policy;" (ii) "the establishment of stricter internal controls;" (iii) "the initiation of additional employee training" and (iv) "other personnel remedial measures, including written warnings and/or the demotion or reduction in responsibilities for certain employees, lost bonus awards for certain employees and the termination of [Delivery Agent's] then head of internet advertising."

Abdo FAC ¶ 51; Rising Tide FAC ¶ 60.[2]

In or about July 2014, Delivery Agent presented the internal investigation reports and the Board of Directors' remediation plan to the Auditor. Abdo FAC ¶¶ 52-53; Rising Tide FAC ¶ 61. In July 2014, the Auditor determined that it could not rely on the representations of Delivery Agent's management for purposes of completing audits of Delivery Agent's consolidated financial statements. Abdo FAC ¶ 53; Rising Tide FAC ¶ 62. Thus, the Auditor announced that it would not be able to reissue its previously issued audit report or continue with its audit of the December 31, 2013 financial statement as long as the executives involved in the alleged cover-up, including Fitzsimmons and Lai, were involved in the accounting or internal controls of the company, were in a financial role, or were in a supervisory role or position to influence those in such positions. Abdo FAC ¶ 56; Rising Tide FAC ¶ 63. The Auditor also informed Delivery Agent that it would need to expand the scope of its previously completed 2012 audit and the incomplete 2013 audit "to determine if the senior executives implicated in the misconduct (including Fitzsimmons and Lai) had inappropriately influenced" Delivery Agent's accounting or financial reporting. Abdo FAC ¶

---

[2] Abdo uses quotation marks for each of these elements of the plan, but does not provide a reference to the source from which it is quoting.

53; Rising Tide FAC ¶ 64.

Sometime before July 29, 2014, Power, who was Chairman of the Audit Committee at that time, discussed the Auditor's position with the Auditor.  Abdo FAC ¶ 54; Rising Tide FAC ¶ 65 (Rising Tide does not allege a specific date).  On July 29, 2014, the Board of Directors, consisting of Fitzsimmons, Power, Goettner, Borcher, Del, Yi, and Badran, voted to terminate the auditor. Abdo FAC ¶ 55; Rising Tide FAC ¶ 66.  Delivery Agent formally dismissed the auditor on August 4, 2014.  Abdo FAC ¶ 55; Rising Tide FAC  ¶ 66.  The consequence of the decision to terminate the Auditor was that Delivery Agent could not complete the contemplated IPO until it met its obligation triggered by the termination under the federal securities laws to file an Item 304 explaining the basis for terminating the auditor and allowing the auditor an opportunity to respond to the company's explanation.  Rising Tide FAC  ¶ 67.

Shortly after the firing of the Auditor, Rising Tide's representative exchanged emails with Fitzsimmons on August 11, 2014, about further investments in the company.  Rising Tide FAC  ¶ 93.  Rising Tide's representative asked about the changing dates for launching the IPO, the reason for the change, and management's outlook for a future IPO.  Rising Tide FAC ¶ 93.  Fitzsimmons replied: "We made a significant acquisition at the end of Q'2 (Music Today). This was fully vetted with both Credit Suisse and Deutsche Bank who jointly advised the company to fully integrate and execute at least one quarter as a merged entity before going public."  Rising Tide FAC ¶ 93.  Fitzsimmons encouraged Rising Tide to make another investment in Delivery Agent, claiming that Rising Tide would have "2.0X upside protection in IPO."  Rising Tide FAC ¶ 93.

On September 24, 2014, Abdo purchased Series F Preferred Stock for $5 million.  Abdo FAC ¶ 38.  On October 13, 2014, Abdo wrote an email to Fitzsimmons to ask if Delivery Agent intended to file the Form S-1 in November 2014 so that Delivery Agent could proceed with an IPO in February 2015.  Abdo FAC ¶ 89.  Fitzsimmons replied that same day: "We are having to do a carve-out audit of Music Today from Live Nation which is taking some time but all good. The current plan is to confidential file in December [2014] and go out in March."  Abdo FAC ¶ 89.

On January 9, 2015, Delivery Agent and Fitzsimmons sent two Delivery Agent investors

8

United States District Court
Northern District of California

an updated draft Form S-1 that continued to claim that the February 2014 Super Bowl advertisement was a success.  Abdo FAC ¶ 74.

On January 15, 2015, Abdo purchased additional Series F Preferred Stock with 120-Day Warrant for $5 million.  Abdo FAC ¶ 38.  On or about March 9, 2015, Abdo first learned of the dispute with the auditor.  Abdo FAC ¶ 103.  Around that time, however, Fitzsimmons represented to Abdo in a phone call that the Super Bowl events were immaterial and that the auditor's position was unreasonable.  Abdo FAC ¶ 103.  Still, Delivery Agent continued its efforts to raise funds through the sale of securities to investors, including Abdo, by claiming that the company's IPO was imminent.  Abdo FAC ¶ 104.  On March 11, 2015, Delivery Agent released an investor update that stated that the "IPO process [was] progressing with continued audit delays," although it did not explain the nature of the delays.  Abdo FAC ¶ 105; Rising Tide FAC ¶ 109.  On April 4, 2015, Fitzsimmons sent an email to Abdo and other investors explaining that Delivery Agent "continue[s] to battle through roadblocks heading towards our IPO," including "general market conditions" and an "SEC ruling on revenue recognition, 2014 audits and 304 disclosure."  Abdo FAC ¶ 107.  Fitzsimmons further stated that "[t]here is nothing more humanly possible our team could be doing to achieve this important milestone and we are working around the clock to resolve."  Abdo FAC ¶ 107.

Rising Tide also first learned of the "304 issue" in March 2015.  Rising Tide FAC ¶ 105.  On March 10, 2015, Rising Tide's representative sent an email to Power, chair of the Audit Committee, asking why there had been a delay in obtaining the 2012 and 2013 audits needed for the IPO and what else could delay the IPO.  Rising Tide FAC ¶ 105.  Power responded that: "The main delay driver was the treatment of the revenue on a gross versus net basis.  Since [Grant Thornton] was taking a position that was counter to that taken by [the auditor], they spent additional time within [Grant Thornton] to run it all the way up their chain of command."  Rising Tide FAC ¶ 105.  Defendant Power further stated that "I believe you are now up to speed on the 304 issue with [the auditor] that we are currently working through—there is definite risk on that front but we are actively working it."  Rising Tide FAC ¶ 106.  He concluded that "[w]e are currently on pace to receive the reports for all three years by the end of March which is in line

with the current late June IPO timeline." Rising Tide FAC ¶ 106. Rising Tide previously learned of the "304 issue" before this email with Power when he explained that the Item 304 related to certain internal financial control issues the auditor had identified in connection with the company's former CFO. Rising Tide FAC ¶ 107. Power told Rising Tide that the issue was relatively minor and would be resolved easily, without ever mentioning the Super Bowl advertisement or the subsequent cover-up. Rising Tide FAC ¶ 107.

On April 20, 2015, Abdo purchased Series G Preferred Stock for $1 million. Abdo FAC ¶ 38. At the April 28, 2015 Board of Directors meeting, Rising Tide's representative, now a member of the Delivery Agent Board of Directors, requested a copy of the draft Item 304. Rising Tide FAC ¶ 112. Fitzsimmons responded that it was being kept confidential and Plaintiff's representative would receive it in due course, and that the Item 304 was immaterial to the company's financial statements. Rising Tide FAC ¶ 112. Rising Tide's representative followed up with email requests for the draft language on May 8 and May 11, 2015, but did not receive it. Rising Tide FAC ¶ 112.

In July 2015, Delivery Agent prepared a draft Item 304 and sent it to the Auditor for its response. Abdo FAC ¶ 91. On August 5, 2015, Fitzsimmons wrote to Abdo that Delivery Agent would be able to file for an IPO as soon as August 12, 2015, "[a]ssuming [the Auditor] plays along . . . " Abdo FAC ¶ 91. The auditor prepared a response to Delivery Agent's Item 304, which set forth Fitzsimmons' involvement in the cover-up. Abdo FAC ¶¶ 92, 94-99. On the same day that Rising Tide made another investment, July 21, 2015, Rising Tide finally received the draft Item 304 language. Rising Tide FAC ¶ 115. On July 21, 2015, Abdo purchased a Convertible Promissory Note for $1 million. Abdo FAC ¶¶ 38 109.

On August 16, 2015, Fitzsimmons told Rising Tide's representative that the auditor's response was a "major setback" that might render Delivery Agent "unmarketable." Rising Tide FAC ¶ 117. On August 19, 2015, Abdo obtained a copy of the draft Item 304 and the auditor's response. Abdo FAC ¶ 110.

On January 14, 2016, Delivery Agent sent an update to certain investors, including Abdo, stating that the "304 [was] nearing resolution." Abdo FAC ¶ 111. The update also stated that

10

Delivery Agent needed more cash and was exploring selling the company.  Abdo FAC ¶ 111.

After it received the draft Item 304 language and Fitzsimmons had acknowledged the issues that it potentially created, Rising Tide purchased a convertible note from Delivery Agent on March 30, 2016 in reliance on Defendants' representations that the company needed more money to survive until management could find a buyer or launch an IPO.  Rising Tide FAC ¶ 124.  On April 20, 2016, Abdo purchased another $1 million in a convertible note from Delivery Agent in reliance on similar representations that the company needed more cash to survive.  Abdo FAC ¶ 38, 112.

Ultimately, Delivery Agent never went public.  Abdo FAC ¶ 144; Rising Tide FAC ¶ 6.  Delivery Agent was unable to attract a buyer or raise more cash, which led Delivery Agent to file for Chapter 11 bankruptcy in September 2016.  Abdo FAC ¶ 147; Rising Tide FAC ¶ 126.  Plaintiffs claim that their securities are now worthless as a result.  Abdo FAC ¶ 148; Rising Tide FAC ¶ 127.

## II.    PROCEDURAL HISTORY

On February 21, 2017, Abdo filed a complaint against Defendants for violation of federal securities laws and intentional and negligent misrepresentation.  Abdo raised the following claims against all Defendants: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5; (2) violation of Section 20(a) of the Exchange Act; (3) intentional misrepresentation or omission; and (4) negligent misrepresentation.  Rising Tide filed its complaint on March 8, 2017, raising the same claims as well as asserting claims against an additional defendant, David Cowan.  On March 15, 2017, the Court granted Rising Tide's administrative motion to relate the two cases.  On May 23, 2017, Defendants filed a motion to disqualify Abdo's counsel Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. and for limited discovery.  The Court denied the motion.

On June 2, 2017, Defendants filed six simultaneous motions to dismiss the two complaints.  Case No. 17-cv-00851, Dkt. Nos. 21, 22; Case No. 17-cv-01232, Dkt. Nos. 19, 20, 22, 23.  Defendants also filed a request for judicial notice in each case.   Case No. 17-cv-00851, Dkt. No. 23; Case No. 17-cv-01232, Dkt. No. 21.  Plaintiffs opposed the motions.  On November 3, 2017, the Court issued an order granting in part and denying in part Defendants' motions.  Dkt. 57.  The

United States District Court
Northern District of California

Court granted Defendants' motions to dismiss all claims against Goettner, Del, Yi, Peters, Borcher, Badran, Lai, and Cowan. The Court dismissed all claims in the Abdo complaint against Power. The Court dismissed the Section 20(a) claims against Fitzsimmons and Power, but denied Defendants' motions to dismiss the other claims against Fitzsimmons and Rising Tide's other claims against Power. The Court granted Plaintiffs "leave to amend all dismissed claims." Abdo Dkt. 57 at 43.

On December 15, 2017, Plaintiffs in both cases filed amended complaints. Both Plaintiffs asserted claims for: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 against Fitzsimmons, Badran, Power, Goettner, Borcher, Yi, and Del; (2) violation of Section 20(a) of the Exchange Act against Power, Goettner, Barcher, Yi, Del, Badran, Peters; (3) violation of the first clause of California Corporation Code § 25504 against Power, Goettner, Borcher, Yi, Badran, and Peters; and (4) violation of the third clause of California Corporation Code § 25504 against Lai, Power, Goettner, Borcher, Yi, Badran, and Peters. Although Plaintiffs originally also asserted claims under California Corporation Code §§ 24501 and 25501, they have since withdrawn those claims. Plaintiffs did not reassert any of their state common law claims for intentional or negligent misrepresentation. Because Rising Tide did not reassert any claims against Cowan, he is no longer a party.

Defendants filed a total of five motions to dismiss Plaintiffs' amended complaints.[3]

---

[3] Defendants also filed requests for judicial notice in both cases. Abdo, Dkt. 68, Request for Judicial Notice ("RJN"), Rising Tide, Dkt. 60 RJN. In both cases, they request judicial notice of documents necessarily relied on in Plaintiffs' FACs: (A) the Unanimous Written Consent dated March 14, 2014; (B) the Unanimous Written Consent dated August 22, 2014; (C) the Unanimous Written Consent dated April 17, 2015; (D) Series G Preferred Stock and Warrant Purchase Agreement dated April 20, 2015; and (E) Series F Preferred Stock and Warrant Purchase Agreement dated January 28, 2014. Rising Dkt 60, Abdo Dkt. 68. In Abdo, Defendants also request judicial notice of (F) John E. Abdo Trust Dated March 15, 1967 Joinder Agreement dated May 13, 2015 and (G) John E. Abdo Trust Dated June 18, 2014 Joinder Agreement. Abdo Dkt. 68. In Rising Tide, Defendants also request judicial notice of (F) Schedule of Exceptions as Exhibit F to the Amended Purchase and Sale Agreement as of August 25, 2014; (G) Rising Tide I, LLC Joinder Agreement. Rising Tide Dkt. 60. Plaintiffs do not oppose having the Court "incorporate the foregoing documents into the FAC by reference solely for the purpose of the Court's consideration of Defendants' motions to dismiss," but argue that the Court should not take judicial notice of the documents because that would entail an evidentiary finding that a fact is not subject to a reasonable dispute. See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (analyzing the doctrines of judicial notice and incorporation by reference separately when deciding whether the district court properly considered documents outside the complaint); see also Knievel

Plaintiffs opposed all five motions and Defendants filed replies.  The Court held a hearing on all five motions and took them under submission.

### III.    LEGAL STANDARD

A complaint will survive a Rule 12(b)(6) motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." Lazy Y Ranch LTD v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 556 U.S. at 678.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679.  Thus, a reviewing court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.  Further, courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998).

Claims alleging federal securities fraud and state securities fraud must also satisfy Rule 9(b), which requires that the circumstances constituting the alleged fraud be "state[d] with particularity." Fed. R. Civ. P. 9(b); Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009) (holding that Rule 9(b) applies to actions brought under federal securities laws); Siegal v. Gamble, No. 13-CV-03570-RS, 2016 WL 3648503, at *4 (N.D. Cal. July 7, 2016) (holding Cal. Corp. Code § 25401 claim to Rule 9(b) standard).[4]  "Thus, Rule 9(b) requires particularized allegations of the circumstances constituting fraud, including identifying the

_____

v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (taking into account webpages referenced in complaint).  Accordingly, the Court **DENIES** the requests for judicial notice but considers the documents as incorporated into Plaintiffs' FACs.

[4] With respect to Rising Tide, Defendants argue that all their allegations of misrepresentations fail to meet Rule 9(b)'s heightened pleading standard because Rising Tide Plaintiffs have not identified their representatives.  The Court rejected this argument in its prior order. See Order at 31-32, n. 10

United States District Court
Northern District of California

United States District Court
Northern District of California

statements at issue and setting forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 876 (9th Cir. 2012).  Rule 9(b) allows allegations regarding intent and knowledge to be alleged generally.  Fed. R. Civ. P. 9(b).  Although the claims must be alleged with particularity, collective allegations may be used "to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct."  United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1184 (9th Cir. 2016) (holding that the collective allegations failed to state a claim because they failed to allege sufficient details about the scheme, not because they were collective).

## IV.    DISCUSSION

### A.    Section 10(b) and Rule 10b-5 Claims

Rule 10b-5 states that it is "unlawful for any person, directly or indirectly" to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. §240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts establishing: (1) a misstatement or omission; (2) of a material fact; (3) connected to the purchase or sale of a security; (4) made with scienter; (5) on which the plaintiffs relied; and (6) that proximately caused the plaintiffs' injuries.  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).  As noted above, plaintiffs must satisfy Rule 9(b)'s particularity requirement.  A federal securities fraud claim must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.  The PSLRA requires plaintiffs bringing securities fraud claims to "plead with particularity both falsity and scienter."  Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir. 2002) (quoting Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)).  Thus, a securities fraud complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . " Id.

The PSLRA's pleading standards are "exacting." Zucco, 552 F.3d at 990.  To establish the "required state of mind," a complaint must "allege that the defendants made false or misleading

14

statements either intentionally or with deliberate recklessness."  Zucco, 552 F.3d at 991 (quoting In re Daou Sys., Inc., 411 F.3d 1006, 1014-15 (9th Cir. 2005)).  In the Ninth Circuit, "deliberate recklessness" is "view[ed] . . . as a form of intentional or knowing misconduct," requiring the plaintiff to plead "a highly unreasonable omission, involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Zucco, 552 F.3d at 991 (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974, 976 (9th Cir. 1999)).

A securities fraud claim will survive a motion to dismiss only "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues Rights, Ltd., 551 U.S. 308, 324 (2007).  In light of Tellabs, the Ninth Circuit has engaged in a "dual inquiry": (1) the Court must "determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter"; and (2) "if no individual allegations are sufficient, [the court must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness."  Zucco, 552 F.3d at 992.  Because falsity and scienter in securities fraud cases are generally inferred from the same set of facts, the Ninth Circuit has incorporated the falsity and scienter requirements into a single inquiry.  See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Co., 320 F.3d 920, 932 (9th Cir. 2003).

### 1.   Adequacy of Allegations against Power, Goettner, Barcher, Badran, Yi, and Del

Plaintiffs allege that Badran, Power, Goettner, Barcher, Yi, and Del falsely represented that there were no investigations pending against Delivery Agent and that, to the best of Delivery Agent's knowledge, there was no basis for any investigation or litigation against Delivery Agent.[5] The allegedly false statements were made in the "Litigation" provision of the Series F Purchase Agreements executed and delivered in March and August 2014, and in the Schedule of Exceptions

---

[5] The parties do not dispute that Fitzsimmons also made these statements.

15

to the August 2014 Series F Purchase Agreements.

### a.    Maker of Statements

Plaintiffs allege that the Series F Purchase Agreements contained false or misleading representations, and that, by signing the Unanimous Written Consents in March 2014 and August 2014, which authorized and directed the Delivery Agent's officers to execute and deliver the purchase agreements,  Badran, Power, Goettner, Barcher, Yi, and Del made those statements. Abdo FAC ¶¶ 80, 84; Rising Tide FAC ¶¶ 80-84, RJN Exs. A & B. The purchase agreements were attached as exhibits to the Unanimous Written Consents. RJN Exs. A & B.

Relying principally on Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011), Defendants argue that the defendants in question cannot be held liable for these statements.  There, the Supreme Court held:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker.

Id.[6]  "What is essential under [Janus] is whether the defendant 'actually exercised control over the content' of the statements at issue. Sec. & Exch. Comm'n v. Goldstone, 233 F. Supp. 3d 1169, 1226–27 (D.N.M. 2017) (quoting Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 427 (7th Cir. 2015) (emphasis omitted)).

Prior to Janus, the Ninth Circuit held that corporate officers could be liable as primary violators under Rule 10(b) for misrepresentations in SEC filings that they had signed, although their ultimate liability might depend on whether they had the requisite scienter.  Howard v. Everex Systems, Inc., 228 F.3d 1057, 1061-63 (9th Cir. 2000).  The court clarified that, in cases holding that directors were not liable merely for signing documents containing misrepresentations under

---

[6] In a footnote, the Supreme Court explained, "In this case, we need not define precisely what it means to communicate a 'made' statement indirectly because none of the statements in the prospectuses were attributed, explicitly or implicitly, to JCM. Without attribution, there is no indication that Janus Investment Fund was quoting or otherwise repeating a statement originally 'made' by JCM. . . .  More may be required to find that a person or entity made a statement indirectly, but attribution is necessary."
Janus, 564 U.S. at 147, n. 11.

Section 10(b), "there was either no showing of scienter or the defendant was an *outside* director." Id. Since Janus, courts within this district have continued to hold that one who signs a document is the maker of statements within that document. See, e.g., Special Situations Fund III QP, L.P. v. Brar, No. 14-CV-04717-SC, 2015 WL 1393539, at *3 (N.D. Cal. Mar. 26, 2015) (also rejecting the defendants' argument that Howard applied only to SEC filings and not contracts). In Thomas v. Magnachip Semiconductor Corp., the court held that outside directors who were members of the Board of Directors and the Audit Committee of a company were "makers" of the allegedly false SEC filings that they signed on behalf of the company. 167 F. Supp. 3d 1029, 1047 (N.D. Cal. 2016). The court observed that cases that distinguished between outside and inside directors in similar situations had done so primarily on the grounds that the outside directors lacked the knowledge or awareness of the company's inside directors, which was relevant to the directors' scienter, not whether they had "ultimate authority" over their statements. Id.

Defendants argue that the act of signing a document alone is insufficient, relying on district court cases from Arizona holding that an outside director's signature on an SEC filing is insufficient to plead a securities fraud claim against that director. See Amr v. Sollitto, No. CV-08-1686-PHX-ROS, 2009 WL 10673610, at *5 (D. Ariz. Sept. 30, 2009); Wojtunik v. Kealy, 394 F. Supp. 2d 1149, 1165 (D. Ariz. 2005). The approach taken in Thomas and Special Situations is more consistent with the Ninth Circuit's policy of holding officers responsible for the contents of the documents they sign. 228 F.3d at 1061-63.

Defendants also rely on cases from within this district that held that outside directors who were not involved in the day-to-day control of a company were not subject to group pleading liability, and cannot be held liable for group published documents even if they have signed them. See In re Gupta Corp. Sec. Litig., 900 F. Supp. 1217, 1240-41 (N.D. Cal. 1994); Stack v. Lobo, 903 F. Supp. 1361, 1376 (N.D. Cal. 1995). However, these cases pre-date Howard. Moreover, Gupta is distinguishable because there the court held that the plaintiffs could not hold directors liable under the group pleading presumption based on oral statements by specific individuals as opposed to company documents the directors signed. 900 F. Supp. at 1240.

Defendants argue next that Badran, Power, Goettner, Barcher, Yi, and Del were not makers

17

of the statements within the Series F Purchase Agreements because they did not sign the purchase agreements themselves and did not have ultimate authority over the content of the purchase agreements.  The Unanimous Written Consents provided that Delivery Agent's officers had the discretion to amend or modify the purchase agreements as they deemed necessary or desirable. RJN, Exs. A & B.  Defendants liken their roles to those who conveyed a misstatement to a maker or were significantly involved in preparing a misstatement but who did not have "ultimate authority" over the statements, citing Janus, 564 U.S. at 142, 147-48, or approved a misstatement or furnished false information included in a misstatement, without making the statement itself, citing Glickenhaus, 787 F.3d at 425.  However, Defendants here were not the source of the information and were not involved in preparing the statements.  Defendants not only approved the statements in the purchase agreements, but also authorized Delivery Agent's officers to execute and deliver the purchase agreements.

Defendants also argue that a party's position as a board member is not sufficient to allege ultimate authority over statements made by the company, citing several cases.  In Markette v. XOMA Corp., the court held that the plaintiff had not shown that, by virtue of being a board member, the defendant had ultimate authority over the alleged misrepresentations at issue.  No. 15-CV-03425-HSG, 2017 WL 4310759, at *13 (N.D. Cal. Sept. 28, 2017).  However, in Markette there was no allegation that the defendant had signed the documents or even knew about any of the challenged statements.  City of Royal Oak Ret. Sys. v. Juniper Networks, Inc, also does not help Defendants because, although the chairman of the board of directors was not liable for any of the other individual defendants' allegedly misleading statements, he conceded that he had ultimate authority over and could be held liable based on the SEC filings he signed.  880 F. Supp. 2d 1045, 1071 (N.D. Cal. 2012).  Indeed, City of Royal Oak held that the chairman could also be liable for statements in other SEC filings which the company intended to file, because they were incorporated by reference in the SEC filings that he did sign.  Id. at 1051, 1071.

Defendants also rely on In re Solarcity Corp. Sec. Litig., in which the district court held that a chief operating officer did not have authority over statements in shareholder letters and SEC filings because, although he was the source of the allegedly false or misleading information, he did

United States District Court
Northern District of California

not actually have authority over whether that information was included in the documents. 274 F. Supp. 3d 972, 1007 (N.D. Cal. 2017).  Here, however, Plaintiffs do not allege that Defendants were merely the source of the misleading information; rather they allege that Defendants authorized Delivery Agent's officers to execute and deliver the purchase agreements despite the fact that the purchase agreements contained misleading information.  Defendants also rely on Rok v. Identiv, Inc., in which the district court held that an officer could not be held liable for alleged misrepresentations in Sarbanes-Oxley Act ("SOX") certifications because he had not signed the several filings or the accompanying SOX certifications.   No. 15-CV-5775-CRB, 2017 WL 35496, at *9 n.13 (N.D. Cal. Jan. 4, 2017), aff'd sub nom. Cunningham v. Identiv, Inc., No. 17-15220, 2018 WL 1443597 (9th Cir. Mar. 23, 2018).  Rok is distinguishable because nothing in the case indicates that the officer in question signed a document to which the SOX certifications were attached.  Accordingly, Plaintiffs have adequately alleged that Defendants had "ultimate authority" over the statements in the Series F Purchase Agreements, because they signed the Unanimous Written Consents in their capacity as board members and authorized Delivery Agent officers to execute and deliver the purchase agreements.

       **b.**  **Falsity**

        **i.**  **Litigation Section of Series F Purchase Agreements**

Plaintiffs allege that the Litigation provision of the Series F Purchase Agreements, which they received in  March and August 2014, contained false or misleading statements.  That section provided:

> *There is no action, suit, proceeding or investigation pending or, to the best of the Company's knowledge, currently threatened against the Company* (including without limitation any suit, proceeding, or investigation (a) involving the prior employment of any of the Company's employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers of (b) that questions the validity of the Ancillary Agreements or the right of the Company to enter into them, or to consummate the transactions contemplated hereby or thereby), *nor, to the best of the Company's knowledge, is there any basis for the foregoing.*  The Company is not a party to, and none of its assets is bound by, or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.  There is no action, suit or proceeding *by the Company currently pending or that the Company currently*

*intends to initiate*.

RJN, Ex. E § 2.13 (emphasis added).  Plaintiffs allege that the italicized statements are false or misleading because, by March 2014 and certainly by August 2014, Delivery Agent knew that there were at least two pending investigations at Delivery Agent: the internal investigation by its Audit Committee and the investigation by the outside law firm into the whistleblower's allegations about the conduct of Fitzsimmons and others with respect to the Super Bowl ad and related cover-up.   Rising Tide FAC ¶¶ 85-86; Abdo FAC ¶¶ 79-86.

Defendants argue that these investigations were not the type of investigations listed in the purchase agreements because they were not *against* Delivery Agent.  Defendants argue that the difference between the first part of this section, which refers only to investigations *against* Delivery Agent, and the last section, which refers to actions *by* Delivery Agent, shows that the disclosure was not intended to cover investigations *by* Delivery Agent.  Plaintiffs respond that Defendants are reading extra words into this section and that the section makes no distinction between external and internal investigations.  An investigation by a company, or by a third party hired on behalf of the company, is not necessarily an investigation *against* that company.

Plaintiffs also allege that the statement that to the best of Delivery Agent's knowledge, there was no basis for an "action, suit, proceeding, or investigation" against Delivery Agent was false because, by the time of the March 2014 purchase agreements, Delivery Agent knew that the events connected to the Super Bowl ad would be a basis for a lawsuit or investigation against Delivery Agent.  Plaintiff argues that Delivery Agent knew there was a basis for a lawsuit against the company by then because the members of the Audit Committee presented their findings to the Auditor on March 14, 2014.  Rising Tide FAC ¶ 80; Abdo FAC ¶ 86.

Defendants argue that Plaintiffs' allegation that there was a known basis for a lawsuit is based on pure speculation.  It is not.  It is based on Delivery Agent's knowledge of Fitzsimmons' and other Delivery Agent's employees' actions regarding the Super Bowl ad and the cover-up.  Plaintiffs' allegations, including that there were ongoing investigations into the misdeeds of Delivery Agent's CEO Fitzsimmons, give rise to at least a plausible inference that Delivery Agent knew that those actions might be a basis for a lawsuit or investigation.   Thus, the statement that

Delivery Agent knew of no basis for a lawsuit or investigation contained a misstatement of fact. Plaintiffs' allegations with respect to statements made in the August 2014 purchase agreements are even stronger, because, by that time, the Audit Committee's and Law Firm's findings had been presented to the Board of Directors and the Board of Directors had fired the auditor. Rising Tide FAC ¶ 58; Abdo FAC ¶ 49.

Plaintiffs must also show that the misrepresentation was material. See Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988). The Supreme Court has held that, with "respect to contingent or speculative information or events, . . . materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" Basic Inc., 485 U.S. at 238 (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968)). Applying that standard, the Ninth Circuit determined that the failure to disclose contingent liabilities stemming from earlier securities laws violations in certain SEC filings was material because, although liability for the violations was not inevitable, the liabilities represented a potentially large financial loss for the company. SEC v. Fehn, 97 F.3d 1276, 1291 (9th Cir. 1996).

To support their allegation that this misrepresentation was material, Plaintiffs have included allegations that that the aftermath of the Super Bowl ad doomed Delivery Agent's IPO and forced it into bankruptcy. Rising Tide FAC ¶¶ 186-88; Abdo FAC ¶ 353. Given the magnitude of those alleged losses, the misrepresentation was material, even if an investigation or lawsuit was not inevitable at that point.

Relying on cases from other circuits, Defendants argue that the failure to disclose the mere possibility of litigation does not violate security laws because it is not material. See City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1267 (10th Cir. 2001) (addressing whether company had to weigh the possibility of other lawsuits when making disclosures under 17 C.F.R. § 229.103, which directs a company to "[d]escribe briefly any material pending legal proceedings" and under Section 10(b)); Gen. Elec. Co. by Levit v. Cathcart, 980 F.2d 927, 932 n.11, 935 (3d Cir. 1992) (holding that failure to disclose threatened litigation in proxy statements was not a material omission under Section 14(a), which has the same standard of materiality as

Section 10(b)); Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571, 589 (E.D. Va. 2006) (holding that failure to disclose possible litigation was not a material omission). However, these cases do not rely on the balancing test set out in Basic Inc. and Fehn.

                              ii.        Schedule of Exceptions to August 2014 Series F Purchase
                                         Agreements

Rising Tide alleges that the Schedule of Exceptions to the August 2014 Series F Purchase Agreement contained a misleading omission: "The Company is in the process of changing accountants from [the Auditor] to Grant Thornton." Rising Tide FAC ¶¶ 99-100 (alteration in original). Plaintiffs allege that the statement was misleading because it characterized the change in auditing firms benignly rather than revealing that Delivery Agent's Board had terminated the Auditor and would have to disclose why before any IPO. Defendants argue that the statement is not misleading because the Schedule was not designed to give the details of every exception and also included the following disclaimer: "Where terms of a contract or other disclosure items have been summarized or described in this Schedule of Exceptions, such summary or description does not purport to be a complete statement of the material terms of such contract or other item." RJN, Ex. F at 1. Even in the light of this disclaimer, the omission of the reason for Delivery Agent's termination of the Auditor was misleading, given how material the change would be to the filing of the IPO.

In sum, the Series F Purchase Agreements and the Schedule of Exceptions to the August 2014 Series F Purchase agreements contained material misrepresentations made by Defendants Badran, Power, Goettner, Barcher, Yi and Del.

                              c.        Scienter

Although the Court previously dismissed claims against Borcher, Power, Goettner, Yi, Del and Badran for failure to state actionable misrepresentations or omissions, the Court determined that Plaintiffs had adequately pleaded scienter for Borcher and Power because, based on their roles on the Audit Committee and Board of Directors, they had detailed knowledge of the cover-up. Order at 29, 31. The Court will not revisit this determination. Similarly, Goettner was a member of both the Audit Committee and the Board of Directors and so had detailed knowledge of the

22

Audit Committee's investigation of the cover-up and the Board of Directors' subsequent termination of the auditor.   Yi, Del, and Badran were members of the Board of Directors and would certainly have known about the internal investigations into the cover-up and the subsequent termination of the Auditor by the time they signed the August 2014 Unanimous Written Consents. Thus, Plaintiffs adequately allege scienter for the August 2014 alleged misrepresentations and omissions.

The March 2014 Unanimous Written Consents presents a closer question.  Yi signed it on March 8, Del on March 5, and Badran on March 4. FJN Ex. A.  The Audit Committee provided its findings to the Auditor on March 14, 2014.  Rising Tide FAC ¶ 86; Abdo FAC ¶ 80.  Plaintiffs argue that all members of the Board were aware of the allegations and investigation by the time they signed the Unanimous Written Consents.  However, Plaintiff has not alleged a specific date by which the Board of Directors, as a whole, became aware of the these allegations.  Abdo argues that Yi, Del, and Badran were personally apprised of and substantiated the Audit Committee's and Law Firm's findings between March 2014 and June 2014.  See Abdo FAC ¶¶ 46, 49, 50, 80. Rising Tide argues that they were aware of the allegations and investigations when they signed their Unanimous Written Consents.  See Rising Tide FAC ¶ 86.  These allegations are too vague as to timing.  The Court concludes that Plaintiffs adequately allege that all Defendants had the requisite scienter for the August 2014 alleged misrepresentations but that they do not adequately allege that Yi, Del, and Badran had the requisite scienter for the March 2014 alleged misrepresentations.

### 2.   Adequacy of Other Allegations Against Power

As it did in its original complaint, Rising Tide alleges that Power individually made specific misrepresentations.  One alleged misrepresentation was contained in a March 10, 2015 email from Power to Rising Tide stating that the IPO had been delayed because of an issue regarding the company's audited financial statements.  Specifically, he said that "[t]he main delay driver was the treatment of the revenue on a gross versus net basis.  Since [Grant Thornton] was taking a position that was counter to that taken by [the Auditor], they spent additional time within [Grant Thornton] to run it all the way up their chain of command."  Rising Tide FAC ¶ 105

(alterations in original).  The same email contained his second statement in which he stated that he believed Rising Tide had been brought "up to speed on the 304 issue with [the Auditor]" that Delivery Agent was "working through."  Rising Tide FAC ¶ 105.  Power stated that there was "a definite risk on that front," but that Delivery Agent was "actively working on it.  Rising Tide FAC ¶ 105.  Power added that Delivery Agent was "currently on pace to receive the reports for all three years by the end of March which [was] in line with the current late June IPO timeline."  Rising Tide FAC ¶ 105.  The complaint also alleges that in a separate conversation shortly before the March 10, 2015 email, Power told Rising Tide that the "304 issue" was related to internal financial control issues in connection with the company's former Chief Financial Officer and that, while Delivery Agent would need to file an Item 304, the issue was relatively minor and would be easily resolved.  Rising Tide FAC ¶ 107.

The Court denied Power's first motion to dismiss this claim and ruled that Rising Tide had adequately alleged falsity and scienter for these misrepresentations.  Order at 29-31.  Power moves to dismiss them again.   Power argues that these allegations are defective as a pleading matter because they do not identify to whom precisely they were made, when they were made, the circumstances, and who else was on the call, relying on In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1079-80 (N.D. Cal. 2001).  There, the court ruled that the plaintiffs had not sufficiently alleged the scienter of certain individual defendants who were "top executives" at a corporation.  Id.  Plaintiffs had alleged that the defendants learned facts through which they would have known that their representations were false when they spoke to executives at two other companies, who were not parties to the lawsuit.  Id.  The plaintiffs failed, for the most part, to identify which of the defendants spoke to representatives of the other companies and anything else about the communications between the two companies.  Id.  By contrast, here Rising Tide alleges that Power made specific misrepresentations, identifies the content of his statements, the times the statements were made, and the medium through which the statements were conveyed.

Power also argues that, under the PLSRA, in order to rely on statements from a "confidential witness," Rising Tide must describe the witness with "sufficient particularity to

24

United States District Court
Northern District of California

establish [his] reliability and personal knowledge," and the statements themselves be indicative of falsity and scienter. Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 995 (9th Cir. 2009). In Zucco, the plaintiff relied on allegations by confidential witnesses who were the defendant's former employees to support their allegations of *scienter*. Id. at 992-93. Even assuming that Rising Tide's unnamed representative is a "confidential witness," the cases on which Power relies are distinguishable because none of them involve defendants making the alleged *misrepresentations* to unnamed sources. Rather, in each of those cases the complaints relied on information from confidential witnesses to allege scienter or falsity, the elements of securities fraud for which the PLSRA imposes heightened pleading requirements. 15 U.S.C. § 78u-4(b); See In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1145 (9th Cir. 2017); 3226701 Canada, Inc. v. Qualcomm, Inc., No. 15CV2678-MMA (WVG), 2017 WL 4759021, at *18 (S.D. Cal. Oct. 20, 2017); Applestein v. Medivation, Inc., 861 F. Supp. 2d 1030, 1037-38 (N.D. Cal. 2012), aff'd, 561 F. App'x 598 (9th Cir. 2014); In re Nvidia Corp. Securitites Litig., No. 08-CV-04260-RS, 2010 WL 4117561, at *6-7 (N.D. Cal. Oct. 19, 2010); In re Portal Software, Inc. Sec. Litig., No. C-03-5138 VRW, 2005 WL 1910923, at *7-9 (N.D. Cal. Aug. 10, 2005); In re Metawave Commc'ns Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003). Accordingly, this argument is not persuasive.

Finally, Power argues that Rising Tide does not adequately allege falsity or scienter. Power asserts that the Court should disregard Rising Tide's allegation that Power told its representative that the "304 issue" was related to internal financial control issues in connection with the company's former Chief Financial Officer and that, while Delivery Agent would need to file an Item 304, the issue was relatively minor and easily resolved. He argues that the inconsistency between that statement and his email, only a few days later, "strongly suggests [that] Plaintiffs' mysterious, confidential 'representative' misremembered, misunderstood or concocted the conversation." Power Rep. RT at 7. This argument fails because the Court must assume the allegations in the complaint are true.

### 3. Adequacy of Allegations Against Fitzsimmons

Both Plaintiffs allege that Fitzsimmons made the misrepresentations contained in the

25

United States District Court
Northern District of California

Series F Purchase Agreements and Schedule of Exceptions to the Series F Purchase Agreements. As set forth above, those allegations are actionable.

###### i.        Rising Tide's Other Allegations Against Fitzsimmons

From Rising Tide's FAC alone, it is difficult to determine which of Fitzsimmons' statements, besides those related to the Series F Purchase Agreements, it alleges are actionable misrepresentations.  Rising Tide clarifies in its opposition to Defendants' motions that it does not currently contend that the following statements by Fitzsimmons are actionable misrepresentations: January 6, 2014 Press Release (Rising Tide FAC ¶ 45); January 31, 2014 Press Release (Rising Tide FAC ¶ 48); February 6, 2014 Statement (Rising Tide FAC ¶ 76); February 13-22 Statements (Rising Tide FAC ¶ 78); and August 16, 2015 Statement (Rising Tide FAC ¶ 117).  In its previous order, the Court ruled that these statements were not actionable.  Order at 22-26.

Rising Tide re-alleges two of the statements that the Court found were actionable: Fitzsimmons' statement in the February 3, 2014 press release that the Super Bowl "campaign kicked-off a new paradigm for advertising, fundamentally changing the discipline by making television advertising actionable and measurable" (Rising Tide FAC ¶ 52), and Fitzsimmons' email exchange with Rising Tide's representatives on August 11, 2014 (Rising Tide FAC ¶¶ 93-94).  Rising Tide also amends one allegation that the Court previously held was not actionable because Rising Tide failed to specifically allege materiality: Fitzsimmons' statements at the April 28, 2015 Board Meeting that the Draft Item 304 "was being kept confidential" and "was immaterial to the financial statements of the Company." Rising Tide FAC ¶¶ 112-13.[7]   Rising Tide now alleges, to support its allegation that the second part of that statement was false, "In truth, Draft Item 304 was far from immaterial.  It was material to Delivery Agent's ability to conduct an IPO and would significantly impact the company's financial statements in the near future, if not already."  Rising Tide FAC ¶ 113.  This allegation of materiality is adequate. However, with respect to the statement that the draft was being kept confidential, the Court previously held that statement was not actionable because it was not false.  Order at 25.

---

[7] Rising Tide is not alleging that the outside director Defendants are liable for this statement.

Accordingly, only the statement regarding immateriality is actionable.

Rising Tide also alleges that, in a February 20, 2014 Draft S-1 statement, Fitzsimmons misleadingly represented that the Super Bowl ad was a success and that viewers "*were* able to buy the clothing featured in the ad directly from their remote control on an enabled TV." Rising Tide FAC ¶ 75. This statement is misleading for the same reasons that the Court found that the February 3, 2014 press release was misleading.

Defendants argue that while Rising Tide alleges that Fitzsimmons shared the Draft S-1 with Rising Tide's representative, it does not include any allegations that Fitzsimmons was connected to the making of the particular document. Rising Tide argues that Fitzsimmons was the maker of the statements in the Draft S-1 because by choosing to share the document he had authority over whether and how to communicate its contents. See Janus, 564 U.S. at 142. Although merely sharing a document will not always indicate control over the statement, here Fitzsimmons effectively endorsed the contents of the document. Accordingly, this alleged misrepresentation is actionable.

Finally, Rising Tide alleges that in February 2014, Fitzsimmons and an investment banker from Delivery Agent spoke with Rising Tide's representative to explore having Rising Tide invest in Delivery Agent. Rising Tide FAC ¶ 76. Fitzsimmons described the company as "poised for success" and cited the Super Bowl campaign as an example of that success. Rising Tide FAC ¶ 76. After those statements, and "at the direction of Fitzsimmons" the investment banker provided Rising Tide's representative with an "Executive Summary of Delivery Agent" and a term sheet for the Series F investment, which Defendants had "prepared, approved, and/or authorized." Rising Tide FAC ¶ 77. The Executive Summary stated that Delivery Agent was "planning to go public in April 2014" and included other statements about Delivery Agent's IPO preparation. Rising Tide FAC ¶ 77. Fitzsimmons argues that Rising Tide has not sufficiently tied Fitzsimmons to the content of the Executive Summary. By alleging that Fitzsimmons made misleading statements about the Super Bowl ad and then followed up on those statements by directing another Delivery Agent employee to provide Rising Tide with the Executive Summary, Rising Tide sufficiently alleges that Fitzsimmons was the maker of the statements within the Executive Summary.

27

Accordingly, this alleged misrepresentation is also actionable.

### ii.      Abdo's Other Allegations Against Fitzsimmons

In its FAC, Abdo lists five times that it alleges Fitzsimmons made material misrepresentations or omissions.  Abdo again alleges two misrepresentations that the Court determined were actionable in its Order because they omitted material information: Fitzsimmons' statements on October 13, 2014 (Abdo FAC ¶¶ 89-90, 156(c)) and April 4, 2015 (Abdo FAC ¶¶ 107, 156(d)).  See Order at 19.  The Court will not revisit those.  Abdo also included statements in its FAC that the Court had ruled were not actionable misrepresentations, including statements that Fitzsimmons made on March 9, 2015 and in an email on August 5, 2015.  Order at 30.  See Abdo FAC 91, 103.  When asserting its claim against Fitzsimmons, Abdo specifies which representations it is alleging are actionable and did not include either of those alleged misrepresentations.  Abdo FAC ¶ 156.

Finally, Abdo includes two new misrepresentation.   Abdo alleges that during a phone call on May 26, 2014, Fitzsimmons made the following statements that were misleading, false, or omitted material information:

> (1) that it was more likely that the Company would file for an IPO in October 2014 than in September 2014
>
> (2) that the Company was using one of the "Big Four" accounting firms to assist with the IP
>
> (3) that the Company's t-commerce platform allowed TV viewers to purchase goods directly from their TVs using their remote controls and was successfully live-tested during Super Bowl XLVIII.

Abdo Opp. at 12 (citing Abdo FAC ¶ 70).

Abdo alleges that the first statement was misleading because Fitzsimmons knew at the time that the Super Bowl ad had been a failure and attempted to interfere with the resulting investigations, and the Auditor had grave doubts about the reliability and credibility of senior management, including Fitzsimmons.  Abdo alleges that the second statement was misleading because by May 26, 2014, the Auditor's relationship with Delivery Agent had "deteriorated to the point where it was misleading for Fitzsimmons to imply that the Auditor would see the Company through to an IPO."  Abdo FAC ¶ 72.

28

United States District Court
Northern District of California

With respect to the first statement, Abdo fails to tie the Super Bowl ad's failures and the resulting cover ups to a postponement of the IPO.  Abdo has not alleged that in May 2014 Fitzsimmons and Delivery Agent knew the Auditor would refuse to reissue its previous audits or continue its current audit unless Delivery Agent made certain changes.  See Abdo FAC ¶ 53 (Auditor's conditions from July 2014).  Similarly, Abdo has not alleged that in May 2014, Delivery Agent knew that it would have to terminate the Auditor and, as a consequence, have to file an Item 304 explaining that basis, which would mean significantly postponing the IPO.  Thus, this statement is also not an actionable misrepresentation.

With respect to the second statement, although the Auditor informed the Audit Committee about the allegations against Fitzsimmons and others in February 2014, the complaint alleges that the relationship between Delivery Agent and the Auditor was deteriorating as of July 2014.  Abdo alleges that "[s]ometime before June 2014" the Audit Committee's and Law Firm's investigative findings were presented to the Audit Committee and the Board of Directors.  Abdo FAC ¶ 49.  In July 2014, Delivery Agent presented the Auditor with those findings and the Board's remediation plan.  Abdo FAC ¶ 52.  Later that month, the Auditor responded, informing Delivery Agent that it would not reissue its audit reports for 2012 or continue its report for 2013 if the senior executives implicated in the misconduct were involved in any significant way and that it could no longer rely on senior management's representations.  Abdo FAC ¶53.  This statement is not an actionable misrepresentation because Abdo has not alleged facts showing that it was misleading or false when made.

In its earlier Order, the Court ruled that Fitzsimmons' statement in the post-Super Bowl press release that the campaign had made "television advertising actionable and measurable" was misleading because it "failed to account for the fact that Fitzsimmons is alleged to have orchestrated a scheme to significantly increase the number of sales . . . to create the false impression that the commercial was more successful than it actually was." Order at 25.  Because Fitzsimmons' third statement that Delivery Agent's technology was successfully tested during the Super Bowl but omits the significant problems with the commercial, Abdo adequately alleges that it was misleading.

29

Abdo also alleges that Fitzsimmons made false statements and omissions via email on January 14, 2016.  Abdo FAC ¶¶ 111-13, 156(e).  On January 14, 2016, Fitzsimmons sent an update to several investors, including Abdo, stating that "an IPO was still imminent," the Item 304 problem was "nearing resolution," that "Delivery Agent needed more cash" and that "Delivery Agent was exploring selling the company."  Abdo FAC ¶ 11.  Abdo alleges that these statements were false because Delivery Agent was not nearing a resolution on the Item 304 problem and the IPO was not imminent.   The statements regarding the "imminent" IPO and the 304 problem "nearing resolution" are not mere corporate optimism because Fitzsimmons had known for months by then that the Item 304 problem was a serious obstacle to the IPO rendering the IPO far from imminent.  See Abdo FAC ¶ 144 (the Item 304 situation was never resolved and there never was an IPO). Because these statements "contravened the unflattering facts in [Fitzsimmons']possession," they are actionable misrepresentations.  See Warshaw v. Xoma Corp., 74 F.3d 955, 960 (9th Cir. 1996).  Abdo does not adequately plead that the statements concerning Delivery Agent's needing more cash and looking for a buyer were false or misleading.

### iii.    Scienter

In both cases, Fitzsimmons also argues that the allegations in the complaint do not plead a sufficient inference of scienter.  The Court previously ruled that Plaintiffs had adequately pleaded scienter.  Order at 20-22, 27.  A court reviewing scienter allegations under the PSLRA must "consider the complaint in its entirety" and determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Tellabs, 551 U.S. at 322-23 (emphasis in original).

Plaintiffs have alleged significantly more than Fitzsimmons' position at the company to support the strong inference of scienter against him, including his personal involvement and knowledge of the circumstances that rendered his statements misleading.  Taken together, the complaint's allegations give rise to a strong inference of Fitzsimmons' scienter that is at least as compelling as the opposing inference that the allegedly false statements were made innocently. Plaintiffs allege that after the Super Bowl commercial ran, Fitzsimmons was not only involved in the subsequent cover-up of the alleged failure of Delivery Agent's technology during the

30

commercial but actually spearheaded those efforts.  Rising Tide FAC ¶¶ 49-50, Abdo FAC ¶ 63.  As a member of Delivery Agent's Board of Directors, Fitzsimmons is also alleged to have received the findings from the Audit Committee's investigation of the cover-up and, in that capacity, was aware that the Audit Committee and Board of Directors largely substantiated the whistleblower's claims about the cover-up and implemented a remediation plan.  Abdo FAC ¶¶49-51l Rising Tide FAC 58-60.  Also, in his role as a member of the Board of Directors, Fitzsimmons voted to terminate the Auditor after the Auditor determined that it could no longer rely on management's representations in light of the Audit Committee's findings.  Abdo FAC ¶¶ 53-55; Rising Tide FAC ¶¶62-66.

In addition, although motive standing alone is not sufficient to plead scienter (see Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1166 (9th Cir. 2009)), the fact that Fitzsimmons made these alleged misrepresentations while soliciting funds from investors adds to the strength of the allegations, taken collectively, that Fitzsimmons had knowledge that his statements to Plaintiffs were misleading at the time he made them.  Plaintiffs adequately allege scienter .

### 4.    Reliance

Defendants again challenge the sufficiency of the allegations that Plaintiffs relied on the misrepresentations and omissions described above.  Defendants primarily raise the same arguments the Court found unpersuasive in its previous Order, including that disclaimers and integration clauses in the purchase agreements preclude a finding of reliance, that Plaintiffs cannot rely on draft versions of documents, and that Plaintiffs cannot allege reliance for their final purchases because they were aware by then of the Super Bowl ad failure, the cover-up, and the Item 304 issue.  Because it is generally inappropriate to decide the question of whether a party relied on the alleged representations at the motion to dismiss stage, see Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615, 619 (9th Cir. 1981), and Defendants make no new arguments, the Court will not revisit its decision that Plaintiffs adequately alleged reliance.

### B.    Section 20(a) Claims

Plaintiffs allege that all Defendants except Fitzsimmons and Lai are subject to secondary liability for violations under Section 20(a) of the Exchange Act in addition to their liability as

31

primary violators under Rule 10b-5. Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Plaintiffs allege that Defendants had control over Delivery Agent, Fitzsimmons, and Power, who they allege were primary violators. As set forth above, Plaintiffs have adequately alleged that Fitzsimmons and Power were primary violators.

### 1. Delivery Agent as a Primary Violator

#### a. Whether Plaintiffs Need to Name Delivery Agent as a Defendant

Although Plaintiffs do not assert any claims against Delivery Agent itself, they allege that Delivery Agent was a primary violator under Section 10(b). Abdo FAC ¶¶ 185, 237, 288; Rising Tide FAC ¶¶ 207, 266, 314. Plaintiffs argue that the complaint does not have to assert a claim directly against the primary violator in order to hold persons who controlled the primary violator liable under Section 20(a). Relying on In re VeriFone Holdings, Inc. Sec. Litig., Defendants contend that Section 20(a) claims are subject to dismissal unless the plaintiffs also bring claims against the primary violator. 704 F.3d 694, 711 (9th Cir. 2012). In VeriFone, the Ninth Circuit stated, "Dismissal of the § 20(a) claim was proper because there [was] no underlying claim against the 'controlled' person." Id. However, the court went on to explain that the district court had dismissed the claim against the controlled person for failure to sufficiently plead scienter and that the plaintiff had not challenged that ruling on appeal. Id. Accordingly, the court was "bound by the district court's determination that [the plaintiff] failed to establish that [the alleged primary violator] violated § 10(b) or Rule 10-b." Id. The Ninth Circuit did not address whether the primary violator had to be a party to the lawsuit in order for the plaintiff's Section 20(a) claims to proceed against control persons.

Plaintiffs cite several cases that have held that plaintiffs do not need to actually name the primary violator as a defendant. See Sec. & Exch. Comm'n v. Savoy Indus., Inc., 587 F.2d 1149, 1170, n. 47 (D.C. Cir. 1978) ("It is established that the plaintiff need not proceed against the

principal perpetrator, nor need the principal perpetrator be identified in the complaint."); S.E.C. v. Hawk, No. 03:05CV00172LRH-VPC, 2007 WL 2257321, at *3 (D. Nev. Aug. 3, 2007) (The "majority of courts to address the issue have concluded that it is not necessary to join the primary violator in an action against a control person."). As persuasively explained in In re CitiSource, Inc. Sec. Litig., "there is nothing in the language of section 20(a) which compels the joinder of the controlled person, 'and nothing in familiar and conceptually related attribution principles such as conspiracy membership, agency, or aider and abettor, demands a visiting of actual liability upon an active wrongdoer as a condition to an attribution of that liability.'" 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988) (quoting Keys v. Wolfe, 540 F. Supp. 1054, 1062 (N.D.Tex.D.D.1982), rev'd on other grounds, 709 F.2d 413 (5th Cir.1983)). Just as a defendant may be indicted and convicted while a co-conspirator may remain unindicted, a controlling person may be liable based on the conduct of a primary violator who is not a defendant.

Within this district, In re Exodus Commc'ns, Inc. Sec. Litig., the district court held that a complaint could allege violations by an entity "for purposes of control person liability" without naming that entity as a defendant or attempting to hold it liable. No. C 01-2661 MMC, 2005 WL 1869289, at *45 (N.D. Cal. Aug. 5, 2005), reconsidered on other grounds, No. C-01-2661-MMC, 2005 WL 2206693 (N.D. Cal. Sept. 12, 2005). Plaintiffs also cite numerous cases from around the country where plaintiffs were allowed to proceed against control persons without naming the primary violator as a defendant. For example, in Kemmerer v. Weaver, the Seventh Circuit rejected the defendants' argument that they could not be held liable for the acts of the association they controlled because there was no finding of liability against the association, which had been dismissed for failure to serve. 445 F.2d 76, 78 (7th Cir. 1971). See also In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., No. 2:03-MD-1565, 2006 WL 469468, at *24 (S.D. Ohio Feb. 27, 2006) (allowing Section 20(a) claim to proceed where primary violator was bankrupt and could not be sued); In re Hayes Lemmerz Int'l, Inc., 271 F. Supp. 2d 1007, 1021 n. 11 (E.D. Mich. 2003) (holding that "if the complaint states a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons"); Elliott Graphics, Inc. v. Stein, 660 F. Supp. 378, 381 (N.D. Ill. 1987)

33

(rejecting the defendants' argument that the plaintiffs had failed to join an indispensable party because "securities laws do not impose any express requirement to join an issuer where plaintiff seeks to impute liability for that entity's conduct to its controlling persons"); Briggs v. Sterner, 529 F. Supp. 1155, 1170 (S.D. Iowa 1981) (rejecting defendants' argument that the plaintiffs had to join the primary violator in order to assert control liability because there was "no express requirement" to do so in Section 15 or Section 20(a)).

By contrast, Defendants cite only a few cases where the plaintiffs were required to name the primary violator as a defendant in order to hold control persons liable. In Stephenson v. Deutsche Bank AG, the court held that, although the plaintiff had alleged that a company violated Rule 10b–5, neither that plaintiff nor any other party had asserted claims against that company and therefore, the company could not be a "person *liable* under [Rule 10b–5]." 282 F. Supp. 2d 1032, 1059 (D. Minn. 2003) (quoting 15 U.S.C. § 78t(a)) (emphasis added)). The court also noted that the company had not been found liable under Rule 10b-5 in any other forum. Id. Similarly, in In re Pronetlink Sec. Litig., the district court required the plaintiffs to name the bankrupt primary violator as a "nominal defendant" in order to pursue Section 20(a) claims, even though the claims were in "all other respects," adequately pleaded. 403 F. Supp. 2d 330, 337 (S.D.N.Y. 2005). See also Griffin v. PaineWebber Inc., 84 F. Supp. 2d 508, 516 (S.D.N.Y. 2000) (applying the test for control person liability under Section 15 and holding that the plaintiffs should name the primary violator as a nominal defendant because of its bankruptcy).[8] The cases Defendants cite are contrary to the weight of authority and impose a requirement not expressly required or naturally

---

[8] Defendants also rely on Wenger v. Lumisys, Inc., to support their position that Plaintiffs cannot establish control person liability based on Defendants' alleged control of Delivery Agent because they have not brought a Section 10(b) claim against Delivery Agent. 2 F. Supp. 2d 1231, 1252 (N.D. Cal. 1998). However, there the court dismissed the Section 20(a) claims because the "plaintiff [had not pleaded] sufficient facts to show a primary violation," not because the plaintiff had failed to name the right party as a defendant. Id. Similarly, Defendants rely on Zurich Capital Markets Inc. v. Coglianese, 332 F. Supp. 2d 1087, 1111 (N.D. Ill. 2004). There, the court dismissed the plaintiffs Section 20(a) claim because they had failed to "allege a primary violation" by the primary violator, Millennium, in that count. Id. The dismissal could not have been based on any failure to assert a claim against the primary violator because the plaintiffs had done so in a separate count. Id. at 1099.

implied in Section 20(a). Accordingly, the Court holds that Plaintiffs' failure to name Delivery Agent as a defendant is not fatal to their claims that Defendants are liable under Section 20(a) based on their control of Delivery Agent.

### b.    Sufficiency of Section 10(b) and Rule 10b-5 Claims against Delivery Agent

Plaintiffs argue that Delivery Agent is liable for Fitzsimmons' violations of Section 10(b) under the doctrine of respondeat superior and the principles of agency. Under the general "rule of imputation," "a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority.'" In re ChinaCast Educ. Corp. Sec. Litig., 809 F.3d 471, 476-77 (9th Cir. 2015) (quoting Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1577 n. 28 (9th Cir. 1990) (imputing executive's scienter to corporation even though the executive "had lined his own pockets at the expense of [the corporation's] interests" because innocent third parties were hurt).

In Nordstrom, Inc. v. Chubb & Son, Inc., the court stated that "a corporation may be liable for actions by senior management personnel that are 'intrinsically corporate and bear the imprimatur of the corporation itself.'" 54 F.3d 1424, 1435 (9th Cir. 1995) (quoting Caterpillar v. Great Am. Ins. Co., 864 F. Supp. 849, 856 (C.D. Ill. 1994)) (discussing director liability in determining how to allocate settlement payments and defense costs between directors and officer when joined as co-defendants)). Quoting Nordstrom, the district court in Shepherd v. S3 Partners, LLC held that there was at least a question of fact as to whether the defendant corporation was directly liable under Section 10(b) for statements made during a presentation to solicit investment by three officers of the corporation. No. C-09-01405 RMW, 2011 WL 4831194, at *5 (N.D. Cal. Oct. 12, 2011). See also In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000) (holding that a corporation "is vicariously liable for the fraud of its own officers").

Defendants tellingly do not respond to Plaintiffs' argument that Delivery Agent is a primary violator under the doctrine of respondeat superior based on the acts of its Chief Executive Officer Fitzsimmons. Plaintiffs allege that Fitzsimmons' alleged material misrepresentations and

United States District Court
Northern District of California

35

omissions were committed within the scope of his employment and in furtherance of Delivery Agent's interests. Abdo FAC ¶¶ 184, 235, 286; Rising Tide FAC ¶¶ 205, 263, 312. Those allegations are well-supported by factual allegations showing that Fitzsimmons' statements were made in the context of soliciting investments in Delivery Agent. Accordingly, Plaintiffs sufficiently allege that Delivery Agent is a primary violator.

Plaintiffs also allege that Delivery Agent is a primary violator based on many allegedly false or misleading statements that Plaintiffs attribute directly to Delivery Agent. Rising Tide alleges that Delivery Agent is a primary violator based on alleged misstatements by Delivery Agent in press releases after the Super Bowl ad (Rising Tide FAC ¶ 52), draft S-1 forms (Rising Tide FAC ¶¶ 72, 103-104), a Power Point presentation by the company (Rising Tide ¶¶ 88-90), a Management Presentation dated July 18, 2014 (Rising Tide FAC ¶¶ 91-92), and a March 2015 investor update (Rising Tide FAC ¶¶ 109-11). Abdo similarly alleges that Delivery Agent is a primary violator based on the PowerPoint presentation, the two drafts of the S-1 form, and the March 2015 investor update. Abdo FAC ¶¶ 186, 237, 288.

Defendants argue that Plaintiffs may not allege securities fraud against Delivery Agent as to any statements for which they have not identified a speaker because a "defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter." See In re Apple Computer, Inc., Sec. Litig., 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002). The cases on which Plaintiffs rely for their argument that their allegations that Delivery Agent directly violated Section 10(b) refer only to whether a corporation can make a statement, not whether the corporation has the requisite scienter. See Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 148 (2011) (dismissing claim against one entity because it held that a different corporate entity was the maker of the alleged misrepresentations in question, but not addressing whether either entity had the requisite scienter); In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017) (dismissing claim based on corporate statement in a newspaper because, although the statement was attributable to the corporation, the plaintiff had not adequately alleged that the corporation had the requisite scienter because it was not attributed to any particular individual and the plaintiff had

36

"not adequately alleged that the statement would have been approved by a corporate official knowledgeable enough about the company to know that the statement was misleading"); Middlesex Ret. Sys. v. Quest Software Inc., 527 F. Supp. 2d 1164, 1192 (C.D. Cal. 2007) (holding that the corporate defendant was a primary violator because the misleading financial statements were attributable to the corporation itself, but clarifying that it had already established that the other defendants had the appropriate scienter).

Plaintiffs have not attempted to show Delivery Agent's scienter, but have established that Delivery Agent is a primary violator based on the acts of its agent Fitzsimmons.

### 2.      Sufficiency of Control Allegations

Defendants also argue that Plaintiffs have not sufficiently alleged that they controlled the primary violators.  Generally, "at the motion to dismiss stage, courts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control."[9]  In re Montage Tech. Grp. Ltd. Sec. Litig., 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015) (citation and quotation marks omitted); In re Adaptive Broadband Sec. Litig., 2002 WL 989478, at *19 (N.D. Cal. Apr. 2, 2002) ("[t]he fact that the named individual defendants held important positions in the company is sufficient at the pleadings stage"); In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1031-32 (S.D. Cal. 2005) (allegations of CEO and Chairman's day-to-day involvement with the business were sufficient to establish control).

To state a claim for Section 20(a) liability, a party must "demonstrate 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the

---

[9] Defendant argues that Rule 9(b)'s requirement that fraud claims must be pled with particularity applies to the control element of Section 20(a).  There is a split of authority on this issue. Compare, for example, In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 66281, at *19 (N.D. Cal. Jan. 4, 2017), reconsideration denied, 258 F. Supp. 3d 1037 (N.D. Cal. 2017) (applying Rule 9(b)'s heightened standard to control allegations under Section 20(a)) with Siemers v. Wells Fargo & Co., No. C 05-04518 WHA, 2006 WL 2355411, at *14 (N.D. Cal. Aug. 14, 2006) ("Plaintiff is only required to assert fraud with particularity as to the primary violations.").  The Ninth Circuit has yet to rule on this issue.  However, in In re Daou Sys., Inc., the Ninth Circuit held that, because the plaintiffs' Section 11 securities claim adopted wholesale their securities fraud allegations, "all of plaintiffs' claims, whether including an element of fraud or not, [had to] satisfy the heightened pleading standard set out in Rule 9(b)."  411 F.3d 1006, 1028 (9th Cir. 2005).  Because the Court concludes that the sufficiency of Plaintiffs' allegations would be the same under either standard, the Court does not decide this issue.

primary violator.'" Zucco, 552 F.3d at 990. In "order to make out a prima facie case, it is not necessary to show actual participation or the exercise of actual power." Howard v. Everex Sys., Inc., 228 F. 3d 1057, 1065 (9th Cir. 2000). "The 'controlling person' analysis is an intensely factual one requiring inquiry into a 'defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'" Bao v. SolarCity Corp., No. 14-CV-01435-BLF, 2015 WL 1906105, at *5 (N.D. Cal. Apr. 27, 2015) (quoting Howard, 228 F.3d at 1065 (internal citations omitted)). The "plaintiff must allege specific facts concerning a defendant's responsibilities within the company that demonstrate his involvement in the day-to-day affairs of the company or specific control over the preparation and release of the allegedly false and misleading statements." Bao, 2015 WL 1906105, at *5. Without allegations to that effect, a director's review or approval of financial statements is generally insufficient to show that the director is a control person. Howard, 228 F.3d at 1067 n. 13.

Defendants are all officers or directors.[10] Rising Tide FAC ¶¶ 11-23; Abdo FAC ¶¶ 14-22. Relying on Delivery Agent's Certificate of Incorporation and Bylaws and Delaware General Corporation law to establish Delivery Agent's corporate governance structure, Plaintiffs allege that, as members of the Board of Directors, Defendants had the power to control Delivery Agent because they were empowered to discipline and terminate the Chief Executive Officer and were vested with ultimate authority to control and direct the business affairs of Delivery Agent. Rising Tide FAC ¶¶ 198-99; Abdo FAC ¶¶ 178, 180. More specifically, Plaintiffs allege that, in June or July 2014, the Board of Directors, which consisted of Fitzsimmons, Power, Goettner, Borcher, Del, Yi, and Badran, came up with "an intentionally lax" remediation plan after they were presented with substantiated allegations of misconduct by Fitzsimmons, Lai, and other senior officers. Rising Tide FAC ¶¶ 58-60; Abdo FAC ¶ 51. Moreover, Plaintiffs allege that, on July 29, 2014, a unanimous Board of Directors voted to terminate the auditor. Rising Tide FAC ¶ 66; Abdo FAC ¶ 55. Plaintiffs also allege these same directors voted to approve issuing executing, and delivering new stock purchases, including those that contained misrepresentations. Abdo

---

[10] Peters was not a member of the Board until December 2014 or March 2015. Abdo FAC 21

FAC ¶¶ 132, 136, 138, 140).

With respect to Peters, Plaintiffs allege that he was a control person starting in January or March 2015. Abdo FAC ¶¶ 308-09; Rising Tide FAC ¶¶ 310-11. Plaintiffs do not allege specific facts showing that Peters was involved in the day to day affairs of delivery agent or that he had specific control and preparation and release of the allegedly false and misleading statements other than by stating what his positions with Delivery Agent were and that he reviewed or approved of certain financial statements, which is insufficient under Howard. Abdo FAC ¶¶ 136-42; Rising Tide FAC ¶¶.

Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' Section 20(a) claims with respect to Peters but denies Defendants' motions to dismiss Plaintiffs' Section 20(a) claims with respect to Power, Goettner, Borcher, Del, Yi, and Badran.

### C.    California Corporations Code § 25504 Claims

Plaintiffs assert claims against all Defendants under California Corporations Code § 25504. Similar to Section 20(a), § 25504 imposes secondary liability in connection with the fraudulent sale of securities in California. In its first clause, it imposes liability on every person who controlled a person who is liable for fraudulently selling securities within California. In its third clause, it imposes liability on every director of a corporation that that is liable for fraudulently selling securities within California.

#### 1.    Leave to Amend

In its previous Order, the Court granted Plaintiffs "leave to amend all dismissed claims." Order at 43. Defendants argue that the Court should strike Plaintiffs' California securities laws claims because Plaintiffs did not seek leave to amend their complaints to add them. While the Court has the discretion to do so, see, e.g., Larry O. Crother, Inc. v. Lexington ins. Co., No. 2:11-cv-00138-MCE-GGH, 2011 WL 1084201, at *2 (E.D. Cal. Mar. 21, 2011), in the interest of judicial economy and in light of the Federal Rules of Civil Procedure's instruction that leave to amend should be freely granted, the Court instead construes Plaintiffs' additional allegations as a request for leave to amend. See In re Asyst Techs., Inc. Derivative Litig., No. C-06-04669 EDL, 2008 WL 4891220, at *9 (N.D. Cal. Nov. 12, 2008); Brockmeier v. Solano Cnty. Sheriff's Dept.,

No. CIV S-05-2090 MCE EFB PS, 2007 WL 1521074 (E.D. Cal. May 22, 2007) (construing an improperly filed amended complaint as a motion for leave to amend).

Courts typically review four factors when evaluating whether to grant a party leave to amend: "bad faith, undue delay, prejudice to the opposing party, and futility of amendment." Roth v. Garcia Marquez, 942 F.2d 617 (9th Cir. 1991) (quoting DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987)). The Court grants Plaintiffs leave to amend their complaints to add these claims. There is no indication of prejudice. Discovery has been stayed per the PSLRA and the facts that give rise to both claims are generally the same. This case is still in the pleading stage. There has been no undue delay or bad faith. Finally, amendment would not be futile.

### 2.        Statute of Limitations

Defendants next argue that Plaintiffs' claims are barred by the statute of limitations. The statute of limitations  for Plaintiffs' claims lapses at "the expiration of five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, which ever shall first expire." Cal. Corp. Code § 25506(b). Defendants argue that Abdo was on inquiry notice of the information contained in the Auditor's response by August 19, 2015, and Rising Tide was on inquiry notice of the information contained in the Auditor's response by August 21, 2015, so the statute of limitations on their claims expired  in August 2017. Plaintiffs filed their First Amended Complaints on December 15, 2017.

Plaintiffs respond their claims relate back to the filing of their original Complaints, which Abdo filed on February 21, 2017 and Rising Tide filed on March 8, 2017. Under Rule 15, an amended complaint relates back to the date of the original pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out - or attempted to be set out - in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "The relation back doctrine of Rule 15(c) is 'liberally applied.'" ASARCO, LLC v. Union Pac. R. Co., 765 F.3d 999, 1004 (9th Cir. 2014) (quoting Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1259 n. 29 (9th Cir.1982)). "The basic inquiry is whether the opposing party has been put on notice about the claim or defense raised by the amended pleading." S. E. C. v. Seaboard Corp.,

United States District Court
Northern District of California

40

677 F.2d 1301, 1314 (9th Cir. 1982).  In deciding whether an amended pleading relates back, the court "must determine whether the amended complaint shares sufficient commonality to the original complaint 'to impart fair notice of the transaction, occurrence, or conduct called into question.'" U.S. ex rel. Cericola v. Fed. Nat. Mortg. Assoc., 529 F. Supp. 2d 1139, 1149 (C.D. Cal. 2007) (quoting Martell v. Trilogy Ltd., 872 F.2d 322, 327 (9th Cir. 1989)).

Plaintiffs' California securities claims relate back to their earlier pleaded federal securities claims because they rely on the same core conduct.  Accordingly, Defendants were on adequate notice.  Defendants also overstate the holdings of several of the cases upon which they rely.  For example, Defendants argue that Williams v. Boeing Co., 517 F.3d 1120, 1133 (9th Cir. 2008) and Seabord Corp., 677 F.2d at 1314 support their argument that Plaintiffs' FACs do not relate back because they have added allegations that there were misrepresentations in the litigation and warranty in the Series F Purchase Agreements.  In Williams, the Ninth Circuit held that the plaintiffs' compensation discrimination claim, contained in their second amended complaint, did not relate back to their earlier  pleaded allegations of promotion discrimination, hostile work environment, and retaliation.  517 F.3d at 1133. The court held there was no "common core of operative facts" because the defendant used different processes to determine salary and promotion decisions, so the plaintiffs' new claims would require different statistical evidence and witnesses. Id.  The court held that the compensation discrimination claim "was a new legal theory depending on different facts, not a new legal theory depending on the same facts."  Id.  Here, the claims share the same common core of facts.

In Seabord, the court held that a party's second amended cross-claims that alleged "misrepresentations and omissions" did not relate back to an SEC complaint that had described a scheme to manipulate the market or the first amended cross-claims, which merely added new defendants and did not include any allegations relating to misrepresentations.  677 F.2d at 1314. Similarly, in Stichting Pensioenfonds ABP v. Countrywide Fin. Corp., the district court ruled that a plaintiff's claim under Section 10(b) did not relate back to a claim under Section 11.  802 F. Supp. 2d 1125, 1134 (C.D. Cal. 2011).  There, the Section 11 claim, as originally pleaded, was not a "fraud-based claim," and the plaintiffs had "expressly disclaimed" facts necessary to support a

41

strong inference of scienter. Id. Therefore, the complaint for a violation of Section 11 had not placed the defendants on notice that they needed to preserve evidence or craft a litigation strategy relating to scienter. Id. Unlike this case, the prior pleadings in Seabord and Stichting did not allege any misrepresentations.

Finally, Defendants argue that the California claims do not relate back because Plaintiffs must show that the purchase of the securities took place in California. Abdo's original complaint alleged venue was proper in this district because Delivery Agent's principal office and place of business was in San Francisco, California and "the securities that are the subject of this lawsuit and the alleged omissions of material fact, as well as false and misleading statements, were made in or issued from this District." Abdo Compl. ¶¶ 27-28. Rising Tide alleged that venue was proper because "the securities that are the subject of this lawsuit, as well as the false and misleading statements, were made in or issued from this District" and a "substantial part of the events and omissions giving rise to this action occurred in San Francisco." Rising Tide Compl. ¶¶ 25-26. Defendants argue that these references to California are too "vague" to "trigger relation back of subsequent claims." For support, they rely on Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin., in which the court held that generic references to the environment "and environmental statutes" in a complaint did not provide adequate notice that an amended pleading would assert violations of the Clean Air Act ("CAA"), particularly where the details concerning the CAA conformity finding were present in the amended complaint but "entirely absent from the original complaint." No. CV 12-9861-GW(SSX), 2016 WL 4650428, at *111 (C.D. Cal. Feb. 1, 2016). The references to California in the original complaints, which include that the securities were made or issued in California, were sufficient to give Defendants notice that Plaintiffs might allege the securities were purchased or sold in California. Accordingly, the statute of limitations does not bar Plaintiffs' state-law claims.

### 3. Adequacy of Allegations of Delivery Agent's Primary Liability

To recover against Defendants as secondarily liable under § 25504, Plaintiffs must sufficiently allege Delivery Agent's primary liability under § 25501, which make a person liable for violations of § 25401. See Cal. Corp. Code. §§ 25504, 25501. Plaintiffs' allegations for its

United States District Court
Northern District of California

42

California securities fraud claims must also satisfy Rule 9(b)'s particularity requirement. See Siegal v. Gamble, No. 13-CV-03570-RS, 2016 WL 3648503, at *4 (N.D. Cal. July 7, 2016).

### a.   § 24501 - Sale of Securities in California

Section 25401 provides:

> It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

Cal. Corp. Code. § 24501.

Defendants argue that Plaintiffs have failed to adequately allege that the sale of the securities took place in California.  In Olenicoff v. UBS AG, the court held that the plaintiffs had sufficiently alleged that the sales or offers to sell securities took place in California where the original agreement between one of the plaintiffs and one of the defendants took place in California, documents were sent to that plaintiff at his California office with instructions to sign forms to create new entities, and the alleged fraudulent statements were sent to California.   No. SACV 08-1029 AG RNBX, 2010 WL 8530286, at *24-25 (C.D. Cal. Mar. 16, 2010), on reconsideration in part, No. SACV081029AGRNBX, 2010 WL 11558127 (C.D. Cal. June 21, 2010).  By contrast, in Seigal, the court dismissed a plaintiff's complaint where the plaintiff did "not provide any factual information establishing that the sale took place in California," although the plaintiff had alleged that that the investment opportunity involved six billion barrels of oil in San Joaquin Valley.  2016 WL 3648503, at *6.

Abdo responds that its allegations that Delivery Agent's principal place of business is in California, that the securities were issued in California, and their Section 25504 counts contain the phrase "[i]n connection with an offer to sell securities in California" suffice.  Abdo FAC ¶¶ 27-28, 193, 195, 214, 216, 245, 247, 264, 266, 296, 298, 318, 320.  Similarly, Rising Tide argues that its allegations that several defendants, including Delivery Agent, reside in California, that the securities in question were made in or issued in this district, that "a substantial part of the events giving rise to this action occurred in San Francisco, California,"  and that the misrepresentations

United States District Court
Northern District of California

and omissions it alleges were made "in connection with an offer to sell securities in California and the sale of securities in California" suffice.  Rising Tide FAC ¶¶ 11-23, 26-27, 217, 234-35, 274-75, 292-93, 322, 324, 343-44.  Plaintiffs sufficiently allege that the securities were sold or offered in California.

### b.    § 24501 Violations by Delivery Agent

Defendants argue that Plaintiffs must plead allegations against Delivery Agent that are consistent with a violation of Rule 10b-5 in order to successfully state a claim under § 24501, because it was modeled after Rule 10b-5.  See Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284–85 (9th Cir. 1982) (reversing summary judgment on the state law claims "for the same reasons and to the same extent" as it reversed summary judgment with respect to the federal claims because "California Corporations Code Section 25401 tracks the language of section 10(b) of the Securities Exchange Act of 1934," and the plaintiffs' "claims under section 25401 [were] based on the same factual allegations as [were] their parallel federal claims").  In Mueller v. San Diego Entm't Partners, LLC, No. 16CV2997-GPC(NLS), 2017 WL 3387732, at *10 (S.D. Cal. Aug. 7, 2017), the court held, "Since the Court has concluded above that Plaintiff has alleged a cause of action under § 10(b) and Rule 10b-5, then Plaintiff has also stated a claim for a violation of state securities law."  Id.  Similarly, in Mausner v. Marketbyte LLC, the court analyzed the various defendants' liabilities under Section 10(b) and Rule 10b-5 before concluding, as "the elements are similar to Plaintiff's federal security law claims, the same analysis applies."  No. 312CV2461JMNLS, 2013 WL 12073832, at *12 (S.D. Cal. Jan. 4, 2013).

Here, because Plaintiffs sufficiently allege that Delivery Agent was a primary violator under Section 10(b), Plaintiffs also sufficiently allege that Delivery Agent violated § 24501 through the actions of Fitzsimmons.  However, because Plaintiffs do not adequately allege Delivery Agent's scienter for Delivery Agent's representations, including in the PowerPoint presentation, the Draft S-1 and updated S-1, and the March 2015 Investor Update, those are not an actionable basis for Plaintiffs' California securities fraud claims.

### c.    § 25501- Plaintiffs' Knowledge

Section 25501 provides, in relevant part:

United States District Court
Northern District of California

> Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission.

Cal. Corp. Code. § 25501.

Defendants argue that Delivery Agent is not liable under § 25501 because Plaintiffs do not adequately allege their own lack of knowledge. Defendants rely on Siegal, 2016 WL 3648503, at *5 (citing Apollo Capital Fund, LLC v. Roth Capital Partners, LLC, 158 Cal. App. 4th 226, 253 (2007)) for the argument that Defendants are not liable if Plaintiffs knew the facts concerning the alleged untruth or omission. Neither of those cases holds that Plaintiffs must plead their own lack of knowledge. Their argument is based primarily on the fact that Plaintiffs each made one significant investment after they learned about the Super Bowl ad cover-up and the Item 304 problem. The later does not negate an earlier lack of knowledge. Defendants are asking the Court to make inferences that are inappropriate at this stage.

With respect to Rising Tide, Defendants state that Plaintiffs must have had knowledge of the alleged fraud because by the time of Rising Tide's last two investments, Rising Tide had a representative on the Board. Rising Tide Main Motion at 31; Rising Tide Main Rep. at 22. This argument similarly does not negate an earlier lack of knowledge.

### 4. Liability Under § 25504

Section § 25504 provides:

[1] Every person who directly or indirectly controls a person liable under Section 25501 or 25503, [2] every partner in a firm so liable, [3] every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

45

Cal. Corp. Code § 25504.[11]  Plaintiffs assert claims under the first and third clauses against Power, Goettner, Borcher, Yi, Del, Badran, and Peters.  Plaintiffs also assert a claim under the third clause against Lai.

### a.      Claims under the First Clause of § 25504 Claims

The first clause of § 25504 imposes liability on every person who controlled a person who is liable for fraudulently selling securities within California.  Cal. Corp. Code § 25504.  Just as facts alleging the primary violator's liability under Section 10(b) are sufficient to allege a violation of § 24501, facts sufficient to allege "control" under Section 20(a) are sufficient to allege "control" under the first clause of § 25504.  See Hellum v. Breyer, 194 Cal. App. 4th 1300, 1315, n. 8 (2011) (noting that "the language 'controls a person' as used in section 25504 requires the same pleading allegations as the language 'controls any person' as used in Title 15 of the Securities Act. . . . The analysis for establishing control-person liability under Title 15 of the Securities Act and section 20(a) is identical").  All parties direct the Court to their briefing for Section 20(a).  Accordingly, as discussed above, Plaintiffs sufficiently allege that Defendants Power, Goettner, Borcher, Del, Yi, and Badran had control of Delivery Agent and Fitzsimmons, and therefore denies Defendants' motions to dismiss those claims.  However, because Plaintiffs do not adequately plead that Peters had control of Delivery Agent, the Court grants Defendants' motions to dismiss the claim against Peters under the first clause of § 25504.

### b.      Claims Under the Third Clause of § 25504

The third clause of § 25504 imposes liability on every director or officer of a corporation that is liable for fraudulently selling securities within California unless the director lacks "knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."  Liability under the third clause is broader than under the first

---

[11] The California statute does not number the clauses in this section.  At the hearing on this motion, there was some confusion over which clauses Plaintiffs were referring to as the third and first.  For the sake of clarity, the Court has numbered the clauses based on the allegations in Plaintiffs' complaints and their briefing.  See Abdo FAC ¶¶ 190, 241, 292 (alleging violations of first clause); Abdo FAC ¶¶ 209, 261, 313 (alleging violations of third clause); Rising Tide FAC ¶¶ 212, 270, 319 (alleging violations of first clause); Rising Tide FAC ¶¶ 231, 289, 339 (alleging violations of third clause).

46

clause and does not require the defendant to control the corporation. Defendants allege that Plaintiffs must plead the Defendants' knowledge of the facts that give rise to liabiltiy. See Chassin Holdings Corp. v. Formula VC Ltd., No. 15-CV-02294-EMC, 2017 WL 66873, at *10 (N.D. Cal. Jan. 6, 2017) (citing Moss v. Kroner, 197 Cal. App. 4th 860, 879 (2011)).

In Balkowitsch v. D & M Dev., Inc., the court held that lack of knowledge was an affirmative defense. No. 2:15-CV-00196 JAM EF, 2015 WL 3403083, at *2 (E.D. Cal. May 27, 2015). In Hellum, the court stated that the California legislature had "creat[ed] liability (subject to an affirmative defense)" for principal executive officers and directors of a corporation that is primarily liable. 194 Cal. App. 4th at 1310. Moss cited that quote from Hellum with approval. See Moss, 197 Cal. App. 4th at 877. However, when determining whether the plaintiff had stated a viable cause of action, the court held that the plaintiff "alleged facts from which" the defendants' knowledge could be concluded. Id. at 889. Based on the plain language of the statute, the knowledge requirement to be an affirmative defense, not an element.[12]

In their reply, Defendants argue that Plaintiffs must plead the Defendants' knowledge with particularity due to Rule 9(b). They rely on Gidding v. Zurich Am. Ins. Co., which held that "although Rule 9(b) permits knowledge and intent to be pled in general terms, a plaintiff still must allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." No. 15-CV-01176-HSG, 2016 WL 4088865, at *6 (N.D. Cal. Aug. 2, 2016), reconsideration denied, No. 15-CV-01176-HSG, 2017 WL 3394150 (N.D. Cal. Aug. 8, 2017) (quoting San Francisco Tech., Inc. v. GlaxoSmithKline LLC, No. 5:10-CV-03248, 2011 WL 941096, at *3 (N.D. Cal. Mar. 16, 2011). Because lack of knowledge is an affirmative defense, Gidding is distinguishable.

In any case, Plaintiffs' allegations of scienter as to Section 20(a), discussed in section IV.A.1.c, are sufficient to allege "knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist" on behalf of all Defendants except

---

[12] Analyzing a similar statute, some earlier California cases have held that "lack of knowledge" is an affirmative defense to fraud. See, e.g., Spahn v. Guild Indus. Corp., 94 Cal. App. 3d 143, 157, n. 9 (Ct. App. 1979).

Lai, who was not alleged to violate Section 20(a). See Cal. Corp. Code § 25504. Nonetheless, Plaintiffs allegations that Lai personally participated in the Super Bowl fraud sufficiently allege his knowledge. Abdo FAC ¶ 50, Rising Tide FAC ¶ 59.

### c.    Remedy

Defendants argue that, because Plaintiffs still own their securities, their sole remedy would be rescission but that remedy is barred by the lack of privity. Cal. Corp. Code §§ 25501; 25504. There is a split of authority on this issue. In Viterbi v. Wasserman, the court held that rescission was not available to plaintiffs who asserted claims against secondarily liable defendants under § 25504. 191 Cal. App. 4th 927, 936 (2011). The court reasoned that rescission was not available because the parties were not in privity and in federal cases analyzing federal securities statutes on which California's security statutes were based, courts had held that rescission was not available without privity. Id. (citing Huddleston v. Herman & MacLean, 640 F.2d 534, 555 (5th Cir. 1981), as corrected on denial of reh'g (July 13, 1981), aff'd in part, rev'd in part, 459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) and McFarland v. Memorex Corp., 493 F. Supp. 631, 648 (N.D. Cal. 1980)).

In Moss, the court disagreed with the analysis in Viterbi. 197 Cal. App. 4th at 875-79. First, the court held that the lack of rescission would lead to inequitable results. Id. at 876. Second, it distinguished California securities law from the federal caselaw on which Viterbi had relied. Id. at 876-77. The court noted that California law differed from federal law because the California Legislature had "deliberately created secondary joint and several liability by means of statutes such as section 25504 and 25504.1." Id. Third, it reasoned that Viterbi had not taken into account the "very specific language" of those sections, which indicated the California Legislature's intent "to expand liability, in limited circumstances, beyond the strict privity, direct buyer and seller liability established in section 25501 to other, secondarily responsible participants in securities fraud." Id. at 878. While the court agreed with the Viterbi court that privity would have been required under ordinary principles of rescission, it concluded that the California statutes placed "certain secondary actors in the shoes of the principal violator for the purpose of civil liability as long as the original direct violator was in privity with the plaintiff." Id.

United States District Court
Northern District of California

48

United States District Court
Northern District of California

Unsurprisingly, Defendants argue that Viterbi is the better-reasoned decision. They contend that Moss fails to balance the expansion of liability created by eliminating some common law requirements with other restrictions on recovery. See California Amplifier, Inc. v. RLI Ins. Co., 94 Cal. App. 4th 102, 109 (2001). Just as predictably, Plaintiffs argue that Moss is the better authority. They note that a "leading treatise on California corporations law" determined that Viterbi is "inequitable and contrary to the intention of the Corporate Securities Law" and "reads §§ 25504 and 25504.1 out of the Corporate Securities Law insofar as they apply to secondary violators." Friedman, et al. California Practice Guide: Corporations (Rutter 2012) § 5:395.4(cmt). Plaintiffs also cite Jackson v. Fischer, 931 F. Supp. 2d 1049, 1065 (N.D. Cal. 2013) which observed that Moss is the "better-reasoned decision," citing the same treatise. This Court also concludes that Moss is more persuasive and consistent with California's statutory scheme of expanded liability. Accordingly, the Court denies Defendants' motions to dismiss Plaintiffs' claims under § 25504.

## V.    CONCLUSION

The Court **DENIES** Defendants' motions to dismiss Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims, although some of the alleged misrepresentations and omissions are not actionable as to some Defendants. The Court **DENIES** Defendants' motions to dismiss Plaintiffs' Section 20(a) claims for all Defendants except Peters. The Court **DENIES** Defendants' motions to dismiss Plaintiffs' claims under California's securities laws, except as to Plaintiffs' claims under the first clause of § 25504 against Peters.

Plaintiffs may amend all dismissed claims, provided that they can do so in good faith. See Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (holding that the rule that dismissal without leave to amend is not appropriate unless it is clear that the complaint could not be saved by amendment is particularly important in PSLRA cases because the pleading standards are so high). Plaintiffs must file their amended complaints within two weeks of the date of this order. In those complaints, Plaintiffs should specify which statements they are alleging are actionable misrepresentations and which statements they are only including as background for their other allegations.

49

**IT IS SO ORDERED.**

Dated: May 22, 2018

_Elizabeth D. Laporte_
ELIZABETH D. LAPORTE
United States Magistrate Judge