1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7    JOHN E. ABDO, et al.,                        Case No.  17-cv-00851-TSH

8                    Plaintiffs,

9           v.                                    **PUBLIC REDACTED VERSION OF**
                                                  **ORDER RE: MOTION FOR**
10   MICHAEL FITZSIMMONS, et al.,                 **SUMMARY JUDGMENT (17-851 ECF**
                                                  **NO. 271; 17-1232 ECF NO. 270)**
11                   Defendants.
                                                  Abdo Dkt. No. 201
12   RISING TIDE I, LLC, et al.,
                                                  Rising Tide Dkt No. 197
13                   Plaintiffs,
                                                  Case No.  17-cv-01232-TSH
14          v.

15   MICHAEL FITZSIMMONS, et al.,

16                   Defendants.

17

18                              **I.     INTRODUCTION**

19          This securities fraud action arises from Plaintiffs' investment in a technology company,

20   Delivery Agent, Inc., which went bankrupt, causing Plaintiffs to lose tens of millions of dollars.

21   Plaintiffs maintain that they were led to invest in Delivery Agent by misrepresentations by officers

22   and directors of the company as to several significant problems that eventually prevented the

23   company from having an initial public offering and doomed it.  Pending before the Court is

24   Defendants' Motion for Summary Judgment.  Abdo ECF No. 201/Rising Tide ECF No. 197.

25   Plaintiffs filed an Opposition and Defendants filed a Reply.  Having considered the parties'

26   positions, relevant legal authority, and the record in this case, the Court **GRANTS IN PART** and

27   **DENIES IN PART** Defendants' Motion.

28

United States District Court
Northern District of California

## II.   BACKGROUND

The following factual summary provides an overview of the background of the case.  The Court will add details relevant to particular issues as needed.

### A.   The Parties

Plaintiffs Rising Tide I, LLC and Rising Tide II, LLC (collectively, "Rising Tide" or "RT") are venture capital funds managed by Ossama Hassanein.[1]  Plaintiff John E. Abdo is an individual investor and trustee of the two Plaintiff trusts (collectively, "Abdo").  Between June 2014 and April 2016, Plaintiffs invested nearly $35 million in Delivery Agent, Inc. ("Delivery Agent" or the "Company") through a series of securities purchases.

Delivery Agent was a private e-commerce and marketing company founded in the early 2000s.  Defendant Michael Fitzsimmons was the Company's founder and CEO and Chairman of its Board of Directors (the "Board").  Defendant Peter Lai was President and Chief Operating Officer ("COO") until about January 2015.  Defendant James Peters joined the Board as an outside director in Fall 2014, became the Company's President and COO effective January 5, 2015, and became an inside member of the Board as of March 2015.

By early 2014, the Company had raised more than $100 million from venture capital funds and strategic investors, including from four investors which placed on the Board four of the Defendants: Souheil Badran, Christian Borcher, Peter Goettner, and Marc Yi.  Defendant Ernest Del was another outside member of the Board, as was Defendant Christopher Power, chairperson of the Board's Audit Committee.  Together, these six were the Board's outside directors (the "ODs").

### B.   The Super Bowl Ad

Starting in early 2014, the Company began marketing itself as having developed a "proprietary technology" that would allow television viewers to purchase products from their smart TVs using their remote controls.  The technology, referred to as "television commerce" or "t-commerce," was designed to allow a consumer to engage with live TV through an overlay on

---

[1] The Court will omit citations to the record for facts which the Parties stated in their opposing statements of fact and which neither side attempted to dispute.  References to supporting evidence can be found in the statements of fact, Abdo ECF No. 261-1.

1    the TV screen to transact and purchase products and services seen in programming.  Decl. of Sarah

2    E. Peterson ISO Pls.' Opp'n ("Peterson Decl.") Ex. 72; Peterson Decl. Ex. 75, Tr. of Dep. of

3    Christopher Lee[2] ("Lee Dep.") at 15:14-17:14.

4          Delivery Agent's first public exhibition of its t-commerce technology took place on

5    February 2, 2014 during Super Bowl XLVIII.  The Company was hired by Zenith Media Services,

6    Inc. on behalf of client H&M to deploy the technology in connection with a commercial for a line

7    of H&M underwear sponsored by soccer star David Beckham.  Delivery Agent's overlay was

8    supposed to appear at the bottom of the commercial and allow viewers with smart TVs to order the

9    briefs with their remotes.  However, things didn't go as planned, and when the ad with the

10   underwear ran, the overlay failed to trigger as expected on the majority of TV sets.  Peterson Decl.

11   Ex. 97, Tr. of Dep. of Mac Hagel at 49:12-51:12; Lee Dep. at 127:3-129:8.  Shortly after the Super

12   Bowl debut, Lai (then president and COO) informed Fitzsimmons (CEO) that only three of 600

13   pieces of merchandise had been purchased by the viewing public through the Company's platform.

14   Fitzsimmons responded by telling Lai to "buy every pair" and within hours of the commercial's

15   airing over 472 of the 600 pieces had been purchased by Delivery Agent employees.

16         The day of the Super Bowl, Delivery Agent's Chief Strategy Officer ("CSO") Gabe

17   Greenberg told H&M and Zenith that "we sold out all 1,100 items we had in stock."  The

18   following day, the Company issued a press release quoting Fitzsimmons as stating that the event

19   was "a great campaign" and "kicked-off a new paradigm for advertising, fundamentally changing

20   the discipline by making television advertising actionable and measureable."  At about the same

21   time, several members of Company's senior management, including Lai, were busy fabricating

22   sales and viewer engagement data to send to H&M and Zenith to support the falsehood that the

23   launch of the t-commerce platform had been a great success and that merchandise had "sold out."

24

25

26

_____

27   [2] Plaintiffs do not identify Lee's role at Delivery Agent.  From Lee's deposition testimony, the
     Court gleans he was a Delivery Agent product director who worked as part of a group of
28   employees directly on the partnership with H&M for the 2014 Super Bowl ad.  Lee Dep. at 20:22-
     21:1.

United States District Court
Northern District of California

**C.      The Post-Super Bowl Investigations and Board's Termination of Deloitte**

On or about February 7, 2014, a non-executive Delivery Agent employee approached the Company's CFO, Michael Novelly, and its general counsel, Mark Smith, to report his involvement in the fabrication of data to be sent to H&M.  That same day, Smith notified directors Borcher, Goettner, and Power of the allegations and convened an Audit Committee meeting for the following day.  He told them that the subject of the meeting pertained to a matter of fraud related to a presentation called *H&M David Beckham Super Bowl Campaign Recap* that had been sent to H&M, its agency, and potential Series F investors, that "[i]t came to our attention that the figures in the [] presentation were fraudulently prepared," and that "[u]pon our discovery of this matter, we conducted a preliminary internal investigation and learned that this matter concerns some members of senior management."

The meeting on February 8 was attended by Borcher, Goettner, Power, Smith and others.  At the meeting, the Committee instructed Smith and the head of HR to lead an internal investigation into the allegations.  The Committee also instructed Fitzsimmons to focus on raising money from investors because the Company was in dire financial straits.  On February 14, the Company's CFO emailed the ODs and notified them that a potential investor had "backed out" of its commitment to make a $12 million investment and that if Delivery Agent did not receive $4 million from insiders within five days, "the Company will run out of cash" and "we would need to discuss certain wind down scenarios."  And on February 28, Fitzsimmons advised Badran, Borcher, Goettner, Yi and others that Delivery Agent "barely made payroll today."

Smith and the head of HR began their investigation shortly after the February 8 meeting, and the full Board was notified of the investigation.  By mid-February, the Audit Committee members—Power and Novelly—knew that Fitzsimmons was implicated in the misconduct connected to the H&M Super Bowl ad.  On March 12, 2014, internal investigators including Smith completed their investigation and on March 13 the findings were presented in a written report to Audit Committee members, including Borcher, Goettner and Power, and to Delivery Agent's outside counsel Latham & Watkins ("Latham").  Peterson Decl. Ex. 107.  The report's findings confirmed that Fitzsimmons had ordered Lai to purchase unsold merchandise to create the illusion

of a "sell out."  On March 27, Smith emailed the investigation report to Borcher, Goettner, Yi, and Power.  Power presented the investigative findings to Delivery Agent's auditor, Deloitte & Touche ("Deloitte").  Deloitte found the report unsatisfactory and said that it would not restart audit services until a second investigation was completed by an independent, outside firm.  On March 26, 2014, the Board instructed the Audit Committee to retain outside law firm Bergeson, LLP to conduct that investigation.

On June 18, 2014, Bergeson presented a 76-page report to the Board, Peterson Decl. Ex. 145 at 49:6-14, and Power advised Deloitte of the results of the investigation in early July. Deloitte subsequently informed Delivery Agent's Board that it would not resume auditor services unless all those who participated in the fraud, including Fitzsimmons, Lai, and other members of senior management, were removed from positions of authority within the Company.  Deloitte told the Company it could not accept "management representations" from Fitzsimmons required to issue audit reports.  On July 9, Power emailed Borcher, Yi, Goettner, Del, and Badran to update them on his meeting with Deloitte, telling them that Deloitte "may continue to be concerned about Fitz's role.  I knew going in it would be a challenge to turn them around – they appeared to have strong opinions going in."  He went further, telling them that it was "not likely at this point" that Deloitte would "continue as auditors."  On about July 17, 2014, Deloitte advised Power that it was "walking away," that it was unwilling to rely on "certain reps from management," and that it would not "consent to releasing or publishing" its 2012 audit report.  Deloitte wouldn't be willing to reissue its 2012 audit opinion unless new management was put in place and it could "perform additional procedures to try and get comfortable that there was no other items that might have been influenced by Fitzsimmons that would have impacted" Delivery Agent's reporting.  Peterson Decl. Ex. 16, Tr. of Dep. of Timothy de Kay ("Deloitte Dep.") at 119:2-120:1.  On July 29, the Board unanimously voted to terminate Deloitte.

Following the Board's termination of Deloitte, Deloitte refused to allow the Company to publish or release, and it would not reissue, its 2012 audit of the Company's financial statements. The Company retained a new auditor, Grant Thorton LLP ("Thorton") in September 2014, but Thornton did not complete its audit of the 2012 and 2013 financial statements until April 30, 2015.

United States District Court
Northern District of California

1    More importantly, however, was that Delivery Agent would be required to make an Item 304

2    disclosure.  Such a disclosure must be made by any company wishing to sell shares in an IPO if it

3    has changed auditors within the prior two fiscal years, describing the reasons for the change of

4    auditor.  17 C.F.R. § 229.304.  However, the Company was never able to resolve a dispute with

5    Deloitte over the language of the disclosure and Deloitte's response statement, and its investment

6    banks were unwilling to proceed with an IPO due to the dispute not being resolved.  In other

7    words, Deloitte's termination and the resulting Item 304 conflict was fatal to Delivery Agent's

8    IPO prospects.  *See* Peterson Decl. Exs. 166-70.

9    **D.      Plaintiffs Investments' and the Alleged Material Misrepresentations**

10          During all of this, Delivery Agent continued to raise money from investors, with

11    Fitzsimmons soliciting investments from Plaintiffs without informing them of these events.

12    Beginning on or about May 19, 2014, Abdo and his investment group had numerous meetings and

13    telephone calls and exchanged communications with Fitzsimmons and other Delivery Agent

14    employees in which they touted the t-commerce technology and Delivery Agent's near-term IPO

15    prospects.  Abdo first invested in June 2014, while the Bergeson investigation was ongoing, and

16    Rising Tide first invested two months later, in August, after the investigations were completed and

17    Deloitte had been fired.  Fitzsimmons told Plaintiffs that the t-commerce rollout was a success and

18    that, as late as June 2015, IPO planning was "on track."  This was despite Latham's advice that

19    Delivery Agent refrain from "over-hyping IP chances or the company's prospects."  Peterson

20    Decl. Exs. 180 (June 6, 2014 email from Latham to Fitzsimmons).

21          As is typical for start-up companies, Delivery Agent solicited investments in a series of

22    funding rounds denoted with letters.  By the time Plaintiffs began investing, Delivery Agents had

23    reached Series F.  The Series F Purchase Agreement contained the following representation

24    (hereinafter, the "No-Investigations representation") which Plaintiffs assert is one of the material

25    misrepresentations in the agreement:

26                There is no action, suit, proceeding or investigation pending or, to the
                    best of the Company's knowledge, currently threatened against the
27                Company . . . nor, to the best of the Company's knowledge, is there
                    any basis for the foregoing.

28

6

Decl. of Ryan S. Wolf ("Wolf Decl.") Ex. 2 at DEF_000895, Abdo ECF No. 205-2.  That representation, along with other "representations and warranties of the Company" in the Purchase Agreement, were subject to any "exceptions" "as set forth in the Schedule of Exceptions" ("SOE") which would accompany the Agreement as an exhibit.  *Id.* at DEF_000899-90.  An August 25, 2014 SOE (the SOE relevant here) contained a one-sentence exception which stated, "[t]he Company is in the process of changing accountants from Deloitte & Touche to Grant Thorton" (the "Auditor-Change representation"), Wolf Decl. ¶ 27, Ex. 25 at LW00201964, which the Rising Tide Plaintiffs allege was misleading by omission, Rising Tide First Am. Compl. ("FAC") ¶ 100, ECF No. 53.

Before the end of 2015, Abdo and Rising Tide had purchased a total of about $17 and $16 million, respectively, in Series F and G securities and convertible notes from Delivery Agent. Throughout this time, Fitzsimmons continued to misrepresent the functionality of Delivery Agent's t-commerce technology and the Company's IPO timeline.  Both Abdo and Rising Tide invested under the impression that an IPO was forthcoming.  Peterson Decl. Ex. 18, Dep. Tr. of John Abdo at 350:15-351:4 ("[T]he crux of the matter is we invested in a company that proposed to us that it was going to file for an IPO . . . and it all kept changing and it actually never did go public."); Peterson Decl. Ex. 19 at 196:6-13, Dep. Tr. of Ossama Hassanein (Rising Tide) ("The basis for the investment was Mike Fitzsimmons' representation about the future of the company and particularly the IPO.").  All but $651,805 of Rising Tide's $17 million investments and $1 million of Abdo's $18 million investments occurred before any disclosure was made to Plaintiffs regarding the Super Bowl incident and the events that followed.

**E.    Delivery Agent Goes Bankrupt**

Delivery Agent never reached a compromise with Deloitte regarding the Item 304 disclosure, as Deloitte consistently maintained its position that it would make a truthful disclosure of the reasons for the termination.  As a result, Delivery Agent never commenced the IPO process by filing a registration statement with the SEC.  The Company ran out of funding and filed for bankruptcy in September 2016.  Plaintiffs will receive no recovery from the Company's bankruptcy and thus have lost the entirety of their investments.

**F.   Procedural History**

Plaintiffs filed their initial complaints in February and March 2017.  The complaints were dismissed in large part in November 2017.  *See* RT ECF No. 49; Abdo ECF No. 57.  Plaintiffs filed First Amendment Complaints in December 2017, and defendants again moved to dismiss.  The Court found most, but not all, of the claims sufficiently pleaded.  *See* RT ECF No. 75; Abdo ECF No. 80.

Plaintiffs' surviving claims are: (1) a violation of § 10(b) of the Exchange Act and Rule 10b-5 against Defendants Badran, Borcher, Del, Fitzsimmons, Goettner, Power, and Yi; (2) a violation of § 20(a) of the Exchange Act against Badran, Borcher, Del, Goettner, Power, and Yi; (3) a violation of the first clause of California Corporation Code § 25504 against Badran, Borcher, Del, Goettner, Power, and Yi; and (4) violation of the third clause of § 25504 against Badran, Borcher, Del, Goettner, Lai, Peters, Power, and Yi.

### III.   LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the task of the Court "'to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden "to identify with reasonable particularity the evidence that precludes summary judgment."  *Id.*  Thus,

United States District Court
Northern District of California

a "district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")). Still, to survive summary judgment, the nonmoving party "must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted).

## IV.   DISCUSSION

### A.   Section 10(b) Claims Against the Outside Directors

Section 10(b) of the SEA of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). The SEC promulgated Rule 10b-5 pursuant to authority granted by that section. The Rule makes it "unlawful for any person, directly or indirectly" . . .

> (a) [t]o employ any device, scheme, or artifice to defraud,
>
> (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements . . . not misleading, or
>
> (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5. "To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations and internal

United States District Court
Northern District of California

9

quotation marks omitted).

Plaintiffs' § 10(b) claims against the ODs under subsection (b) of the rule are based on two statements: both Plaintiffs allege that the No-Investigations representation in Section 2.13 was false because of the Audit Committee and Bergeson investigations; and Rising Tide additionally alleges that the August 2014 Auditor-Change representation was misleading by omission because it did not say why Delivery Agent was replacing Deloitte with Thornton.  RT FAC ¶¶ 85-86 (allegations re the No-Investigations representation), 99-100 (re the Auditor-Change representation); Abdo FAC ¶¶ 79-80 (re the No-Investigations representation).

Defendants argue that the ODs are entitled to summary judgment on Plaintiffs' § 10(b) claims because as a matter of law, they did not "make" the challenged statements under the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), and because, even if the Court finds they did, Plaintiffs cannot genuinely dispute that the ODs lack of scienter with respect to the statements.

### 1.    "Maker" Liability Under Rule 10b-5, Subsection (b)

To be liable for purposes of subsection (b) of Rule 10b-5, a defendant must have "made" the material misstatements or omissions upon which the injured investor relied.  Under *Janus*, the "maker" of a statement is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  564 U.S. at 142.  "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by--and only by--the party to whom it is attributed."  *Id.*; *but see Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015) ("Nothing in *Janus* precludes a single statement from having multiple makers.") (citing *In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 268-69 (S.D.N.Y. 2013); *City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011)).

### a.    Application

#### i.    Attribution

First is the question of attribution.  Plaintiffs do not genuinely dispute that nothing in the

United States District Court
Northern District of California

text of the Purchase Agreement explicitly attributed any statements to the ODs.  *See* Opp'n at 15

("The attribution principle thus applies only in the limited situation, not present here . . . .").  The

Agreement was signed by Fitzsimmons as CEO on behalf of Delivery Agent, which makes him

and the Company each a "maker."  *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL

1393539, at *3 (N.D. Cal. Mar. 26, 2015) ("Courts have consistently held that the signer of a

corporate filing is its 'maker,' because signing a filing implies 'ultimate control' over its

contents.") (citations omitted).  Also, under Section 2 of the Agreement, entitled "Representations

and Warranties of the Company," the section under which the No-Investigations and the Auditor-

Change representation were found, the Agreement stated that, except for the SOEs, "which

exceptions shall be deemed to be representations and warranties as if made hereunder, *the*

*Company hereby represents and warrants to each Purchaser . . . .*"  Wolf Decl. Ex. 2 at

DEF_000889-90.  And the No-Investigations representation itself was directly attributed to the

Company:

> There is no action, suit, proceeding or investigation pending or, *to the best of the Company's knowledge*, currently threatened against the Company . . . nor, *to the best of the Company's knowledge*, is there any basis for the foregoing.

*Id.* at DEF_000895-96.[3]  These clauses together are more substantial evidence that the Company

was a maker of the statements in the Purchase Agreement.  Furthermore, Plaintiffs do not point to

anything in the relevant SOE attributing any statements to the ODs.  To the contrary, the SOE

"[s]et forth . . . exceptions to the representations and warranties of [*the Company*] made in Section

2 of the [Purchase Agreement]."  Statements in the Purchase Agreement and SOE were explicitly

attributed to Fitzsimmons and the Company, which is strong evidence that they, and only they,

---

[3] Plaintiffs advance a reading of *Janus* whereby "[t]he attribution principle [] applies only in the limited situation, not present here, where a document contains a statement from another source, and provides that the statement came from that source."  Opp'n at 15; *id.* ("But in any case, the clause is not an attribution.  The misrepresentation does not 'repeat[] a statement originally made by' DA; it does not "quot[e]' DA, nor is it made according – to' DA.").  That reading of *Janus* is not supported by opinion's text.  On the other hand, the Court disagrees with Defendants that only Fitzsimmons and the Company—the parties to whom the statements were explicitly attributed—can be the makers of the statements.  *Glickenhaus*, 787 F.3d at 427 ("Nothing in *Janus* precludes a single statement from having multiple makers.").  Attribution is "strong evidence," but isn't necessarily the only evidence of who is the maker of a statement.

United States District Court
Northern District of California

1    were the makers of the statements.

2           Plaintiffs argue, however, that other documents, two sets of documents signed by or

3    referencing the Board, "can fairly be read as attributing the Purchase Agreements to the Board."

4    Opp'n at 16.  The Court disagrees.  The first set of documents is the Unanimous Written Consents

5    ("UWC").  For each 2014 issuance of Series F shares to Plaintiffs, rather than approve a new

6    purchase agreement, the Board would execute a UWC authorizing the issuance of shares pursuant

7    to the same Series F Purchase Agreement from January 2014, with amendments and

8    modifications.  The relevant language in the UWC read:

9           [S]ubject to the filing of the Certificate of Amendment, the
            Subsequent Closings shall be consummated pursuant to and in
10          accordance with the Purchase Agreement (as amended by the
            Amendment), and *the officers of the Company are authorized and*
11          *directed to execute and deliver the Purchase Agreement, including all*
            *of the exhibits and schedules thereto*, by and on behalf of the
12          Company, *with such modifications and amendments as such officers*
            *may, in their discretion, deem to be necessary or desirable.*
13

14   Wolf Decl. Ex. 14 ("March 14 UWC") (emphasis added); Wolf Decl. Ex. 31 ("August 22 UWC")

15   (same).  But this language says only that the Board authorized the Company to "execute and

16   deliver" the Purchase Agreement subject to "such modifications and amendments" as Company

17   officers deemed necessary—the very wording anticipates that someone else would be "modifying"

18   the content of the Purchase Agreement and SOEs and then "delivering" those documents (and the

19   statements therein) to the purchaser.  *See Janus*, 564 U.S. at 143 (The content of a speech "is

20   entirely within the control of the person who delivers it.  And it is the speaker who takes credit--or

21   blame--for what is ultimately said.").

22          The other set of documents to which Plaintiffs point is a series of certificates, the

23   "Certificate of Secretary of Delivery Agent, Inc., a Delaware Corporation," which were included

24   in the set of Series F financing documents sent to Plaintiffs.  The certificates included the

25   following language:

26          Attached hereto as Exhibit C is a true, complete and correct copy of
            all of the resolutions of *the Board of Directors of the Company*
27          *authorizing and approving . . . delivery and performance of the*
            *Purchase Agreement, all matters in connection with the Purchase*
28          *Agreement and the transactions contemplated thereby*, which

12

resolutions were duly adopted by written consent of the Board of Directors . . . .

*See, e.g.*, Peterson Decl. Ex. 214 at RT0036259. Yet the certificates, coming as they did after the Board signed the UWCs, were signed by Fitzsimmons and Smith, and that language again just expressed that the Board had authorized delivery and performance of the Purchase Agreement "by written consent of the Board of Directors"; in essence, it summarized the UWCs. Neither the UWCs nor the certificates can be read as attributing to the ODs statements made in separate documents (the Purchase Agreement and SOEs), when those documents were finalized after, the content of those documents was explicitly attributed to something else (the Company) and the documents were signed by another person (Fitzsimmons). Plaintiffs do not point to any case where the web of attribution was cast that far, and the Court doesn't see that it should be. *See Janus*, 546 U.S. at 147 ("there is no allegation that JCM in fact filed the prospectuses," "[n]or did anything *on the face of* the prospectuses indicate that any statements therein came from JCM . . . ."); *La. Mun. Police Emples. Ret. Sys. v. KPMG, LLC*, 2012 U.S. Dist. LEXIS 124082, at *18 (N.D. Ohio Aug. 31, 2012) (Courts subsequent to *Janus* "have interpreted the attribution element of *Janus* to reach corporate officers who sign statements filed with the SEC and have been quoted in press releases") (citations omitted).

The misrepresentations were attributed to Fitzsimmons and the Company, and under *Janus* this is "strong evidence" that the statements were "made by--and only by" them.

### ii.       Ultimate Authority

However, the Court must still consider whether the ODs had "ultimate authority" over the misleading statements and omission. *See City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417, n. 9 (S.D.N.Y. 2011) (*Janus* "does not imply that there can be only one 'maker' of a statement in the case of express or implicit attribution. The Supreme Court's statement [about express or implicit attribution] was couched in terms of the 'ordinary case' . . . .") Plaintiffs allege that the ODs had ultimate authority over the timing and contents of the amended Series F Purchase Agreement, including all its exhibits and schedules, because they signed the UWCs and thus "adopted and consented to the form and substance of the Series F sale of securities and [] closing materials," and because they "specifically authorized the delivery of these

13

United States District Court
Northern District of California

1    materials to investors." Abdo FAC ¶¶ 78, 83; RT ¶¶ 84, 97. Plaintiffs argument doesn't carry

2    water.

3         By signing the UWCs, the ODs "authorized and directed" "the officers of the Company . . .

4    to *execute and deliver the Purchase Agreement*, including all of the exhibits and schedules thereto,

5    by and on behalf of the Company, *with such modifications and amendments as such officers may,*

6    *in their discretion, deem to be necessary or desirable*." The Board's authorizing and directing the

7    Company officers to execute and deliver the Purchase Agreement and related documents is

8    evidence that the Board had ultimate authority over "whether" the Company could execute those

9    documents. But *Janus* requires that to be the maker of a statement, a person or entity must have

10   ultimate authority not just over whether a statement is made, but also over the content of a

11   statement and how to communicate it. 564 U.S. at 144 ("[T]he maker of a statement is the entity

12   with authority over the content of the statement *and* whether and how to communicate it.")

13   (emphasis added). Authority over the content of the statement is key. "Without such authority,"

14   the *Janus* Court explained, "it is not 'necessary or inevitable' that any falsehood will be contained

15   in the statement." *Id.* But the Board did not exercise that authority. Through the UWCs, the

16   Board gave to the Company discretion to make "such modifications and amendments as such

17   officers" "deem[ed] to be necessary or desirable" to the Purchase Agreement and exhibits and

18   schedules thereto. In other words, the Board, at least according to the UWCs, delegated to the

19   Company ultimate authority over the content of those documents. And based on the evidence, that

20   appears to be what actually happened.

21        After the Board signed off on each UWC, the evidence shows that Latham and Delivery

22   Agent (non-Board) employees continued to revise the proposed amendments and SOEs without

23   further involvement of the Board. On May 28, 2014 (after the March 14 UWC was signed and

24   before Plaintiffs invested), Latham sent an email to Smith (Delivery Agent's general counsel)

25   writing, "[a]ttached in clean and marked copies is an updated draft of the schedule of exceptions,

26   which includes a few comments for your review. Can you please review the reps and warranties

27   contained in the purchase agreement and update the schedule of exceptions accordingly?" Wolf

28   Decl. Ex. 19. That email chain also shows two Latham attorneys discussing on June 13, 2014

14

1  whether to disclose the falsified data investigation in the SOE "for the Series F closing next

2  week," with one noting that "[w]e didn't disclose the [] investigation in the SOE for the closings

3  on March 18 or March 27."  *Id.*

4      As another example, on June 13, 2014, Latham sent an email to Smith which asked, "[d]o

5  you know if the completion of the investigation has been communicated to the new investor or if

6  he has been provided data room access?" and added, "[y]ou may want to include a sentence in the

7  [SOE] regarding the investigation or separately communicate the investigation to the new investor.

8  Let me know if you would like to discuss."  Wolf Decl. Ex. 22.  The ODs were not privy to this

9  discussion either.  Del Decl. ¶¶ 18, 26-27; Borcher Decl. ¶¶ 6-7, 14; Yi Decl. ¶¶ 8-9; Badran Decl.

10  ¶¶ 8-9; Goettner Decl. ¶ 13.

11      A separate email chain has Latham on August 21, 2014 telling Smith, "[p]lease find

12  attached a draft of the [SOE] for this closing . . . .  Can you please provide your updates to the

13  [SOE]?  In particular, I've highlighted a couple of sections with comment bubbles, including the

14  Litigation section."  Wolf Decl. Ex. 35.  Smith responds on August 22, the day after all ODs had

15  signed the second UWC, with "an updated copy of the [SOE]."  *Id.*  Latham sent back again on the

16  22nd, "attach[ing] in clean and marked copies [] a couple of additional comments to the [SOE],"

17  and asking Smith if he had any further comments as to that document.  *Id.*  Three days later, on

18  August 25, Latham followed up with Smith again on whether he had "any further comments to

19  this [SOE]?"  *Id.*  In none of these emails are any of the ODs included.

20      Furthermore, each of the ODs stated in their declarations that they did not draft or deliver

21  the Purchase Agreements, amendments thereto, or the accompanying SOE.  Badran Decl. ¶ 3;

22  Borcher Decl. ¶ 5; Del Decl. ¶ 13; Goettner Decl. ¶ 5; Yi Decl. ¶ 3.  And more determinative—

23  since Plaintiffs must set forth specific facts showing that there is a genuine issue of fact—is that

24  Plaintiffs, despite having filing hundreds of exhibits comprising thousands of pages and countless

25  documents and communications records, have not pointed to any evidence showing that the ODs

26  were involved in any way with any documents beyond signing the UWCs.  Since the evidence

27  demonstrates that the SOEs underwent changes after the ODs signed off and since there's no

28  evidence that those changes involved the ODs, it cannot be said that they exercised ultimate

United States District Court
Northern District of California

15

United States District Court
Northern District of California

authority over the content over the relevant statements; when the UWCs left the ODs' hands, it was not "'necessary or inevitable' that any falsehood [would] be contained in [those] statement[s]." *Janus*, 564 U.S. at 144.

Plaintiffs other arguments are unavailing. They point to language in *Janus* which instructs that "[o]ne who prepares or publishes a statement on behalf of another is not its maker." 564 U.S. at 143. Here, the Supreme Court used the analogy of a speechwriter preparing a speech for a speaker to demonstrate: "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit--or blame--for what is ultimately said." *Id.* Plaintiffs argue that the Purchase Agreements were prepared for the Board and on its behalf by Latham, thus analogizing Latham to a speechwriter and the Board to the ultimate speaker. But *Janus* presupposed that the "speaker," the one "who takes credit--or blame--for what is ultimately said" was the person who has "entirely within [their] control" the content of what is ultimately said. As Defendants have sufficiently demonstrated, ultimate authority over the content of the statements in the Purchase Agreements and SOEs did not rest with the Board. The ODs had no further involvement beyond authorizing the Company, through the UWCs, to prepare necessary amendments and schedules to the Purchase Agreement and then deliver them.

None of the cases cited by Plaintiffs here help their cause. In *Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017), the D.C. Circuit reviewed the SEC's finding that Lorenzo, an investment banker, was the sender/maker of email messages to investors containing misrepresentations about key features of a securities offering. The court found that it could not sustain the Commission's conclusion that Lorenzo had "ultimate authority" over the false statements under *Janus* because Lorenzo's boss retained ultimate authority. *Id.* at 587. There was evidence in the record that Lorenzo "transmitted statements devised by [his boss] at [the boss's] direction," that Lorenzo generally cut and pasted content given to him by his boss into the emails he sent, and that the boss asked Lorenzo to send the emails, supplied the central content, and approved the messages for distribution. *Id.* at 587-88. The D.C. Circuit found that the boss had ultimate authority over the contents of the statements, despite the fact that Lorenzo put his own name and phone number in

United States District Court
Northern District of California

1  the signature line of emails. *Id.* at 588.  That is a far cry from the facts of this case, where

2  Plaintiffs have pointed to no evidence of the ODs directing anyone as to the content of any

3  statements, nor any evidence showing any involvement by the ODs in the process of preparing and

4  executing the Purchase Agreement beyond signing the UWCs.

5        *EnSource Investments LLC v. Willis*, 2019 WL 6700403 (S.D. Cal. Dec. 6, 2019), doesn't

6  do much for Plaintiffs' case, either.  All the district court found there was that it was "fiction" to

7  claim that Hopewell, which was a start-up and "a legal entity, directed [the defendant] to make the

8  statements he did when [he] was the president and one of two founding managers directing

9  Hopewell's operations." *Id.* at 12.  The defendant, the court found, "had ultimate authority over

10  the statements he made on behalf of Hopewell" and thus could be liable for misrepresentations

11  contained in those statements.  In this case, it is no fiction that individuals other than the ODs had

12  ultimate authority of over the contents of the documents comprising the Purchase Agreement—it

13  is what the UWCs envisioned and what in fact happened.

14        And finally, in *SEC v. Goldstone*, 233 F. Supp. 3d 1169 (D.N.M. 2017), a New Mexico

15  district court found there was sufficient evidence to find the defendant was the "maker" of false

16  statements made to investors.  But there the court found the SEC had introduced sufficient

17  evidence that the defendant had actual authority of the content of the statements, that he was active

18  in "crafting messaging" for investors, that he "provided[] guidance and direction regarding [his]

19  preference for referring to" certain assets, that he directed subordinates to convey particular

20  statements, and that subordinates would "often run message points by" him. *Id.* at 1225-26.  This

21  is, again, poles apart from this case where, above all, the ODs did not exercise ultimate authority

22  over the content of the statements at issue.

23        Finally, Plaintiffs make much of the fact that the UWCs were "each delivered to [them] in

24  a packet of Series F financing documents that also contained the Purchase Agreements."  Opp'n at

25  13.  "A fair interpretation of this," Plaintiffs say, "is that the directors were signatories of the

26  financing package given to Plaintiffs and therefore responsible for misrepresentations in the

27  documents." *Id.*  Not as makers, though.  Plaintiffs argue that there is no material difference

28  between the ODs' signatures on the UWCs and Fitzsimmons' John Hancock on the Purchase

Agreement, but the obvious difference is that Fitzsimmons signed a different document, the one containing the misrepresentations. To treat the two documents as one—which is essentially what Plaintiffs advocate for—would be to turn a blind eye to the fact that one document authorizes a statement but delegates responsibility for its content and the other actually makes the statement. The fact that the documents may have been delivered together, at the same time, with a series of other financing documents doesn't change the analysis: a reasonable investor could tell from the language of the UWCs, as well as by the signatures and dates of the various documents, that the Board authorized the sales but then delegated to Company employees the task of preparing the amendments and SOEs, and the Purchase Agreement made clear that representations therein were subject to the exceptions in the SOEs.

In sum, in a case like this where the misleading statements were not attributed to the ODs, where the ODs delegated authority over the content of those statements to others, and where those individuals were the ones who had actual final authority over the contents, the ODs cannot be "makers" of the statements for purposes of liability under Rule 10b-5(b). *See Janus*, 564 U.S. at 144 ("[W]e will not expand liability beyond the person or entity that *ultimately has authority* over a false statement."); *id.* at 142 ("Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."); *Glickenhaus*, 787 F.3d at 427 ("[A]s we understand *Janus*," while the CEO "of course had authority over the press releases in the sense that he *could* have exercised control over their content" "[he] must have *actually exercised* control over the content of the press releases and whether and how they were communicated.").[4]

### 2. Liability Under Rule 10b-5, Subsection (a) or (c)

Whereas Rule 10b-5 subsection (b) makes it unlawful to "make any untrue statement of a material fact," subsection (a) of the Rule makes it unlawful to "employ any device, scheme, or

---

[4] The undersigned understands that this finding might seem to conflict with Judge Laporte's finding that "Plaintiffs have adequately alleged that Defendants had 'ultimate authority' over the statements in the Series F Purchase Agreements, because they signed the [UWCs] in their capacity as board members and authorized Delivery Agent officers to execute and deliver the purchase agreements." RT ECF No. 75 at 19. But now the Court and the Parties have the benefit of an evidentiary record, and the Court has been presented with no evidence that the Board actually exercised any authority over the content of statements in the Purchase Agreement and SOEs after it signed off on the UWCs.

United States District Court
Northern District of California

artifice to defraud" and subsection (c) makes it unlawful to "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019).  Under subsection (a), "[a] 'device' is simply that which is devised, or formed by design; a 'scheme' is a project, plan, or program of something to be done; and an 'artifice' is an artful stratagem or trick."  *Id.* at 1101 (internal quotation marks omitted).  "[A] non-speaking actor who engages in a 'scheme to defraud' has used or employed a deceptive device within the meaning of § 10(b).  *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006) (citing *SEC v. Zandford*, 535 U.S. 813, 821-22 (2002)), *vacated on other grounds by Avis Budget Group, Inc. v. Cal. State Teachers' Ret. Sys.*, 552 U.S. 1162 (2008).  "The words 'act' and 'practice' in subsection (c) are similarly expansive."  *Id.*  An "act" is a "doing" or "thing done," and a practice is an "action" or "deed."  *Id.* (quoting Webster's International Dictionary 25, 1937 (2d ed. 1934)).  Together, "[t]hese provisions capture a wide range of conduct."  *Id.*  While the second paragraph of Rule 10b-5 "specifies the making of an untrue statement . . . [t]he first and third subparagraphs are not so restricted."  *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

Plaintiffs argue that, even if the ODs are not liable under Rule 10b-5(b) as the makers of the misrepresentations, they are liable under Rule 10b-5, subsection (a) and (c)'s anti-fraud provisions.  Opp'n at 16-18.  Defendants object as a preliminary point that Plaintiffs' Opposition is the first time where they characterize their Rule 10b-5 claim as one claiming "scheme liability."  "Indeed," Defendants say, "Plaintiffs' motion to dismiss oppositions addressed the *Janus* [("maker's" liability)] issue without ever mentioning 'scheme liability' as an alternative."  Reply at 6.  But Defendants don't point to any legal authority which says, nor do they even really attempt to explain themselves, why that matters.  The Complaints plainly allege under the Rule 10b-5 causes of action that the ODs "employed devices, schemes, and artifices."  Abdo FAC ¶¶ 331, 352; RT FAC ¶¶ 187, 245.  And the RT Complaint can reasonably be read as alleging liability under Rule 10b-5(c), which prohibits "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ."  17 C.F.R. § 240.10b-5(c).  *E.g.*, RT FAC ¶¶ 190 ("Defendants Power, Borcher, Dell, Yi, and Goettner, individually and in concert, directly and indirectly . . . engaged and participated in a *continuous course of conduct* to

19

conceal adverse material information about Delivery Agent and its IPO prospects, as described herein.") (emphasis added); 248 (same language for Badran).  The Court can assume that Plaintiffs' focus on "maker" liability in opposing the motions to dismiss was guided (naturally) by the attacks the Defendants were directing at the Complaints.

For purposes of Rule 10b-5, "engaging in a transaction, the *principal purpose and effect* of which is to create the false appearance of fact, constitutes a 'deceptive act.'"  *Simpson*, 452 F.3d at 1048 (emphasis added).  For a defendant to be liable as a primary violator for participation in a scheme or act to defraud or deceive, "the defendant's own conduct contributing to the transaction or overall scheme must have had a deceptive purpose and effect."  *Id.*  "If a defendant's [own] conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)."  *Id.* at 1050.  "Conduct that is consistent with the defendants' normal course of business" is not typically considered to have the purpose and effect of creating a misrepresentation.  *Id.* at 1050 (citation omitted).

Since liability under Rule 10b-5(a) and (c) turns on the "principal purpose" of a defendant's actions or course of conduct, the issue is necessarily wrapped up with the issue of scienter.[5]  In a securities fraud action like this one, to satisfy the element of scienter, "the plaintiffs must show that defendants engaged in 'knowing' or 'intentional' conduct."  *South Ferry LP v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (quotation omitted).  "Reckless conduct" can meet this standard "to the extent that it reflects some degree of intentional or conscious misconduct," or what the Ninth Circuit has called "deliberate recklessness."  *Id.* (citation omitted); *Janas v. McCracken (in Re Silicon Graphics Sec. Litig.)*, 183 F.3d 970, 976 (9th Cir. 1999) ("[R]eckless behavior in the § 10(b) context is merely a lesser form of intentional conduct.").  Put another way, scienter under Rule 10b-5(a) and (c) requires at least either "deliberate recklessness" or "conscious recklessness," and determining scienter includes a "subjective inquiry turning on 'the defendant's

---

[5] Judge Laporte found that Plaintiffs had adequately alleged that all ODs had the requisite scienter by the time they signed the August 2014 UWC, but that they had not alleged that ODs Badran, Del, or Yi had scienter when they signed the March 2014 UWC.

United States District Court
Northern District of California

actual state of mind." *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (citation and internal quotation marks omitted).  Thus, while "objective unreasonableness of a defendant's conduct may give rise to an inference of scienter" sufficient to survive a motion to dismiss," the ultimate inquiry turns on "whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity."  *Gebhart*, 595 F.3d at 1041-42. "[S]ome degree of subjective understanding of the risk of misleading others is required." *Platforms Wireless*, 617 F.3d at 1092; *see also Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010) (establishing scienter requires showing that "'the defendants either knew that the representations they made to investors were false *or were reckless in disregarding a substantial risk that they were false*.'") (quoting *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008)).  Reckless conduct for purposes of securities fraud generally includes "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (emphasis added) (citation and internal quotation marks omitted).  In short, for a defendant to be liable under Rule 10b-5(a) or (c), the defendant must have engaged in a scheme, course of conduct, or the like, whose principal effect was fraud or deceit, the defendant's own conduct must have had a deceptive effect, and the defendant must have known that their conduct would have that effect or been consciously reckless as to a risk that it would.  Finally, "'[s]cienter can be established by direct or circumstantial evidence.'"  *Gebhart*, 595 F.3d at 1041 (quoting *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996)).

### a.    Application

There is enough evidence for a reasonable jury to conclude that the ODs engaged in conduct in violation of Rule 10b-5.

By the time the ODs signed the first UWC on March 5 or 6, 2014, Borcher, Goettner, and

United States District Court
Northern District of California

Power[6] already knew about fraud by senior management of the Company in connection with statements made to investors.  On February 7, 2014, they were told by Smith in writing of a "*matter of fraud related to* the [] presentation that ha[d] been sent to H&M, its agency and *potential Series F investors*," that "figures in the [] presentation were fraudulently prepared," and that after a preliminary investigation, the Company's general counsel had "learned that *this matter concerns some members of senior management*."  Peterson Decl. Ex. 108, Feb. 7, 2014 Email from Smith to Goettner, Borcher, and Power (emphasis added).  Those same ODs were present at the Audit Committee meeting the next day where the fraud was discussed, including that "there were *possible misstatements* in a slide deck prepared by the Company and *sent to certain* customers [and] *potential investors . . . .*"  Peterson Decl. Ex. 125, Feb. 8. 2014 Minutes of Audit Committee Meeting.  It was discussed at the meeting whether "potential investors and other third parties who [sic] Company's pending preferred stock financing had access" to the deck "and if so that they should be contacted promptly and alerted of the possibility that the data contained [therein] may not be accurate and should not be relied upon."  *Id.*  A formal internal investigation was ordered.  And then at that same meeting, even though the Committee had just learned that Company management was implicated in potential fraud concerning statements made to investors, the Committee instructed Fitzsimmons and Novelly (CFO) to focus on raising money from investors because the Company desperately needed cash.  (The part of the meeting about instructing the CEO and CFO to find investors wasn't included in the meeting minutes.)  The full results of the Audit Committee's investigation were presented to the Committee on March 12 and the Report emailed to Borcher, Goettner, Power, and Yi on March 27.  The Board instructed the Audit Committee to retain Bergeson for the outside investigation on March 26 after being told that Deloitte found the internal report to be unsatisfactory and demanded that a second investigation be done by an outside firm.  Bergeson presented its written report to the Board on June 18, 2014, in

---

[6] The other ODs seem to have known by that point as well.  *See* Tr. of Dep. of Marc Yi ("Yi Dep.") at 73:14-18, 221:1-14.  However, Plaintiffs have not directed the Court to evidence showing an exact date when Yi, Del, and Bedran knew.  And in any event, Judge Laporte found that Plaintiffs had not adequately alleged that those ODs had the requisite scienter for the March 2014 UWC, RT ECF No. 75 at 23, so their liability (and hence, their scienter) as to that UWC is not an issue.

which it concluded that Delivery Agent executives were "[f]ollowing Fitzsimmons's direction" to purchase the remaining inventory from the H&M commercial and that *Company executives had asked an employee to "alter result data from* [the] H&M campaign." Peterson Decl. Ex. 44 at 18, 23. Bergeson also found that a Delivery Agent employee *was directed by management to "change[] numbers* to make data consistent with metrics" provided by management *and "create[] false orders*." *Id.* at 26. And Bergeson found that *Fitzsimmons had sent* a copy of the report with *altered data "to potential investors*." *Id.* at 28. The report advised of "Possible Outcomes," including Deloitte resigning, its unwillingness to accept "management representations," a lack of an auditor impeding Delivery Agent's "ability to finance company," and "*[p]otential claims by investors*." *Id.* at 75 (emphasis added). By July 8, the Board formally approved *a Remediation Plan* with measures *that included Fitzsimmons resigning* as chairperson of the Board, establishing an independent chairperson, a demotion for Lai, termination and separation or demotion for Greenberg, and final written warnings in Fitzsimmons and Lai's personnel files. Peterson Decl. Ex. 146. In early July 2014 (again, before the August 22 UWC was signed), *Deloitte told the Board that* it would not resume auditor services unless Fitzsimmons, Lai, and other members of senior management were removed from positions of authority within the Company because *it could no longer "rely on the representations" of Fitzsimmons and other management*. On July 29, instead of meeting Deloitte's conditions and terminating Fitzsimmons, Lai, and other executives involved in fraud towards investors, the Board unanimously voted to give Deloitte the axe instead. All of this happened before the ODs signed the August 22 UWC. Many of the measures in the Remediation Plan were never enacted or were not enacted until many months after the plan was adopted on July 1. *The Board did nothing to establish controls over Fitzsimmons* with respect to his efforts to sell securities to investors.

From this a reasonable jury could conclude that the ODs recklessly disregarded a risk that their signing of the UWCs would contribute to defrauding investors. They knew that Company management, the same people to whom they were delegating authority over the *content* of the Purchase Agreement documents, had actively been involved in crafting and directing other employees to make misrepresentations—a "matter of fraud"—to potential investors at around the

23

same time.  They knew that Deloitte, a professional auditing company, would not complete audits for the Company because it could no longer rely on management representations, and that Deloitte insisted management either be removed from positions of authority or terminated.  They knew that an outside investigator, a law firm, had concluded that the misrepresentations by Company management and employees might result in "potential claims by investors."  The very remedial plan they adopted included demoting or terminating the Company's CSO, CFO, and COO—its officers.  Despite all of this, they signed off on the deals and then left everything in the hands of Company officers, including Fitzsimmons, a person who the ODs suspected (before the March 2014 UWC) or knew (before the August 2014 UWC) had just engaged in and directed fraud against H&M *and* potential investors.  The Company was allowed to turn right around and make more misrepresentations to investors, and Plaintiffs were "induced to invest $30 million when," Plaintiffs argue, "no reasonable investor with complete information would have done so."  At no time apparently did the ODs check to see if Company officers made any modifications or amendments to the Purchase Agreement, attachments, or SOEs (as they were authorized to do by the UWCs) even though when the ODs signed the UWCs, they knew the Agreement in its then-present form contained false or misleading statements.  A reasonable jury could conclude that one effect—though not the only one—of ODs' conduct was to contribute to the false impression that Fitzsimmons was somebody whose representations could be trusted, instead of someone who had just directed fraud by the Company and could not be trusted by an auditor and whom the Board itself had deemed should be terminated.  All of this was going on while the ODs knew that the Company was in a desperate financial situation and was in need of a sudden infusion of cash, which could easily be seen as a motive.  *See Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) ("a motive to commit fraud and opportunity to do so provide some reasonable inference of intent"), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605 (9th Cir. 2017); *S.E.C. v. TLC Investments And Trade Co.*, 179 F. Supp. 2d 1149, 1154–55 (C.D. Cal. 2001) ("motive to . . . turn a blind eye to negative information" is relevant to scienter).

       In the Second Circuit,

24

> *[a]t least four circumstances may give rise to a strong inference of [conscious recklessness]: where* the complaint sufficiently alleges that *the defendants* (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) *knew facts or had access to information suggesting that their public statements were not accurate*; or (4) *failed to check information they had a duty to monitor.*

*Saltz v. First Frontier, L.P.*, 485 Fed. Appx. 461, 464 (2d Cir. 2012) (emphasis added) (citation and internal quotation marks omitted).  A reasonable jury after hearing this evidence could conclude that under these circumstances, by delegating authority to the Company to make disclosures and representations and then failing to check that Fitzsimmons and others were not again making misrepresentations to investors, the ODs consciously ignored a substantial risk and that their conduct was an extreme departure from standards of ordinary care.

In arguing otherwise, Defendants make much of the fact that the SOEs were drafted and finalized by Latham and Company officers after the ODs signed the UWCs.  Thus, they argue that scienter for the ODs cannot be proved for the ODs because they were never actually shown the documents containing the alleged misstatements.  But that argument goes more appropriately to the question of "maker" liability.  Defendants' view that a plaintiff cannot prove scienter if a defendant has not actually seen a misleading statement, implicitly rests on a requirement that a defendant have ultimate authority of a statement, and *Lorenzo* made clear that subsection (b) is not the only subsection of Rule 10b-5 which "regulates conduct *involving* false or misleading statements . . . ."  139 S.Ct. at 1102-03 (emphasis added).  If that were the case, other conduct, like disseminating false statements, "though plainly fraudulent, might otherwise fall outside the scope of the Rule."  *Id.* at 1102.  In any event, Defendants insistence that the ODs must have *known* of specific false statements doesn't square well with the rule in this Circuit that the scienter requirement can be met by showing conscious recklessness, which, although still more than negligence and still a form of intentional conduct, isn't the same as actual knowledge.

Judgment for the ODs as a group on the Rule 10b-5 claim is **DENIED**.

**B.     Claims for Damages Arising from Investments Made on or after April 20, 2015**

Plaintiffs allege that it was not until August 19, 2015 that they obtained a copy of the draft Item 304 and Deloitte's response, and thus up until then "[they] had no reason to believe or ability

to discover that the Super Bowl ad catastrophe and the subsequent related events would ensure that Delivery Agent could never go public." Abdo FAC ¶ 110. Defendants contend that the evidence shows otherwise, that Plaintiffs knew even before they made their April 2015 investments "that the dispute with Deloitte regarding the [Item] 304 disclosure threatened to prevent an IPO." MSJ at 26. Hence, Defendants argue, Plaintiffs cannot prove reliance on any alleged misstatements or omissions from March 2015 onward and thus cannot recover the investments they made after that point. Defendants ask the Court to find that Plaintiffs cannot recover on the following investments:

April 20, 2015:     $1,000,000 (Abdo); $2,500,050 (RT);

July 21, 2015:     $1,000,000 (Abdo); $3,500,000 (RT);

March 30, 2016:    $651,805 (RT);

April 20, 2016:     $1,000,000 (Abdo).

### a.     The Investments Made on or before July 21, 2015

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that . . . the requisite causal connection . . . exists as a predicate for liability." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (citation and internal quotation marks omitted). "To say that a plaintiff relied on a defendant's bad act is to say that the defendant's actions 'played a substantial part in the plaintiff's investment decision.'" *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (quoting *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988)). To demonstrate reliance, an investor-plaintiff must "show that he would not have engaged in the transaction in question had he known about the fraud." *Desai*, 573 F.3d at 939. Reliance can be presumed where the information withheld is material, in the sense that a reasonable investor might have considered the undisclosed facts important in the making of her or his decision. *Id.* (citing *Affiliated Ute Citizens*, 406 U.S. at 153-54).

Although Defendants insist that Plaintiffs knew all the material facts in connection with the Item 304 problem as early as March 2015, they don't actually point to anything showing that before July 21, 2015 they let on about Fitzsimmons' sell-out order and the data fabrication in

connection with the Super Bowl ad campaign, the subsequent investigations, or Deloitte's reaction to all of it.  They point first to a March 11, 2015 email exchange between Power and Hassanein (Rising Tide) in which Hassanein had asked Power if there were any issues Power felt "could delay the IPO," and Power responded, "I believe you are up to speed on the 304 issue with Deloitte that we are currently working through – there is definite risk on that front but we are actively working on it."  Wolf Decl. Ex. 38.  Hassanein forwarded this email to Abdo, who responded, "[i]s this the Mike Novel[l]y issue?"  *Id.*  Defendants assert that Abdo must have been "referring to the fact that issues related to the aftermath of the Super Bowl advertisement were originally brought to Deloitte's attention by former [] CFO Michael Novelly."  MSJ at 27.  But nothing in the email suggests that when Abdo referenced a "Novelly issue" he was referring to what Defendants describe; Defendants merely assert as much without pointing to any evidence—testimonial or otherwise—to support it.  Power testified that he didn't recall the specifics of what he discussed with Hassanein as to the Item 304 issue, including whether the two discussed the Super Bowl ad campaign, the investigations, the circumstances of Deloitte's termination, or the actual contents of Deloitte's draft Item 304.  And Hassanein testified that during the conversation, Power did not discuss alleged fraudulent conduct by management, Fitzsimmons ordering an employee to buy merchandise for a sell-out, or Deloitte's refusal to accept management representations.[7]

Defendants' other evidence says little more as to the Item 304 issue.  A "Q1 2015 Mid Q Investor Update" sent from Fitzsimmons to Hassanein and then forwarded to Abdo on March 11, 2015, told Plaintiffs that the IPO process was "progressing with continued delays" and warned that "key gating factors" for an IPO included "304 disclosure."  Wolf Decl. Ex. 39.  But again, the presentation said nothing about why Delivery Agent's Item 304 was being held up, and in this case, the reason wasn't a minor hiccup (the issue in fact was never resolved in time to save Delivery Agent).  Similarly, in an email sent by Fitzsimmons to Plaintiffs on April 4, Fitzsimmons

---

[7] Even if Power's and Hassanein's testimony were plainly inconsistent with each other—and it isn't—when testimony differs and "credibility is at issue," "summary judgment is singularly inappropriate."  *S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1055 (9th Cir. 2008) (citation and quotations omitted).

United States District Court
Northern District of California

wrote that the "304 disclosure" was one of "3 key issues," or three "roadblocks," "heading towards our IPO." Wolf Decl. Exs. 40-41. Fitzsimmons attached a Series G Term Sheet which stated that, "[f]or purposes of clarity, the Company makes no representation and cannot guarantee specific timing of an IPO. Further, the occurrence of an IPO is contingent upon the resolution of various matters, including but not limited to . . . [f]inal resolution of 304 disclosure." *Id.* Yet, once more—no disclosure there of *why* the Item 304 was a roadblock to getting to the IPO.

The first evidence that clearly shows that either Abdo or Rising Tide was told about the Super Bowl ad campaign, the investigations, and the Deloitte's termination is from July 21, 2015, when Delivery Agent's general counsel sent the Company's draft Item 304 to Audit Committee members, including Rising Tide's representative on the Board. But even that document was no model of transparency. For instance, it stated that, "our [CEO]," Fitzsimmons, "learned that [] data had been fabricated, he retracted it from all recipients and instructed them that data should not be relied upon for any purposes" and that Fitzsimmons "was not involved in the fabrication of data," and it stated that the Board had adopted and the Company "*implemented*" a remedial plan which included "demotion or reduction in responsibilities for certain employees" when in fact it never did fully implement the plan or demote Fitzsimmons. Wolf Decl. Ex. 45.

A reasonable jury could easily conclude that disclosing all *material* facts required Delivery Agent to disclose more than the fact that there was a dispute with a former auditor concerning an Item 304 statement. For all their insistence that Plaintiffs were "fully informed of the 304 issue" from March 2015 onward, Defendants cannot seriously argue that there's no difference between, say, an Item 304 agreement being held up over a revenue recognition disagreement between auditor and company, and an auditor refusing to agree to an Item 304 statement because the auditor had evidence that company management had directed fraud and the auditor insisted those officers be removed but the company fired the auditor instead. A reasonable person might find some roadblocks, like the latter, would play a substantial part in a plaintiff's investment decision while others, like the former, would not.

Nor is the Court moved by the fact that there was language in the Term Sheet that "the Company makes no representation and cannot guarantee specific timing of an IPO," and that, "the

occurrence of an IPO is contingent upon the resolution of various matters, including but not limited to . . . [f]inal resolution of 304 disclosure."  The "bespeaks caution" doctrine "'provides a mechanism by which a court can rule as a matter of law . . . that [a] defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.'"  *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)).  "[G]ranting summary disposition under the bespeaks caution label represents a conclusion that, as a matter of law, a securities prospectus as a whole is not misleading due to the risks disclosed and the nature and extent of the other cautionary language employed."  *Gray v. First Winthrop Corp.*, 82 F.3d 877, 883 (9th Cir. 1996) (citation omitted).  But the "[i]nclusion of *some* cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading."  *Fecht*, 70 F.3d at 1082 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("a misleading statement will not always lose its deceptive edge simply by joinder with others that are true. . . .")).  Cautionary language is ineffective if it is "so generalized in nature that a reasonable jury could nonetheless find" that a document was misleading.  *Gray*, 82 F.3d at 884.  A boilerplate warning that "the company cannot guarantee specific timing of an IPO" and "the IPO is subject to resolution of an Item 304 disclosure"—warnings that could apply to most any IPO—is far from a caveat like "the company's IPO is in serious doubt because the company can't get its former auditor to sign off because the auditor believes the company, etc., etc."  A jury could reasonably find that Defendants' omissions were misleading, that they "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *Brody v. Transition Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).[8]

Lastly, the Court doesn't buy Defendants' argument that the Term Sheet told Plaintiffs that

---

[8] This is all the more likely considering that on March 7, 2015, three days before Defendants began telling Plaintiffs that they were "working" or "progressing" the Item 304 issue, Power, Fitzsimmons, Goettner, Borcher, and others learned that audit partner Tim de Kay was "not optimistic" that there was "further room to move" on Deloitte's 304 disclosure.  Peterson Decl. Ex. 207.

United States District Court
Northern District of California

1    the "'304 disclosure' was not a revenue recognition issue" because the Term Sheet listed "revenue

2    recognition policies" and "final resolution of the 304 disclosure" separately under a list of IP,

3    Reply at 14.  Of course, someone reading that list could conclude that the two issues were

4    intertwined, especially if that person had been led to believe that the 304-disclosure implicated

5    revenue recognition policies, which is what Plaintiffs say happened.  *E.g.*, Opp'n at 34-35, 40.

6    Summary judgment is denied as to the investments which Plaintiffs made on April 20 and July 21,

7    2015.[9]

8                        **b.      The Investments Made in 2016**

9                 Still there is the question of the March 30 and April 20, 2016 investments.  As a

10   preliminary point, Plaintiffs received Deloitte's response to the Company's draft Item 304 in

11   August 2015 and they do not dispute that they were aware of all material facts when they made

12   their 2016 investments; thus, there was no reliance for the two investments.  Plaintiffs assert

13   however that their final investments were "an effort to salvage tens of millions of dollars

14   previously invested by Plaintiffs," and that the investments are "recoverable consequential

15   damages because they were an attempt to mitigate the damage caused by Defendants' fraud."

16   Opp'n at 37-38.

17               "The general rule allows plaintiffs defrauded in violation of section 10(b) and rule 10b-5 to

18   recover the difference between the value of the consideration they gave and the value of the

19   security they received, plus consequential damages that can be proved with reasonable certainty to

20   have resulted from the fraud." *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d

21   615, 621 (9th Cir. 1981) (citation omitted); *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d

22   1017, 1030 (9th Cir. 1999) ("Consequential damages may also be awarded if proved with

23   sufficient certainty.") (citation omitted).  However, to recover on this theory, Plaintiffs must show

24   that these expenditures were "a reasonable effort to . . . minimize [their] losses."  *Madigan, Inc. v.*

25   *Goodman*, 498 F.2d 233, 239 (7th Cir. 1974); *Grubb v. Federal Deposit Ins. Corp.*, 868 F.2d

26   1151, 1165 (10th Cir. 1989) (quoting *Madigan*); *James v. Meinke*, 778 F.2d 200, 206 (5th Cir.

27

28   [9] Rising Tide received the draft Item 304 on July 21 after it had already invested.  Abdo did not
     receive it that day.

1985) (the same).  Defendants argue that Plaintiffs cannot show it was reasonable to continue to invest once they learned the truth, because the premise of their complaint is that no reasonable investor would have done so.

Defendants fail to carry their burden here.  They point to Plaintiffs' allegation that "Fitzsimmons' material misrepresentations and omissions were done . . . for the purpose and effect of concealing negative information that assured that Delivery Agent could not go public, that no buyer would buy Delivery Agent, and that Delivery Agent's bankruptcy was inevitable."  RT FAC ¶ 166.  A reasonable way to summarize that allegation is that "no reasonable buyer would have invested in Delivery Agent if they knew it couldn't go public and was on the verge of going broke."  Once Plaintiffs had invested however—and invested a huge amount of money—the Company's financial situation, along with everything else, changed.  By the time Plaintiffs finally learned of the misrepresentations, they had a substantial amount of skin in the game, and it wasn't necessarily unreasonable for them to want to salvage the Company so that they wouldn't lose everything or necessary unreasonable for them to think that investing more would help to do so.  Plaintiffs do allege that Abdo purchased "from Delivery Agent on April 20, 2016, *in reliance on Delivery Agent's and Fitzsimmons' representations* that the Company needed more cash to survive or to achieve a sale of the Company, which, if successful, could have salvaged Plaintiffs' investments."  Abdo FAC ¶ 112 (emphasis added).  Since Defendants have put forth no evidence or argument challenging or disproving that assertion, they've not managed to shift the burden here to Plaintiffs, and so summary judgment is **DENIED**.

## C.        Controlling Person Liability Against the Outside Directors

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and *to the same extent as such controlled person to any person to whom such controlled person is liable* . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Similarly, § 25504 of the California Corporations Code imposes secondary liability in connection with the fraudulent sale of securities.  Cal. Corp. Code § 25504.  In its first

1    clause, the section imposes liability on every person who controlled a person who is liable for

2    fraudulently selling securities within California.  *Id.*  Plaintiffs alleged that the ODs had control

3    over Fitzsimmons and Delivery Agent.  *E.g.*, Abdo FAC ¶¶ 116-17; RT FAC ¶ 210, 233.

4         Defendants argue that the ODs cannot be liable as control persons of the Company because

5    control person liability is "'to the same extent' as Delivery Agent's," and "Plaintiffs did not name

6    the company even as a nominal defendant" and "Delivery Agent has been liquidated and therefore

7    cannot have any monetary liability to plaintiffs."  MSJ at 31 (quoting 15 U.S.C. § 78t(a)).  As

8    Plaintiffs point out, this argument is the same, repackaged argument Defendants made in moving

9    to dismiss.  Judge Laporte considered that argument at length and the weight of authority on the

10   issue, including examining the same case that Defendants extensively rely on now.  *See* RT ECF

11   No. 75 at 31-35; MSJ at 30; Reply at 15.  She held that, "Plaintiffs' failure to name Delivery

12   Agent as a defendant is not fatal to their claims that Defendants are liable under Section 20(a)

13   based on their control of Delivery Agent."  ECF No. 75 at 35.  The Court sees no reason to revisit

14   the issue here, and accordingly **DENIES** summary judgment for all ODs on this claim.

15   **D.    Liability for Power for Statements in His March 11, 2015 Email**

16        Plaintiffs assert that in his March 11, 2015 email, Power made false and misleading

17   statements on behalf of Delivery Agent.  *See* RT FAC ¶¶ 105-08.  More specifically, they allege

18   that while Power mentioned a "304 issue," he misrepresented its nature because neither he nor any

19   other Defendant disclosed the Super Bowl campaign failure, the cover-up after, or Deloitte's

20   "complete lack of faith in management."  *Id.* ¶ 107.

21        Plaintiffs allegations here concern three sets of statements in the March 11 email.  One,

22   Hassanein had asked Power, "what caused the four months delay in completing the 2012-2013

23   audits, whether related to internal controls or financing reporting?", and Power responded, "[t]he

24   main delay driver was the treatment of the revenue . . . .  Since [Thorton] was taking a position

25   that was counter to that taken by Deloitte, they spent additional time . . . to run it all the way up

26   their chain of command."  Wolf Decl. Ex. 38.  Two, in response to Hassanein's asking about

27   further delays with the IPO, Power wrote, "I believe you are now up to speed on the 304 issue

28   with Deloitte that we are currently working through – there is definite risk on that front but we are

United States District Court
Northern District of California

actively working on it." *Id.*  And three, when Hassanein asked about receiving the final auditor reports for the years 2012-2014, Power told Hassanein that, "[w]e are currently on pace to receive [the reports] by the end of March which is in line with the current late June IPO timeline." *Id.* Defendants argue that Plaintiffs' claim against Power should be dismissed to the extent it is based on these statements because there is no evidence Power made the statements with the necessary intent, and because "undisputed evidence shows the statements were true."  MSJ at 31.

"Generally, 'whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.'"  *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011) (quoting *Fecht*, 70 F.3d at 1081); *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) ("Like materiality, adequacy of disclosure is normally a jury question.").  "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is 'so obvious that reasonable minds could not differ.'"  *Todd*, 642 F.3d at 1220 (quoting *Durning*, 815 F.2d at 1268).  Power's March 11 responses don't get there.

Defendants have not shown that when Hassanein emailed Power, Plaintiffs knew of the true nature of the Delivery Agent's dispute with Deloitte and why the Company terminated Deloitte, or the fact that the two were having trouble reaching an agreement over language pertaining to some pretty serious issues, including *Deloitte's opinion that managements' representations couldn't be trusted*.  Reasonable minds could certainly find that all that information was material to the issue of whether "there [are] issues that . . . could delay the IPO" and thus needed to be disclosed.  Defendants repackage an earlier argument and contend that Power's response here was "entirely accurate" because he disclosed a "'definite risk' that the Item 304 disclosure posed to an IPO."  MSJ at 32.  But again, being "led to believe that the 304 issue was minor and would be easily resolved," Hassanein Decl. ¶ 7, is a lot different than being told that there's a risk an IPO might never happen because of the type of significant dispute with an auditor that the Company had here.  A jury could reasonably find that Power's failure to disclose the extent of the conflict behind the Item 304 issue created "an impression of a state of affairs" that was materially different from what was really going on.  *See United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010) ("[A] statement is material if there is a substantial likelihood that a

33

reasonable investor would consider it important in making a decision.") (citation and internal quotation marks omitted).

Defendants' argument as to Power's answer about the "four months delay in completing the 2012-13 audits" is nonsensical.  They argue that "Plaintiffs are left with the inconvenient fact that the *actual* question Mr. Hassanein asked pertained to the '*four* month' delay, and the "*main driver*" of that delay was the revenue recognition issue, which means the answer was true."  This argument basically amounts to, "Well we didn't tell Plaintiffs about the other reasons for the delay because they didn't ask, so there's no problem!"  The problem is, Plaintiffs weren't then aware (or at least Defendants have not shown they were) of the extent of the "304 issue" or the conflicts with Deloitte and Deloitte's refusal to issue audits, so how could they have known to ask?  (If it turns out Hassanein did know about the Deloitte issues when he asked about the "four month" delay, then Defendants' argument might make more sense.)  Presumably, had they been informed that the problems with the 2012 and 2013 audits were far more extensive than an issue of revenue treatment with Thorton lasting only a few months, they might have asked about them.  The adequacy of Power's answers and disclosures here are not "so obvious that reasonable minds could not differ."  Accordingly, the Court does not find as a matter of law that Power's statements in the March 11 email disclosed all material information.  And as to the issue of intent, intent can be inferred from the fact that the Company was in dire need of cash.  *Reese*, 747 F.3d at 569 ("a motive to commit fraud and opportunity to do so provide some reasonable inference of intent").  Summary judgment is **DENIED** on this issue.

**E.      The Veracity of Statements in the Purchase Agreement and August 2014 SOE**

Defendants argue that they are entitled to summary judgment on Plaintiffs' § 10(b) claim to the extent it is founded on the No-Investigations representation because the challenged statements were true.  They argue that the language that "[t]here is no action, suit, proceeding or investigation pending or, to the best of the Company's knowledge, currently threatened *against the Company*," was true because the investigations into the Super Bowl cover-up were not investigations *against* the Company.  MSJ at 33.  The problem here is that Defendants simply ignore that the Complaints cite additional language from the Agreement: "nor, to the best of the

Company's knowledge, is there any basis for" a suit, proceeding, or investigation.  Judge Laporte

previously found that "the statement that Delivery Agent knew of no basis for a lawsuit or

investigation contained a misstatement of fact."  RT ECF No. 75 at 20-21.  The Court sees no

reason to revisit that issue.  And since Defendants do not even address the full statement upon

which Plaintiffs rely, or the Court's earlier finding as to the veracity of it, summary judgment is

**DENIED** as to that issue.

Defendants also argue that they're entitled to summary judgment on the Plaintiffs'

allegation that the Auditor-Change representation was misleading.  This statement was true,

Defendants insist, because "[t]he Company was in the process of changing accountants from

Deloitte to [] Thornton."  MSJ at 33.  But Plaintiffs' allegation here is that the statement was

misleading by omission, and Judge Laporte found previously that, "the omission of the reason for

Delivery Agent's termination of the Auditor was misleading, given how material the change

would be to the filing of the IPO."  The Court again sees no reason why that finding should be

reconsidered, and since Defendants don't even address the alleged omission, summary judgment is

**DENIED** as to the veracity of the Auditor-Change representation.

**F.     Badran's Liability for Damages Incurred after April 15, 2015**

Defendants argue, without citing to legal authority, that Badran is entitled to summary

judgment on Plaintiffs' claims for damages allegedly incurred after April 15, 2015 because Badran

resigned as a Delivery Agent director on that date, Wolf Decl. Ex. 50, before the Board authorized

Plaintiffs' purchases of the Series G investment (made on April 20, 2015) or the subsequent

purchases of convertible promissory notes.  The Board authorized the Series G shares on April 17,

2015 and authorized the notes in 2016.  Badran did not sign the UWC authorizing the Series G

shares, nor did his name appear as a Board member on the signature pages.  Wolf Decl. Ex. 51.

Plaintiffs have not alleged or argued that he was a Board member when the Board voted to

authorize any of these sets of transactions.  Abdo FAC ¶ 137, 139, 141 (alleging Board members,

not including Badran); RT FAC ¶ 146, 148, 150 (the same).

However, Plaintiffs argue that Badran cannot escape § 20(a) liability because their "losses

on April 20, 2015 were caused by false statements and omissions made by Fitzsimmons while

Bardan was on the board."  Opp'n at 43.  They point to *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996), where the Ninth Circuit wrote that the question of control "revolve[s] around the 'management and policies' of the corporation, not around discrete transactions . . . ."  *Id.* at 1162.  They note that Badran testified that as a director, it was "part of [his] job" to "supervise the CEO," that the Board was responsible for hiring and firing the CEO, and that the Board could have "prohibit[ed] anyone from communicating with potential investors" or "required the Company's general counsel to approve communications with investors."  Peterson Decl. Ex. 68, Tr. of Dep. of ("Badran Dep.") at 50:2-4, 50:25-51:2, 257:5-258:1.  A jury, Plaintiffs contend, "could conclude that Badran's . . . failure to supervise Fitzsimmons make Badran liable for the misleading statements that induced Plaintiffs to buy on April 20 []."  Opp'n at 43.

Defendants in their Reply don't really respond with a coherent counterargument.  They state that, "[t]o show that Badran bears responsibility investments in April 2015, Plaintiffs would need evidence that Badran was responsible for misstatements after their last payment that led them to make the April investments."  Reply at 19.  It's not clear what they mean to say there, and they still cite no legal authority, and in any event they shift tactics in their Reply and spend the remainder of their argument arguing that "there is no evidence that misstatements during Bardan's tenure induced Plaintiffs' April 2015 investments."  Reply at 20.  But that's not true.  For example, there is Fitzsimmons' April 4, 2015 email to Abdo.[10]  Judge Laporte previously found that statements in the email were actionable because "any 'reasonable investor' would certainly want to know about the auditor's firing and the reasons for the firing."  RT ECF No. 49 at 19.  Defendants respond that Plaintiffs "do not now dispute the truth of any statement in this email."  Reply at 20.  But even if that's true, that doesn't respond to Plaintiffs' argument (Opp'n at 45) and the Court's finding that the email was misleading because it did not disclose enough information.  Affirmative misrepresentations are one side of the coin, misleading omissions the

---

[10] To refresh, in that email Fitzsimmons wrote that the "304 disclosure" was one of "3 key issues," three "roadblocks heading towards our IPO," and he attached a Series G Term Sheet which stated that, "[f]or purposes of clarity, the Company makes no representation and cannot guarantee specific timing of an IPO.  Further, the occurrence of an IPO is contingent upon the resolution of various matters, including but not limited to . . . [f]inal resolution of 304 disclosure."  Wolf Decl., Exs. 40-41.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   other.

2       Where, like here, a defendant director served in a controlling position up until two days

3   before the board signed the documents authorizing a sale of securities, and the plaintiff relied on

4   fraudulent statements made during the director's time on the board, a reasonable jury might

5   conclude that the director is subject to control-person liability.  Summary judgment is **DENIED**

6   on Plaintiffs' claims against Badran for damages springing from the April 20, 2015 investments.

7   However, Badran couldn't logically be expected to exercise control over Fitzsimmons or the

8   Company for any statements made after that, and certainly not three months or a year later.

9   Hence, summary judgment is **GRANTED** for Badran on Plaintiffs' claims to the extent they seek

10  damages based on investments Plaintiffs made after April 20, 2015.

11  **G.    Peters' Liability under Section 25504 of the California Corporations Code**

12      The Court has dismissed all claims against Peters save one, an alleged violation of the third

13  clause of § 25504 of the California Corporations Code.  Under that clause, a "principal executive

14  officer or director of a corporation" may be secondarily liable for a securities fraud violation by

15  the corporation of § 25401, unless the officer or director "had no knowledge of or reasonable

16  grounds to believe in the existence of the facts by reason of which the liability is alleged to exist"

17  against the corporation.  Cal. Corp. Code § 25504; Cal. Corp. Code § 25401 (prohibiting securities

18  sales "by means of any . . . communication that includes an untrue statement of a material fact or

19  omits to state a material fact necessary to make the statements . . . not misleading").  "'[T]he plain

20  language of section 25504 expressly subjects outside directors to collateral liability based solely

21  on their status as directors, without requiring proof of control.'"  *Balkowitsch v. D&M Dev., Inc.*,

22  2015 WL 3403083, at *2 (E.D. Cal. May 27, 2015) (quoting *Hellum v. Breyer*, 194 Cal.App 4th

23  1300, 1314 (2011)).

24      Defendants argue that the fraudulent statements or omissions alleged against Delivery

25  Agent cannot, "[a]s a matter of law . . . support liability against Peters because each of them either

26  (i) took place prior to Peters' tenure, and thus there is no liability or causation; (ii) cannot support

27  primary liability against Delivery Agent; and/or, (iii) demonstrably was made without Peters'

28  knowledge, actual or implied."  MSJ at 35.  To the extent the Court finds any of these claims not

1    appropriate for summary judgment, Peters requests partial summary judgment holding that the

2    corresponding material undisputed facts are established.

3        As to Peters' argument that he is not liable for investments predating his tenure at the

4    Company, Plaintiffs agree. Reply at 44.  Thus, Peters is entitled to summary judgment for liability

5    arising from statements made by the Company (including Fitzsimmons) before October 28, 2014

6    (Abdo FAC ¶ 318(a), (b), (d), and (e)) and the Court **GRANTS** Defendants' motion to that

7    extent.[11]  That takes care of the first prong of Peters' liability.  For the remaining allegedly

8    fraudulent statements, those made after Peters became a director, there are those which Defendants

9    argue were not fraudulent *or* Peters had no reason to believe otherwise, and another category for

10   which Defendants argue only the ground that Peters had no reason to believe that material

11   misrepresentations were made.

12       **1.      Statements Which Were Not Fraudulent or Which Peters Had no Reason to
                   Believe Were Fraudulent**

13

14           **a.      The January 2015 Updated Draft S-1 and the March 2015 Investor
                       Update**

15       Plaintiffs allege that, "[o]n January 9, 2015, Delivery Agent disseminated or caused to be

16   disseminated . . . to investors, including Plaintiffs, an updated draft S-1 that contained [sic] to

17   include the same statement falsely indicating that the February 2014 Super Bowl H&M

18   advertising test run was a success and that viewers 'were able to buy clothing' using Delivery

19   Agent's technology, without disclosing that many could not."  RT FAC ¶¶ 343, 103; Abdo FAC

20   ¶¶ 318(c), 74.  They allege that, "[o]n or about March 11, 2015, Delivery Agent released an

21   investor update entitled 'Q1 2015 Mid Q Investor Update' . . . not[ing] that the 'IPO process [was]

22   progressing with *continued audit delays*."  RT FAC ¶¶ 343, 109-11 (emphasis added); Abdo FAC

23   ¶¶ 318(f), 105-06.  However, Defendants point out, and Plaintiffs' agree, that Judge Laporte held

24   that the January 2015 Updated S-1 and the March 2015 Investor Update were not "actionable

25   [bases] for Plaintiffs' California securities fraud claims" because Plaintiffs did not adequately

26

27   ───────────────────────

28   [11] According to Peters, he was "not involved with Delivery Agent until Fall 2014 and attended his
     first Board meeting on October 28, 2014."  MSJ at 36.  Plaintiffs don't argue he was liable for any
     statements before October 28.

United States District Court
Northern District of California

allege scienter as to statements in those documents.  RT ECF No. 75 at 44.  Defendants argue that without primary liability for Delivery Agent under § 25501, there cannot be secondary liability for Peters, and Plaintiffs do not argue otherwise.  Thus, summary judgment is **GRANTED** for Peters on statements in the January 2015 Updated Draft S-1 and the March 2015 update (Abdo FAC ¶ 318(c) and (f)) and those statements are not actionable under § 25504.  The Court will not reach the additional ground for summary judgment based on these claims.

### b.      The April 4, 2015 Email

Defendants argue first that there are no fraudulent statements in the April 4, 2015 email from Fitzsimmons to Abdo.  The Court already addressed this argument above and found it was without merit, *supra* § IV(F), and it needn't repeat that discussion here.  Now to Defendants' second argument, that Peters had no reason to suspect securities fraud at the time of the April 4 email.  Defendants argue that Peters cannot be liable if "the undisputed evidence shows Peters had no knowledge or reasonable grounds to believe Delivery Agent was guilty of misrepresentation or of concealing material facts."  And indeed, the Ninth Circuit has held that the "knowledge" inquiry is met where a defendant "knew or had reasonable grounds to believe that violations of the securities laws were taking place."  *Underhill v. Royal*, 769 F.2d 1426, 1433 (9th Cir. 1985); *see also Durham v. Kelly*, 810 F.2d 1500, 1505 (9th Cir. 1987) ("The facts relied upon by [the plaintiffs] do not demonstrate that [the defendant] had knowledge that [her husband] was guilty of misrepresentation or concealed material facts in violation of California's securities laws."); *Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 256 (2007) ("To plead that [the defendant] materially aided [] in the [] sales of the bridge notes by false or misleading representations, the investors were required to plead facts showing [the defendant's] knowledge of the false or misleading nature of the representations in the offering documents (or that [it] knew facts giving it reasonable grounds to know the statements were false or misleading).").  But Plaintiffs provide enough evidence to raise a genuine issue as to whether Peters should have known that Plaintiffs were being misled.

Peters states that he had no "contemporaneous knowledge of" Delivery Agent's Super Bowl promotion with H&M "or the surrounding issues," the "resultant investigation," "the

United States District Court
Northern District of California

1    Bergeson law firm investigation," or the termination of Deloitte as auditor.  Decl. of James C.

2    Peters ("Peters Decl.") ¶ 6, RT ECF No. 192.  But Plaintiffs' evidence suggests otherwise.  For

3    example, in an email from Fitzsimmons to Jeff Hagan and Peters on February 8, 2015,

4    Fitzsimmons tells the two that he "spoke with Latham yesterday," and that "[t]hey connected with

5    Bergeson and confirmed that he is not willing to share the report."  Peterson Decl. Ex. 26.

6    Fitzsimmons forwarded along an email from Deutsche Bank Securities ("DB"), Delivery Agent's

7    investment bankers, wherein the bank indicated that it would be conducting "further diligence"

8    which included "review of Bergeson independent report," the "call with audit committee chair,"

9    the "call with Deloitte," "how much product was bought by employees and which employees

10   purchased at the direction of CEO," "whether there have been any other instances of employees . .

11   . purchasing product at the direction of CEO or any other DA employee," and "meeting with CEO

12   to get his understanding of the situation, lessons learned, etc."  *Id.*  This email chain strongly

13   suggests Peters knew about the H&M ad campaign flop and the "surrounding issues," as well as

14   the resulting investigations, if not more.

15        Also, Peters was interviewed by DB on February 13, 2015 and issues discussed with Peters

16   evidently included: [REDACTED].  Defendants don't deny that Peters was questioned on these

17   issues, and the fact that he was, again, suggests that he was *at least* aware of the circumstances of

18   the H&M ad incident and cover-up, as well as misconduct by management including, of most

19   relevance here, instances of fraudulent conduct.  Defendants address neither of these pieces of

20   evidence in their Reply.[12]  The evidence conflicts with Peters' statements in his declaration, and

21   "where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—

22   that issue is inappropriate for resolution on summary judgment."  *Zetwick v. Cnty. of Yolo*, 850

23   F.3d 436, 441 (9th Cir. 2017) (citation and internal quotation marks omitted).  Peters insists that,

24   "I simply had no reason, and have never had any reason, to believe that investors were not

25   adequately informed," Peters Decl. ¶ 8, but for purposes of Peters' liability under § 25504,

26

27   ───────────────────────

28   [12] Defendants do challenge the admissibility of DB's summary of Peters' answers to these
     questions as inadmissible hearsay, Reply at 25, but they do not suggest that he was not asked
     about these issues.

United States District Court
Northern District of California

whether that is so is a question for the finder of fact.  Summary judgment for Peters is **DENIED** as to statements in the April 4, 2015 email (Abdo FAC ¶ 318(g)).

### c.    The January 14, 2016 Email and Executive Summary from Fitzsimons

Judge Laporte previously found that certain statements in Fitzsimmons' January 14, 2016 email and attached executive summary to investors were actionable misrepresentations, RT ECF No. 75 at 30, and the Court will not revisit that finding here.  Defendants argue, however, that Plaintiffs are barred from recovery under California Corporate Code § 25501 because they knew of the Item 304 issue with Deloitte.  *See* Cal. Corp. Code § 25501 ("Any person who violates Section 25401 shall be liable to the person who purchases a security from him . . . unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission . . . .").  Plaintiffs do not argue otherwise, and since the Court found earlier that Plaintiffs could not show reliance for the 2016 investments, *supra* § IV(B)(b), the Court **GRANTS** summary judgment for Peters for liability arising from the January 14, 2016 email (Abdo FAC ¶ 318(h)).

### 2.    Statements Which Peters Had no Reason to Believe Were Fraudulent

Defendants argue that Peters has no liability for the remaining § 25504 claims against Peters in the Rising Tide Complaint, the March 11, 2015 email from Power to Plaintiffs and statements by Fitzsimmons at an April 28, 2015 board meeting, because Peters had no reason to believe any material misstatements or omissions were then made.  MSJ at 43-45.  The Court previously held that it could not find as a matter of law that Power's statements in the March 11 email disclosed all material information.  And with regard to the statements by Fitzsimmons at the April 28 meeting, Judge Laporte previously found that the statement that the Item 304 language was "immaterial to the financial statements of the Company" was actionable.[13]  RT ECF No. 49 at 25  (The minutes for the meeting can be found at Peterson Decl. Ex. 294.)  Turning to Defendants' arguments that Peters cannot be liable because he had no reason to suspect the Company was misleading the Plaintiffs, the argument fails for the same reason discussed above: Plaintiffs put

---

[13] Even considering Defendants' passing argument that these statements aren't actionable, the Court does not find them persuasive.  *See* MSJ at 43-45.

forth enough evidence raising a genuine issue as to whether Peters should have known that investors were not being full apprised of material facts.  That evidence comes from February 2015 at the latest, and thus predates statements in the March 11 email and at the April 28 Board meeting; summary judgment for Peters is denied as to liability arising from these statements (RT FAC ¶¶ 105-108, 112-114).  The Court **DENIES** summary judgment for Peters for liability arising from the March 11, 2015 email and statements by Fitzsimmons at the April 28, 2015 board meeting.

**H.    Lai's Liability under Section 25504 of the California Corporations Code**

Similar to Peters, the only claim against Lai is a claim under the third clause of § 25504 of the California Corporations Code.  Defendants argue for summary judgment for Lai because, they argue, Plaintiffs can't prove Lai had knowledge of facts underlying any violations of § 25401 and because Lai was not a "principal executive officer" for purposes of § 22504.

As to the question of Lai's knowledge of misrepresentations made to Plaintiffs, Lai stated in his declaration that: he was never on the Board or involved in the Company's fundraising; he never saw the Series F or G Purchase Agreements; and he had no knowledge of any statements made to Plaintiffs about Deloitte, the Item 304 or IPO timing.  Lai Decl. ¶ 5, RT ECF No. 204-1.  When deposed he testified that he had no part in drafting materials for investors, that he had "zero" level of control over Fitzsimmons or what he said to investors, that he had no involvement in Fitzsimmons' phone calls with investors and, importantly, that he did not know "at any point in time fabricated data was sent to any potential IPO investor in Delivery Agent."  Dep. of Peter Lai at 203:1-204:25, Wolf Decl. Ex. 57.

Plaintiffs for their part do not point to any evidence refuting any of Lai's statements or testimony, and hence for purposes of this Order they are undisputed facts.  Plaintiffs make much of the fact that Lai "was aware of the Super Bowl fraud because he directly participated in it" after Fitzsimmons told him to "buy every pair" and Lai then did so.  But it's not enough for purposes of liability under § 25504 that a defendant knew of the material facts which were omitted from an investor; the defendant must also have known or had reason to know that the facts were withheld from the party so defrauded.  Plaintiffs point to no evidence that Lai knew that knew of or was

United States District Court
Northern District of California

involved in any of the communications in which misrepresentations were made to Plaintiffs, nor to any other third-party investor; there is an absence of any facts suggesting that he did or was.

Accordingly, summary judgment is appropriate for Lai and is **GRANTED**.[14]  The Court will not reach the other ground for summary judgment.

## V.    CONCLUSION

Based on the analysis above, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment.  Judgment is granted to the extent outlined above.

**IT IS SO ORDERED.**

Dated: February 17, 2021

THOMAS S. HIXSON
United States Magistrate Judge

---

[14] Plaintiffs point out that Judge Laporte found that "Plaintiffs allegations that Lai personally participated in the Super Bowl fraud sufficiently allege his knowledge."  ECF No. 75 at 48.  The allegations were enough to survive dismissal, but the evidence put before the Court is not now enough for the claims against Lai to survive summary judgment.